David N. Lake, State Bar No. 180775
**LAW OFFICES OF DAVID N. LAKE,**
  **A Professional Corporation**
16130 Ventura Boulevard, Suite 650
Encino, California 91436
Telephone: (818) 788-5100
Facsimile: (818) 788-5199

Attorneys for Plaintiffs ROBERT K. RUEGSEGGER, JR.
and GIGI E. RUEGSEGGER

### UNITED STATES DISTRICT COURT

### CENTRAL DISTRICT OF CALIFORNIA – SANTA ANA DIVISION

| | |
|---|---|
| ROBERT K. RUEGSEGGER, Jr., an individual, and GIGI E. RUEGSEGGER, an individual, | Case No. 8:17-cv-0907 |
| Plaintiffs, | **COMPLAINT FOR:** |
| v. | **(1)  VIOLATION OF THE CALIFORNIA HOMEOWNERS BILL OF RIGHTS;** |
| CALIBER HOME LOANS, INC.; U.S. BANK TRUST, N.A. AS TRUSTEE FOR THE LSF9 MASTER PARTICIPATION TRUST; LSF9 MASTER PARTICIPATION TRUST; LAW OFFICES OF LES ZIEVE; OCWEN LOAN SERVICING, LLC; WILMINGTON TRUST, N.A.; ARLP SECURITIZATION TRUST, SERIES 2014-2; RESI WHOLE LOAN IV LLC; ALTISOURCE RESIDENTIAL CORPORATION, ALL PERSONS UNKNOWN, CLAIMING ANY LEGAL OR EQUITABLE RIGHT, TITLE, ESTATE, LIEN, OR INTEREST IN THE PROPERTY DESCRIBED IN THE COMPLAINT | **(2)  VIOLATION OF ROSENTHAL ACT;** |
| | **(3)  SLANDER OF TITLE;** |
| | **(4)  NEGLIGENCE;** |
| | **(5)  QUIET TITLE;** |
| | **(6)  TO SET ASIDE AND CANCEL THE NOTICE OF DEFAULT AND NOTICE OF TRUSTEE'S SALE;** |
| | **(7)  FRAUDULENT CONCEALMENT;AND** |
| | **(8)  DECLARATORY RELIEF** |
| | **Jury Trial Demanded** |

1  ADVERSE TO PLAINTIFF'S TITLE,  )
   OR ANY CLOUD ON PLAINTIFF'S  )
2  TITLE THERETO; AND DOES 1-20,  )
   INCLUSIVE,  )
3                                )
4          Defendants.           )
5                                )
6  _____ )
7
8       Plaintiffs Robert K. Ruegsegger, Jr. ("Robert") and Gigi E. Ruegsegger

9  ("Gigi") (together "Plaintiffs") bring this Complaint, and allege, upon personal

10 knowledge as to their own actions and their counsel's investigations, and on

11 information and belief as to all other matters, as follows:

12                         **NATURE OF THE CASE**

13      This case seeks to redress violations of both California and Federal law for

14 and related to (1) the wrongful filing and recording of a Notice of Default

15 ("NOD") and Notice of Trustee's Sale against Gigi's home and through such filing

16 the initiation of non-judicial foreclosure against her property by persons or entities

17 lacking standing to assert such claims; (2) the wrongful attempt to collect monies

18 on a mortgage debt that the parties seeking to collect do not own and which cannot

19 be validated or substantiated in terms of the nature, extent, or amount of the debt;

20 (3) the knowing and repeated failure on the part of Defendants to timely provide

21 Plaintiffs specific documentation substantiating their standing to initiate a non-

22 judicial foreclosure, as well as their ability to validate the amount of mortgage debt

23 allegedly owed under the mortgage loan; (4) the apparent fabrication and forgery

24 of documents upon which Defendants now rely for the authority to act; and (5) the

25 wrongful attempt to assert an invalid ownership interest in contravention of Gigi's

26 clear title.

27      Since 2013, the California Homeowner Bill of Rights ("HBOR") has placed

28 on entities initiating non-judicial foreclosure proceedings, including the filing and

recording in the property records of a Notice of Default ("NOD"), certain affirmative obligations aimed at protecting homeowners.  One such obligation is to verify their standing and legal authority to initiate and record the NOD, taking care to review evidence supporting their ability to take such action and formally recording a NOD only after completing a review of competent and reliable evidence which supports the veracity of that authority.  Defendants sued herein failed to meet these obligations.

To record a NOD as a predicate to instituting a non-judicial foreclosure in California, the foreclosing party (usually a bank or similar entity) must, at the time it records the NOD and initiates such foreclosure proceedings, validly hold the mortgage note and the beneficial interest under the deed of trust. If the entity does not hold such ownership interest, any recording of the NOD is invalid.  In this case, Defendant Caliber, presumably at the request and direction of Defendant US Bank (themselves acting on behalf of Defendant LSF9 Trust), recorded a NOD on Gigi's home as the first step towards carrying out a non-judicial foreclosure.  As will be discussed herein, Caliber did this even though the LSF9 Trust did not have the legal standing or authority to do so because the LSF9 trust did not own Plaintiff's loan at the time Defendant Caliber recorded the NOD.

Defendant LSF9 held itself out as the owner of the underlying Promissory Note and the holder of the beneficial interest under the deed of trust.  Ostensibly, it held the interest by virtue of assignments of the original Promissory Note and Deed of Trust from the original lenders.  In truth, LSF9 was not the owner of or in possession of the Promissory Note or a holder of the beneficial interest under Plaintiffs' deed of trust because the Promissory Note and Deed of Trust, and accordingly the beneficial interest under such instruments, were never properly and legally transferred from the original lender to LSF9.

Moreover, Defendant Caliber, as servicer of the loan and acting as the agent for and at the behest of Defendants US Bank and LSF9, had an affirmative duty

and obligation under the law to independently review competent and reliable evidence (including at a minimum the Note and Deed of Trust Assignment and Endorsement Chain, as well as the mortgage loan file received from prior loan servicers) to ensure that the LSF9 Trust was, in fact, the valid legal owner and thus entitled to direct them to actually record the NOD. Such review, which US Bank and LSF9 should have insisted upon, would have revealed that there were significant gaps and discrepancies in the respective Note and Deed of Trust Assignment and Note Endorsement chains of title, and, as a result, that real questions existed as to whether or not the LSF9 Trust was, in fact, the valid owner of the underlying Promissory Note and the holder of the beneficial interests at the time the NOD was recorded and at the time the Notice of Trustee's Sale was issued.

Indeed, prior to such NOD filing, Defendant Caliber had been put on notice, both by a review of the loan file received from the prior loan servicer as well as by repeated communications with Plaintiffs' representative, of the existence of serious gaps and deficiencies in the chain of title of the loan (information that US Bank as well as LSF9 had either actual or constructive notice of) and that, as a result, there were serious questions as to who actually owned the loan.  This included information that (1) the prior servicer, Ocwen, had itself determined that there were serious gaps in the chain of title placing legal ownership of the loan in dispute; (2) that Ocwen had "recreated" documents after-the-fact in the form of so-called "corrective assignments" in an attempt to legitimize and sanitize an otherwise invalid and toxic chain of title on the loan; and (3) that Ocwen, just before transferring servicing to Caliber, in recognition that their unusual and suspect activities was only serving to highlight that the chain of title was incomplete and thus the true ownership of the loan in question, rescinded and withdrew the Notice of Default it had recorded.

Upon this servicing transfer, Plaintiffs' representative contacted Defendant Caliber, alerted them to the chain of title problems and urged Caliber to exercise restraint in reinitiating any non-judicial foreclosure actions against the property considering the serious title issues presented. On Plaintiffs information and belief Caliber advised both US Bank and LSF9 of these communications with Plaintiff's representative.  Plaintiffs, as was their statutory right, also requested that Defendant Caliber provide them with documents substantiating the legal ownership by LSF9 of the Note and Deed of Trust, including the Note and Deed of Trust Assignment and Endorsement Chain on the loan -- a request that Caliber only partially complied with and not within the time limits imposed by law, in violation of the provisions of the Real Estate Settlement Practices Act (RESPA) 12 U.S.C. §2605.  Eventually Caliber conceded this failure in writing.

Caliber also admitted, in writing, that it too had found gaps in the documented chain of title, but remarkably advised that it intended to "recreate" endorsement chains and "corrective" assignments to fill in the acknowledged gaps. With full knowledge of these legal deficiencies and the absence of competent and reliable evidence of the legal authority of LSF9 or their representative Defendant U.S. Bank to do so, Caliber still proceeded to record a NOD on Gigi's home and to issue a Notice of Trustee's Sale.

Additionally, Caliber had the wrong party execute the Certificate of Compliance required under Civil Code 2923.55, and the trustee representing the purported owner nevertheless attested to its accuracy despite the mistake being readily apparent on the face of the document. As compliance with the provisions of Civil Code 2923.55 is a pre-requisite to their ability to record a NOD, this failure to comply with the statute rendered such recording void and invalid.

Caliber's knowing and intentional actions go far beyond simple negligence. Caliber has abrogated and rejected its affirmative obligations under law.  In failing to fulfill and discharge their statutory obligations, Defendants violated the HBOR

and subjected Gigi to the wrongful recording of a NOD on her home, the issuance
of a baseless Notice of Trustee's Sale and thus the wrongful initiation of a non-
judicial foreclosure.

Further, as the mortgage loan was not owned by LSF9, Defendants Caliber,
US Bank and LSF9 lacked the legal authority to collect on the alleged debt.
Nevertheless, they continued to send mortgage statements to Plaintiffs to collect
on a debt not owed to LSF9. Caliber also sought to collect on a debt they could not
validate, nor could they ascertain how much was supposedly owed under said debt,
as they conceded in writing that they lacked a full and complete payment history
on the loan (documentation needed for Caliber, US Bank, and LSF9 to validate the
amount of the alleged debt).  Rather, Caliber relied on what they had received
from the prior servicer, Ocwen, albeit incomplete. Caliber then, despite
acknowledging that there were unexplained financial discrepancies in the debt
validation statements, mortgage statements and other demands for payment they
had sent to Plaintiffs on behalf of Defendants US Bank and LSF9, nevertheless
attempted to collect the debt as if it had the authority to do so and as if the amount
was validated and undisputed.  These actions violated California's Rosenthal Fair
Debt Collection Practices Act ("Rosenthal Act") and provisions of the federal Fair
Debt Collection Practices Act ("FDCPA").

Finally, in reliance on flawed and inconsistent chain of title documents as
well as deceptive and imaginatively created if not outright fraudulently
manufactured documents, Defendants slander Gigi's title to her home and seek to
impose a superior ownership in contravention of her clear title to the property.
This too is improper.

## THE PARTIES

1.    Plaintiff Robert K. Ruegsegger, Jr. ("Robert") is, and at all times
mentioned herein was, an individual residing in the State of California, County of
Orange, and is the former husband of Plaintiff Gigi E. Ruegsegger.

2.     Plaintiff Gigi E. Ruegsegger ("Gigi") is, and at all times mentioned herein was, an individual residing in the State of California, County of Orange, and is the former wife of Gigi is the sole current record owner of the Property, a single family residence, located at 22442 Cassia Ln, Lake Forrest, California 92630, with a legal description of:

> PARCEL 1:
> LOT 45 OF TRACT NO. 8384, IN THE CITY OF LAKE FOREST, COUNTY OF ORANGE, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 390, PAGES 11 TO 13 INCLUSIVE OF MISCELLANEOUS MAPS IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.
>
> PARCEL 2:
> AN UNDIVIDED 1/55TH INTEREST IN LOT AA THROUGH QQ INCLUSIVE OF SAID TRACT NO. 8384.  EXCEPT THEREFROM FROM ALL OIL, GAS, MINERALS AND OTHER HYDROCARBON SUBSTANCES LYING BELOW A DEPTH OF 500 FEET FROM THE SURFACE OF SAID LAND, BUT WITH NO RIGHT OF SURFACE ENTRY AS PROVIDED IN DEEDS OF RECORD.

(together, the "Property").

3.     Defendant Caliber Home Loans, Inc. ("Caliber") is, and at all times mentioned herein was, a corporation organized and existing under and pursuant to the laws of the State of Delaware, and doing business in Orange County, California.  From approximately May 2016 to the present time Caliber was the loan servicer on the mortgage loan and during said time period was acting at the request and on behalf of Defendants U.S. Bank Trust, N.A. and the LSF9 Master Participation Trust.

4.     Defendant U.S. Bank Trust, N.A. ("U.S. Bank") is and at all times herein mentioned was an organization of unknown type doing business in Orange County, California.  On Plaintiffs' information and belief during the acts complained of herein Defendant U.S. Bank was acting as Trustee for and on behalf of the LSF9 Master Participation Trust and engaged Defendant Caliber to service the loan at their request, on their behalf, and under their instruction and direction.

5.     Defendant LSF9 Master Participation Trust ("LSF9") is, on information and belief, a securitized trust whose place of business is presently unknown to Plaintiff, but which is organized and existing under the laws of the State of Delaware.  LSF9 purports to be the current legal owner of a Promissory Note executed by Robert Ruegsegger in 2006, secured by a Deed of Trust executed by the Plaintiffs also in 2006.

6.     Defendant Ocwen Loan Servicing, LLC ("Ocwen") is and at all times mentioned herein was a limited liability company organized and existing under and pursuant to the laws of the State of Delaware, with its principal place of business at 1661 Worthington Road, Suite 100, West Palm Beach, Florida 33409, and was doing business in Orange County, California. From approximately 2012 until approximately May 2016 Ocwen was the loan servicer on the mortgage loan, and was acting at the request and on behalf of Defendant Wilmington Trust, National Association as Trustee for the ARLP 2014-2 Securitized trust and under their instruction and direction.

7.     Defendant Wilmington Trust, N.A. ("Wilmington") is and at all times herein mentioned was an organization of unknown type which conducted business in Orange County, California.

8.     Defendant Law Offices of Les Zieve ("Zieve") is and at all times herein mentioned was a California professional corporation with its principal place of business at 30 Corporate Park, Suite 450, Irvine, CA 92606.  Zieve regularly conducts business within the State of California and is the current Trustee under the DOT.

9.     Defendant ARLP Securitization Trust, Series 2014-2 ("ARLP") is and at all times herein mentioned was an organization of unknown type which conducted business in Orange County, California.

10.     Defendant Resi Whole Loan IV LLC ("Resi") is and at all times herein mentioned was a limited liability company organized and existing under the

laws of the State of Delaware and which conducted business in Orange County, California.

11.    Defendant Altisource Residential Corporation ("Altisource") is and at all times herein mentioned was, a corporation organized and existing under and pursuant to the laws of the State of Maryland and doing business in Orange County, California.

12.    Plaintiffs do not know the true names and capacities of the defendants sued herein as DOES 1 through 20 ("DOE Defendants"), inclusive, and therefore sues said DOE Defendants by fictitious names.  Plaintiffs are informed and believe and based on such information and belief allege that each of the DOE Defendant is contractually, strictly, negligently, intentionally, vicariously liable and or otherwise legally responsible in some manner for the acts and omissions described herein.  Plaintiffs will amend this Complaint to set forth the true names and capacities of each DOE Defendant when same are ascertained.

13.    Plaintiffs are informed and believe and based on such information and belief allege that Defendants Caliber, U.S. Bank, Ocwen, and Wilmington Trust and DOES Defendants 1 through 10, inclusive, and each of them, are and at all material times have been, the agents, servants or employees of each other, purporting to act within the scope of said agency, service or employment in performing the acts and omitting to act as averred herein.  Each of the Defendants named herein are believed to, and are alleged to have been acting in concert with, as employee, agent, co-conspirator or member of a joint venture of, each of the other Defendants, and are therefore alleged to be jointly and severally liable for the claims set forth herein, except as otherwise alleged.

**JURISDICTION AND VENUE**

14.    Jurisdiction in this matter is based on 28 U.S.C. § 1332 as there is complete diversity between the parties in that Plaintiffs and Defendants are

citizens of different states and the amount in controversy exceeds the sum of $75,000.

15.    This Court has personal jurisdiction over Defendants because Defendants conduct business in the State of California, a substantial portion of the wrongdoing alleged by Plaintiffs occurred in the State of California and this District, Defendants have sufficient minimum contacts with and/or otherwise has purposefully availed themselves of the markets of the State of California and this District such that it is fair and just for Defendants to adjudicate this dispute in this District.

16.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events and omissions giving rise to the claims occurred in this District and, as a corporation subject to personal jurisdiction in this District, Defendants conduct business in this District.

**HISTORY OF THE MORTGAGE LOAN AND PROPERTY OWNERSHIP**

17.    In or around October 1998, Gigi and her then husband Robert purchased their home in Lake Forest, California.  They resided in the home with their two small children.

18.    In October 2006, Robert decided that he wanted to refinance the mortgage on the family home.  He submitted a loan application in his own name through a mortgage broker, Pacific Southwest Lending & Realty who, in turn, submitted his information to a possible lender, MortgageIT, who ultimately approved the loan.

19.    MortgageIT requested Robert execute a Promissory Note in the amount of $630,000 in its favor, which he did on October 13, 2006 (the "Note"). MortgageIT did not ask his wife Gigi to sign the Note and indeed only Robert's name appears on it as the sole Borrower.  A copy of the Promissory Note is attached hereto as Exhibit "A."

20.    The Promissory Note was secured by a Deed of Trust (hereafter "DOT") also executed on the same day, October 13, 2006.  The DOT was executed by both Robert and Gigi, and in the DOT the "Borrower" was defined as "Robert K. Ruegsegger and Gigi E. Ruegsegger, Husband and Wife as Joint Tenants," thus both Robert and Gigi were parties to the agreement.  Paragraph 13 of the DOT specifically stated that Gigi was not obligated to pay the sums secured by the DOT: "However, any Borrower who co-signs this Security Instrument but does not execute the Note (a 'co-signer'):…(b) is ***not personally obligated to pay the sums secured by this Security Instrument***…." (Emphasis added).  A copy of the DOT is attached hereto as Exhibit "B."

21.    On or about February 1, 2007, Robert and Gigi were advised that CitiMortgage, Inc. ("Citi") would be taking over Robert's loan from MortgageIT.  They were not told if Citi was simply taking over the servicing of the loan on behalf of MortgageIT, or whether they had purchased the loan from MortgageIT.  They continued to make their payments, but now remitted them to Citi.

22.    In September 2008, Gigi contacted Citi to see whether she could modify the loan because she and Robert were going through a divorce and she was facing financial hardship.  On September 14, 2008, Robert signed over the Property to Gigi, and the quitclaim deed was recorded in Gigi's name on September 23, 2009.  A copy of the Quitclaim Deed is attached hereto as Exhibit "C".

23.    On or about November 26, 2008, Plaintiffs' divorce became final.  As part of the divorce decree and property settlement, Gigi never agreed to and did not assume any of the obligations under the October 13, 2006 Promissory Note executed by Robert on behalf of the original lender, MortgageIT.

24.    Between her initial conversation with Citi in September 2008 and February 2009, Gigi continued to make payments to Citi and each payment post-divorce consisted of her separate property.  Gigi also made numerous telephone

calls trying to find out the process for a loan modification, but was transferred to multiple agents, and many times calls would drop or she would be put on hold for inordinate amounts of time and had to hang up and try again. When Gigi did finally speak with someone, she was told she was ineligible for modification as the loan was current and that Citi was doing trial modifications only for those in arrears. On Gigi's information and belief, this statement was inaccurate as the HAMP and other government sponsored loan modification programs for which Gigi was inquiring had no such requirement, and a borrower did not need to be in arrears or default to qualify for a loan modification.

25.    In March of 2009, Gigi continued to make calls to Citi to get information regarding mortgage assistance. At this time, Gigi reminded the Citi representative that only her ex-husband was on the loan, but she wanted to continue living in the home and would be the one making the payments. She explained that she needed to modify the loan payment in order to afford the house payment alone. She was informed that Citi could defer her payments for three months and put it on the "back end" of the loan. This sounded like a good interim resolution as it would give Gigi three months of non-payment and time to pursue the loan modification, so she accepted this option. Gigi was told by the Citi representative that she would receive a call in a couple of weeks from Citi to start the modification process. Based on what she had been told, Gigi stopped making payments for the deferment period.

26.    Citi subsequently established a "forbearance payment plan" for Gigi for three months, starting July 26, 2009 and concluding on September 26, 2009, where her payment would be reduced to $2,743.29 per month.

27.    Citi sent Gigi the Home Affordable Modification Trial Period Plan paperwork on or around August 21, 2009 indicating that the loan had been approved for at trial payment plan under the HAMP program. Gigi called Citi to ask about how the documents should be completed and was told to sign her name

on the forms wherever a signature was required.  Gigi completed this package on September 1, 2009 and returned the signed documents to Citi.

28.   As she had been instructed to do, Gigi, on October 1, 2009 made her first loan modification trial period payment of $2,743.29.  Gigi made her second loan modification trial period payment of $2,743.29 to Citi on October 30, 2009 (for November 2009).

29.   On December 1, 2009, Gigi made another loan modification payment of $2.743.29 – the third of the three required trial period payments as instructed by Citi.  By law, under HAMP and United States Department of Treasury directives, Citi was obligated at this point to offer a permanent modification of the loan. This Citi did not do. Rather, notwithstanding Gigi's adherence to the trial payment plan established by Citi, and unbeknownst to her, on this same date, based on its receipt of the reduced payment that Citi had directed Gigi to pay during the trial modification period, Citi nevertheless determined the loan was in default and used this as the basis for issuing a Notice of Default.

30.   As reflected in Citi's records, Gigi called in on December 17, 2009, to check on the status of the modification and was transferred to loss mitigation.  She was told the modification was awaiting review.

31.   On December 29, 2009, Gigi called Citi again.  According to its records, Gigi called Citi this time in response to a letter from Citi that stated, contrary to what she had been told before, that the loan modification application needed to be signed by her ex-husband Robert as well.  Despite the contrary information she had been given by Citi before, Gigi obtained the signatures and returned the new packet on February 13, 2010, along with a copy of the previous packet which she had submitted on September 1, 2009.

32.   In the meantime, Plaintiff made another trial period payment on January 2, 2010 which was followed by yet another $2,743.29 payment on February 2, 2010.

33.     Gigi made another payment in March 2010.  On March 11, 2010, Citi's records reflect all of Gigi's trial period payments had been received and the file was ready for review for a final modification.

34.     The March payment was followed by another call by Gigi to Citi inquiring about the status of the loan modification.  Gigi was told the application was still waiting for review.  Gigi, at the same time as the March 2010 payment, arranged for the April 2010 payment to be made, and it was made as well.

35.     Citi's records reflect that on May 24, 2010 Gigi had returned all documents required for a modification.

36.     Gigi called Citi again on May 28, 2010 to try and get some answers about the status of the permanent modification.  However, this time Citi refused to speak with Gigi stating she was "not on the loan".

37.     A few weeks later, Gigi received a letter from Citi dated June 17, 2010, stating they were unable to offer her a loan modification because of "incomplete documents."  Gigi called and explained to the Citi agent that she had already submitted all the documents requested.  The agent examined the notes on the account and reported to Gigi that the notes reflected a notation on May 24, 2010 saying, "client returned all docs required for modification."  A case number was assigned (0067163097) for document review.

38.     According to its records, on June 29, 2010, Gigi contacted Citi again about the modification and was told again that it was under review.  Citi's internal notes reflect an inquiry on this date, wanting to know why the account was "set back up on HAMP TPP and then taken off."

39.     In mid-July 2010, Gigi again called Citi to check on the status of the modification.  Again, the agent confirmed that the notes reflected that the documents were received in May and Gigi was told she would hear from Citi regarding its decision.

40.    On July 30, 2010, Gigi called Citi again to inquire about the status of the modification and was again told it remained under review.

41.    On August 4, 2010, Gigi called Citi again to check on the status of her modification and was again told it was still in review. On this same date, however, Citi's records state there are missing documents, and that the file was closed on August 9, 2010. However, Gigi placed another call to Citi on August 30, 2010 when she was again told the file was under review. By this time, Gigi had made over ten payments to Citi under the auspices of the modification program, totaling $27,472.90.

42.    Gigi called yet again on September 24, 2010 and this time was told all the documents were in order and they were just waiting for a negotiator to be assigned to the case.   Despite this, on September 27, 2010, Citi's records state Plaintiff's file was referred to foreclosure.

43.    On or about September 30, 2010, Mortgage Electronic Registration Systems, Inc. executed an Assignment of the Note and the DOT pursuant to which the Note and DOT were allegedly transferred to Citi. This assignment was recorded on October 5, 2010 and was signed on behalf of MERS by Lisa Markham ("Markham"), its Assistant Secretary, and was notarized by Kristin B. Lindner ("Lindner").  This assignment is attached hereto as Exhibit "D".

44.    The same day, September 30, 2010, Citi also executed a Substitution of Trustee ("Substitution") naming CR Title as Substitute Trustee under the DOT, a copy of which is attached hereto as Exhibit "E."  The Substitution is also notarized by Lindner who supposedly witnessed the signature of Citi Assistant Vice President, who as it turns out is the same Lisa Markham, thus making her Citi's Assistant Vice President and MERS' Assistant Secretary on the very same day and at the exact same moment in time.

45.    The Citi employee and notary involved, Ms. Lindner had a well-documented history of abusing her notary license requirements and legal

1    responsibilities, and assisting in the preparation of fraudulent documents.  Indeed,

2    Lindner's notary commission was revoked by the Arizona Secretary of State in

3    December 2010, barely two months after executing the assignment and SOT

4    related to Plaintiff's property, after an investigation stemming from a complaint

5    against her alleging that certain documents she notarized in another matter (also an

6    Assignment of Deed of Trust and Substitution of Trustee) were improper because

7    the signer was not present.

8        46.    In an extensive discussion, the Arizona Secretary of State concluded

9    that Lindner had "failed to properly perform the acknowledgement and executed a

10   notarial certificate containing a false statement…."  The revocation of Lindner's

11   commission was expressly based on her failure to record requisite journal

12   information, her failure to record notarization fees in journal records, her failure to

13   accept satisfactory evidence of identity, her failure to properly perform the

14   acknowledgement, her failure to state her commission-expiration date in the

15   notarial certificate, her knowing execution of a false statement, and her failure to

16   discharge fully and faithfully the duties of a notary public.  A copy of the official

17   findings from the Arizona Secretary of State is attached hereto as Exhibit "F."

18       47.    Ms. Lindner nevertheless continued to notarize documents after the

19   date of the revocation of her notary license.

20       48.    Under cover of the aforementioned documents, on or around October

21   5, 2010, a Notice of Default ("NOD") was recorded. Gigi was unaware of this

22   occurrence as she believed, based on the representations being made to her by Citi,

23   that her loan modification was proceeding.  Although the DOT had already been

24   assigned to Citi according to the September 30, 2010 assignment, the NOD says it

25   is being recorded on behalf of MERS.  This could not be true because it was

26   MERS that assigned the DOT to Citi in the first instance and MERS had no rights

27   upon the assignment to Citi.

28

49.    On October 21, 2010 MERS Inc. on behalf of the original lender MortgageIT, executed an Assignment of the Note and DOT, assigning it to MTGLQ Investors, L.P. ("MTGLQ"). This purported assignment was invalid and void because the Note and DOT had been previously assigned to Citi on September 30, 2010. A copy of this October 21, 2010 assignment is attached hereto as Exhibit "G". On Plaintiffs' information and belief, notice of this purported transfer of ownership was never provided to them by MTGLQ, in violation of Section 131g of the federal Truth In Lending Act ("TILA"), 15 U.S.C. § 1641g.

50.    On November 12, 2010 MTGLQ recorded an assignment of the DOT to RESI Whole Loan IV LLC ("Resi").  However, MTGLQ lacked the legal authority to do so based on the previous assignment to Citi in September 2010. Further, this assignment impermissibly bifurcated the Note and DOT, only purporting to assign the latter. A copy of this assignment is attached hereto as Exhibit "H". On Plaintiffs' information and belief, notice of this purported transfer of ownership was never provided to them by Resi, in violation of Section 131g of TILA, 15 U.S.C. §1641g.

51.    On January 7, 2011, Gigi returned home to find a Notice of Trustee's Sale posted to her front door.  A true and correct copy of the Notice of Trustee's Sale is attached hereto as Exhibit "I."  A Trustee's Sale was scheduled for January 27, 2011.

52.    On January 27, 2011 Citi purported to assign the Note and DOT to MTGLQ. A copy of this assignment is attached hereto as Exhibit "J." On Plaintiffs' information and belief, notice of this purported transfer of ownership was never provided to them by MTGLQ, in violation of Section 131g of TILA, 15 U.S.C. § 1641g.

53. This purported assignment is at odds with the previous assignments of October 21, 2010 from MERS, Inc. as nominee for MortgageIT to MTGLQ and the one that followed on November 12, 2010 from MTGLQ to Resi.

54. After finding the Notice of Trustee's Sale, Gigi attempted to call Citi but only received an automated recording stating that "CitiMortgage is no longer the servicer of record. Your mortgage was paid in full on November 1st, 2010." This was the first-time Gigi had heard that Citi was no longer the servicer of the loan she had been trying to modify with Citi for months.

55. Thereafter, Gigi called Citi again to find out who the new servicer of the loan was, and who owned the loan. Gigi was given the name Litton Loan Servicing and a customer service number of (800) 603-4953. When Gigi called this number, she reached another recording, this one stating, "welcome to Auction.com." On Plaintiff's information and belief, they received no written notice of the transfer of servicing to Litton Loan Servicing as required by the provisions of the Real Estate Settlement Practices Act ("RESPA"), 12 U.S.C. § 2605(e).

56. With a trustee's sale pending, Gigi filed suit on January 20, 2011 to prevent the loss of her home at a foreclosure sale.

57. On January 7, 2013, the Notice of Default previously recorded on October 5, 2010 was rescinded at the instruction of the then loan servicer, Homeward Residential, Inc. f/k/a American Home Mortgage Servicing, Inc. A copy of this rescission is attached as Exhibit "K."

58. In April 2013, Robert received a letter from Ocwen, the new servicer of the mortgage loan, advising that the owner of the loan was now an entity called Invesco IV ("Invesco"). A copy of this notification is attached hereto as Exhibit "L". On Plaintiffs' information and belief, they received no written notice of the transfer of servicing on the loan to Ocwen as required by the provisions of the Real Estate Settlement Practices Act ("RESPA"), 12 U.S.C. § 2605(b)(1).

Additionally, on Plaintiffs' further information and belief, Invesco did not provide any notice of change of ownership of their loan to Plaintiffs as required by Section 131g of TILA, 15 U.S.C. §1641g.

59.     Although there was not any recorded assignment of the loan to Invesco, a change in ownership at or around this date is confirmed in the partial payment history of the loan provided by Defendant Caliber in November 2016. This document reflects that on April 12, 2013 there was a change of investor on the loan account.  A copy of this payment history is attached hereto as Exhibit "M."  On information and belief, it is standard practice in the loan servicing industry for all transfers of loan ownership or change of investors to be registered by the loan servicer handling the account in the payment history of the loan at or about the time of any change in ownership of the loan so as to properly allocate payments received and distribute them to the new owner/investor.

60.     The partial payment history provided by Caliber reflects yet another change of investor on the loan, this one on April 19, 2013, but again there is no recorded assignment reflecting who the new owner of the loan was, nor were Plaintiffs advised of this change of ownership as required by Section 131g of TILA, 15 U.S.C. § 1641g. See Exhibit "M."

61.     In June 2013, Ocwen sent a letter indicating that the loan was in default and it intended to initiate foreclosure proceedings on the property.  A copy of this letter is attached hereto as Exhibit "N."

62.     The partial payment history provided by Caliber reflects that there was another change of investor on the loan, this one on October 23, 2014. See Exhibit "M."  On Plaintiffs' information and belief, the loan was sold on or around this date to Altisource Residential, LP ("Altisource"). (http://ir.altisourceresi.com/sec.cfm?SortOrder=Type%20Ascending&DocType=&DocTypeExclude=&Year=&FormatFilter=&CIK= ) A copy of the August 10, 2015 10Q filed by Altisource Residential Corp is attached as Exhibit "O.".  There

is, however, no recorded assignment of the Note and Deed of Trust from Invesco to Altisource. On Plaintiffs' information and belief, they were not provided with any notice of change of ownership by Altisource as required by Section 131g of TILA, 15 U.S.C. § 1641g.

63.    On October 28, 2014, the partial payment history provided by Caliber, Exhibit "M," reflects that there was another change of investor on the loan, followed, on October 31, 2014, by yet another change of investor. There are no assignments or other documentation indicating who these new investors are. Nor were Plaintiffs provided any notices of change of ownership as required by Section 131g of TILA, 15 U.S.C. § 1641g.

64.    According to page 7 of the Altisource 10Q filed with the SEC on November 24, 2014, the loan was purportedly transferred to the ARLP Series 2014-2 securitized trust. There is no recorded assignment of the loan from Altisource to the ARLP Series 2014-2 Trust, nor is this transfer reflected in the partial payment history provided by Caliber. Exhibit "M." On Plaintiffs' information and belief, they were not provided with notice of this transfer of ownership by ARLP Series 2014-2 Trust in violation of Section 131g of TILA, 15 U.S.C. § 1641g.

65.    On November 20, 2014 Ocwen sent a letter to Plaintiffs advising them that the loan was delinquent and threatening the initiation of foreclosure proceedings. A copy of this letter is attached as Exhibit "P."

66.    In response to Ocwen's letter, on December 12, 2014 counsel for Plaintiffs sent Ocwen a Qualified Written Request (QWR) pursuant to the Real Estate Settlement Practices Act (RESPA), 12 U.S.C. § 2605 advising Ocwen that 1) the property and the subject loan were currently in litigation; 2) that there was a *lis pendens* on the property; 3) that there was a dispute regarding the validity of certain transfers of the Note and DOT rendering the chain of title questionable; 4) that a dispute existed over who the correct legal owner of the Note and DOT were

and who was the proper party with the legal right to initiate any foreclosure proceedings; and 5) questioning whether Ocwen had the legal right to initiate foreclosure proceedings at that time.  Further, the QWR specifically requested that Ocwen provide Plaintiffs with 1) a copy of the original note; 2) a copy of the original deed of trust; 3) copies of any assignments of the note since the inception of the loan to the present time;  4) copies of any assignments of the DOT since the inception of the loan to the present time;  5) copies of any documents which demonstrate the right of Ocwen to institute foreclosure on the property; 6) a copy of the payment history of the loan; and 7) the name and contact details for the current trust a  or other owner of the loan on whose behalf Ocwen was servicing the loan. A copy of this letter is attached hereto as Exhibit "Q."

67.    Pursuant to the requirements of RESPA, Ocwen was required to acknowledge receipt of Plaintiffs' QWR within five (5) days (see 12 U.S.C. § 2605(e)(1)(A)), to provide the identity and contact details of the new owner within ten (10) business days (see 12 U.S.C. § 2605(k)(1)(D)), and to act with respect to Plaintiffs' inquiry within thirty (30) days (see 12 U.S.C. § 2605(B)(2)). Ocwen did none of these. When Ocwen failed to either acknowledge receipt of Plaintiffs' QWR, provide the identity of the new owner of the loan, or timely respond to the questions in the QWR, counsel for Plaintiffs sent them another QWR on January 16, 2015. A copy of this letter is attached hereto as Exhibit "R."   Ocwen also did not provide any acknowledgement of receipt to Plaintiffs' January 16, 2015 as required by 12 U.S.C. § 2605(e)(1)(A).

68.    On January 27, 2015, Ocwen sent a letter to Plaintiffs advising them that the loan was delinquent and threatening the initiation of foreclosure proceedings. A copy of this letter is attached as Exhibit "S."

69.    On January 31, 2015 Ocwen wrote a letter to Plaintiffs which only stated the date the loan was originated, that Ocwen was obligated to service the loan in accordance with the terms of the Note and Mortgage and that a review of

the Note indicated to Ocwen that the loan was valid. Ocwen also provided what it called a Detailed Payment Reconciliation History supposedly reflecting all credits and disbursements made on the loan and the resulting loan status. However, a review of this document reveals that it did not reflect the full payment history of the loan from inception as requested but rather only from the period from on or around March 1, 2013, the date when Ocwen apparently took over servicing of the loan. Ocwen did not provide any of the other information requested in Plaintiffs' first or second QWRs or explain why they were unable to provide it. Here Ocwen was in violation of 12 U.S.C. § 2605 (e)(B)(2) and 12 U.S.C. § 2605(k)(1)(D). A copy of this letter is attached as Exhibit "T."

70.     On March 4, 2015 counsel for Plaintiffs sent Ocwen yet another QWR reminding them of the QWR's sent on December 12, 2014 and January 16, 2015, advising them that they still had not answered any of the questions posed to them in said QWR's or provided the requested documentation.  This letter also pointed out the inadequacy of Ocwen's response of January 31, 2015, and again requested that they comply with their obligations under RESPA. A copy of this letter is attached hereto as Exhibit "U."

71.     Ocwen failed to timely acknowledge receipt of Plaintiffs' March 4, 2015 QWR, in violation of 12 U.S.C. § 2605(e)(1)(A), and failed to respond to Plaintiffs' inquiry within the time limits required by the statute, again in violation of 12 U.S.C. § 2605 (e)(B)(2) and 12 U.S.C. 2605(k)(1)(D).

72.     On April 9, 2015, Ocwen acknowledged receipt of Plaintiffs' correspondence without identifying which of Plaintiffs' three (3) separate QWR's it was referring to, simply stating that: "we have determined additional time is required to review the details pertaining to your specific request. As a result, we are unable to respond within the 30-day anticipated timeline. Under the Real Estate Settlement Procedures Act (RESPA) we are afforded an additional 15 days to complete our research and provide a response."  A copy of this letter is attached

as Exhibit "V."  This acknowledgment was both untimely under RESPA and failed to comply with the requirements of 12 U.S.C § 2605 (e)(C)(i) in that it did not explain why the information Plaintiffs had requested was either unavailable or could not be obtained by Ocwen.  By this point in time over ninety (90) days had passed since Plaintiffs' first QWR dated December 12, 2014 had been received by Ocwen.

73.    On April 13, 2015 Ocwen wrote a letter to Plaintiffs' counsel acknowledging that they had received a QWR, again without noting which of the QWR's they were referring to. Rather than fully responding to the questions that had been raised by Plaintiffs on three (3) occasion now, or providing the documents requested, Ocwen merely parroted its January 31, 2015 letter providing the date the loan originated, stating again that they were obligated to service the loan in accordance with the terms of the Note and DOT, that a review of the Note indicated that the borrower is responsible for the debt and therefore the loan is valid, and they had already provided a Detailed Payment Reconciliation History reflecting all credits and disbursements to the loan.  The letter further indicated that foreclosure proceedings had been initiated on April 1, 2013 and they were unable to cancel the current foreclosure status on the loan. A copy of this letter is attached hereto as Exhibit "W." Yet again Ocwen had ignored their duties and obligations under RESPA.

74.    On April 27, 2015 Ocwen wrote to Plaintiffs advising them that effective June 1, 2015 the escrow payment on the loan would be changed to $1,996.56, broken down as a Principal and Interest payment of $1,376.48 and an escrow payment of $620.08. A copy of this notice is attached as Exhibit "X." This violated the terms of the Promissory Note which was interest only for the first ten (10) years. Additionally, on Plaintiffs information and belief, all monthly mortgage statements sent to Plaintiffs by Ocwen during the time period they were servicing Plaintiffs loan were inaccurate in that they sought both a Principal and

1    Interest Payment. A copy of the Interest Only Addendum to the Promissory Note

2    is attached as Exhibit "A."

3         75.    On June 3, 2015, a Corporate Assignment of Deed of Trust was

4    prepared by Ocwen and recorded on June 19, 2015 purportedly assigning the DOT

5    (but not the Note) from Resi to the Wilmington Trust as Trustee of the ARLP

6    Securitization Trust Series 2014-2 (ARLP).  A copy of this assignment is attached

7    hereto as Exhibit "Z."  This attempted transfer is not reflected in the partial

8    payment history provided by Caliber nor were Plaintiffs ever advised by ARLP

9    that such transfer had taken place, in violation of Section 131g of TILA, 15 U.S.C.

10   § 1641g.

11        76.    Irrespective, this attempted transfer is invalid on its face because Resi

12   was not the legal owner of the loan at the time of the alleged transfer. Further, this

13   attempted transfer also fails because it impermissibly sought to bifurcate the Note

14   and DOT, only transferring the latter.  Additionally, on Plaintiffs' information and

15   belief, Stratus Asset Management Group, who executed the assignment on behalf

16   of RESI, did not have a Power of Attorney allowing them to execute documents on

17   behalf of RESI at this time.

18        77.    On June 25, 2015, yet another Corporate Assignment of Deed of

19   Trust was prepared by Ocwen and subsequently recorded, this time purportedly

20   assigning the loan from MTGLQ to Wilmington Trust as Trustee for the ARLP

21   Securitization Trust Series 2014-2 (ARLP).  The stated purpose of this assignment

22   was to "correct assignee on assignment recorded 3/31/2011", where previously

23   MTGLQ had assigned the DOT to Resi. A copy of this "corrected" assignment is

24   attached hereto as Exhibit "AA."  Ocwen had recognized that there were gaps in

25   the chain of title of the loan and was attempting to address this by creating a new

26   document to fill in the gaps four years after the fact. This June 25, 2015

27   assignment was invalid because MTGLQ had no authority to make this

28   assignment, first because MTGLQ had already assigned the loan four years earlier

but also because the loan had been previously purchased by Altisource.  Here, too, the assignment sought to impermissibly bifurcate the Note and DOT, only seeking to transfer the latter. Plaintiffs never received written notice of this transfer of ownership from ARLP, again in violation of Section 131g of TILA, 15 U.S.C. § 1641g.

78.    On information and belief, on or about August 27, 2015, defendant Zieve was substituted in as the trustee under the DOT.

79.    On August 27, 2015 Ocwen, on behalf of Wilmington Trust as Trustee for ARLP, recorded a new Notice of Default and Election to Sell Under Deed of Trust on the property. A copy of this notice is attached hereto as Exhibit "BB." Pursuant to Paragraph 22 of the Deed of Trust, a Notice of Intent to Accelerate in the event of default must be sent to a borrower and the period of time to cure the breach must pass before any act related to non-judicial foreclosure can be initiated, including the recording of a Notice of Default. This did not happen. Thus, the recording of this NOD was invalid and violated the terms of the Deed of Trust.

80.    On October 6, 2015 counsel for Plaintiffs sent Ocwen (who to this point in time had never properly responded to Plaintiffs' previous Qualified Written Requests of December 14, 2014, January 16, 2015, and March 4, 2015 respectively) another QWR under RESPA requesting that Ocwen provide a copy of the original note, the original deed of trust, all assignments or endorsements of the note since the inception of the loan to the present, copies of any assignments of the deed of trust since the inception of the loan, copies of any documents demonstrating the right of Ocwen to institute foreclosure on the property, the payment history of the loan from the period of time the loan was last less than sixty (60) days delinquent to the present, and the name and contact details for the current owner of the loan on whose behalf Ocwen was servicing the loan.  A copy of the October 6, 2015 QWR is attached hereto as Exhibit "CC."  Ocwen, again in

1    violation of RESPA, failed to timely acknowledge Plaintiffs' QWR or timely

2    provide the requested documents.

3         81.    Later that month a representative for Plaintiffs, who had decades of

4    experience in the mortgage loan servicing industry, spoke with an attorney for

5    Ocwen who by happenstance he had been working with on other, unrelated,

6    mortgage loan issues. He advised Ocwen's attorney that he had reviewed the

7    assignment chain on the loan and saw several significant gaps, that he believed

8    that ownership of the loan by Wilmington Trust was in serious question,  that in

9    his view Ocwen's attempts to recreate "corrective" assignments to address these

10   gaps was suggestive of improper and potentially fraudulent behavior and that, as a

11   result, there was no proper legal basis for Ocwen to have recorded a Notice of

12   Default on behalf of Wilmington Trust and ARLP.

13        82.    Ocwen's attorney agreed to review the situation, including the chain

14   of title, and after doing so conceded that there were significant gaps which called

15   into question whether ALRP was in fact the current legal owner of the loan.

16   Accordingly, he advised Plaintiffs' representative in early November 2015 that he

17   would be recommending to Ocwen that the filing and maintenance of the NOD

18   was improper and lacked legal basis and should be rescinded. The notice of

19   rescission was recorded on November 16, 2015.  A copy of the rescission is

20   attached hereto as Exhibit "DD."

21        83.    The partial payment history provided by Caliber, Exhibit "M,"

22   reflects that on March 24, 2016 there was another change in the investor

23   purportedly owning the loan.  There is no recorded document reflecting any

24   assignment of the loan as of this time.

25        84.    On April 29, 2016, Ocwen advised Plaintiffs that the servicing of the

26   mortgage loan was being transferred from Ocwen to Caliber, effective May 19,

27   2016.  A copy of this Notice of Servicing Transfer is attached hereto as Exhibit

28

"EE." As of the time of this transfer Ocwen still had not provided Plaintiffs any of the information they requested in the four (4) QWR's.

85.     On May 24, 2016, Ocwen provided Plaintiffs with a document entitled "Final Escrow Account Disclosure Statement Account History".  The escrow statement incorrectly reflected, as the first ten (10) years of the loan were interest only, that the monthly mortgage payment on the loan was $2,182.81, of which $1,442.03 was for principal and interest and $740.78 was allocated to the escrow account. In addition to corroborating that the terms of the Promissory Note had been breached, the principal and interest and escrow payment amounts were higher than those contained on the Escrow Analysis of April 27, 2015, Exhibit "X."  No explanation was offered for these discrepancies.  A copy of this Final Escrow statement is attached as Exhibit "FF."

86.     On May 31, 2016, Plaintiffs received a letter from Caliber advising that Caliber had replaced Ocwen as loan servicer on the loan effective May 17, 2016.  The letter was accompanied by a Notice of Servicing Transfer reflecting the same information.  A copy of the letter is attached hereto as Exhibit "GG." As of the time of this letter Ocwen still had not provided to Plaintiffs any of the information requested of them in the four QWR's sent to them.

87.     On Plaintiffs' information and belief, based on servicing industry standards, at the time that Caliber took over the servicing of the loan, Caliber was provided by Ocwen with its entire loan file which should have included, but would not be limited to, the original Note (with a full set of endorsements to the current purported investor), the Deed of Trust (along with all assignments from the date of loan origination to the current time), a full and complete payment history on the loan from its inception, and full correspondence files between the Plaintiffs and Ocwen regarding the loan (including Plaintiff's challenges to the completeness and accuracy of the chain of title, as well as to who was, in fact, the legal owner of the

1  loan, as well as copies of all the QWR's sent to Ocwen and Ocwen's responses

2  thereto in regards to the loan).

3      88.    On June 3, 2016, Plaintiffs received a Debt Validation Notice from

4  Caliber advising them that the LSF9 Master Participation Trust was now the owner

5  of the loan. Pursuant to this notice, the Principal Balance was $629,249.51 and the

6  total debt was $866,125.14. Included in this total amount was Accrued Interest

7  through 6/2/2016 in the amount of $165,746.09. This amount appears overstated

8  based on the $1,609.64 monthly interest amount reflected in the mortgage

9  statements. This purported change of ownership is not reflected on the partial

10  payment history provided by Caliber, and there was no recorded assignment of the

11  loan to LSF9.  A copy of this Debt Validation Notice is attached hereto as Exhibit

12  "HH."

13      89.    On July 18, 2016, Plaintiffs received a letter from Caliber in which

14  Caliber acknowledged receipt of Plaintiffs' written request to cease further

15  communications with them regarding the loan, and stating that accordingly Caliber

16  would no longer communicate with them in this regard.  A copy of this letter is

17  attached hereto as Exhibit "II." Plaintiffs, however, had never sent Caliber such a

18  request.

19      90.    On July 27, 2016 Plaintiffs' representative sent Caliber a Qualified

20  Written Request disputing that the LSF9 Trust was the true legal owner of the

21  loan, and asserting that it could not establish that it was legally entitled to either

22  collect on the debt or to seek to foreclose on the property.  This was based on the

23  recorded assignment chain which indicated that there were significant gaps in the

24  chain of title. The letter also advised Caliber that Ocwen had admitted that it did

25  not have a full and complete payment history of the loan in its files, which threw

26  into question its ability to certify the correct amounts due under the loan.  As such

27  a request was made to Caliber to provide Plaintiffs with a full and complete

28

payment history as well as an itemized breakdown of all amounts Caliber asserted were due and owing on the loan. A copy of this letter is attached as Exhibit "JJ."

91.    Defendant Caliber acknowledged receipt of Plaintiffs' correspondence on July 27, 2016 and again on July 28, 2016. Copies of these letters are attached hereto as collective Exhibit "KK.". However, Caliber did not timely respond within 30 days to Plaintiffs' request for information or provide the documents requested, as required by RESPA, 12 U.S.C. § 2605e(B)(2).

92.    When Caliber did not otherwise respond to Plaintiffs' July 27, 2016 QWR, on August 31, 2016 Plaintiffs' representative sent another QWR, this time to Caliber's CEO, Sanjiv Das, providing him with copies of the July 27, 2016 QWR and asking him to please have someone in his company respond to Plaintiffs' expressed concerns.  A copy of this letter is attached hereto as Exhibit "LL."

93.    On September 1, 2016 Defendant Caliber sent Plaintiffs' representative a letter acknowledging receipt of his August 31, 2016 email, and stating that it would provide the requested information within the time limits provided by statute for them to respond.  A copy of this letter is attached hereto as Exhibit "MM."

94.    On September 7, 2016, Plaintiffs' representative again wrote to Defendant Caliber describing (1) why he was believed that LSF9 Trust could not demonstrate that it was the true owner of the loan; (2) why the LSF9 trust could not demonstrate that it was the appropriate legal entity to either seek to collect on the alleged debt or to initiate any foreclosure related activity; (3) that Caliber was unable to validate the amount it claimed was due under the loan as required by Consumer Protection Finance Board Regulations as well as the Fair Debt Collection Practices Act (FDCPA); (4) that the initial letter of July 27, 2016, which served as a Qualified Written Request (QWR) under the same statutes, had specifically disputed Caliber's right to collect on the debt; (5) that Caliber had not

provided any response to said QWR in violation of RESPA and had failed to validate the debt as required under the provisions of the FDCPA; (6) reminded Caliber that Ocwen had acknowledged there were serious title deficiencies in terms of the ownership of the loan, had attempted to create and file "corrected" assignments to try and fix these issues, and rescinded the NOD once it realized that it was unable to correct these title issues; (7) that Caliber would have the same difficulties in establishing a legal basis for recording any NOD on the home; (8) that Ocwen had already advised that it had lacked possession of a complete payment history of the loan and thus could not substantiate the debt during the time when t when it was the servicer; (9) that because Caliber had only received a partial payment history from Ocwen, it too would not be able to provide a complete payment history as required to collect on the debt; (10) that Caliber had already sent Plaintiffs contradictory demands for payment reflecting different amounts in different documents; (*i.e.* the mortgage statement of June 3, 2016 reflected a total amount due under the loan of $828,122.94, yet the Debt Validation letter dated the same day stated that the total amount due was $886,125.14); and (10) that Caliber could not meet its burden under law to substantiate the amount of the debt in order to either to seek to collect or to initiate any actions for alleged non-payment under the Note. A copy of this letter is attached hereto as Exhibit "NN."

95.    On September 7, 2016, Caliber sent Robert a letter stating it was "in response to your inquiry regarding the owner of your mortgage loan" and stating that the owner was LSF9.  A copy of this letter is attached hereto as Exhibit "OO." This response was untimely in that such information had to be provided by Caliber within ten (10) business days pursuant to 12 U.S.C. § 2605(k)(1)(D).

96.    On September 12, 2016 Caliber responded to Plaintiffs' letter of September 7, 2016, by mischaracterizing it as a request by Plaintiffs for a short sale, and without addressing even one of the points raised in the letter.  Instead, the

response advised that their investor would not approve the loss that Plaintiffs' short sale offer would produce if accepted.  A copy of this letter is attached as Exhibit "PP."  Plaintiffs never made a short sale offer.

97.     On September 21, 2016, Caliber sent Plaintiffs a letter acknowledging, once again, the letter sent to Caliber by Plaintiffs representative on August 31, 2016 and asserting that it was diligently researching the request and would send a follow up response to Plaintiffs within 15 days.  A copy of this letter is attached as Exhibit "QQ."

98.     On September 26, 2016, Plaintiffs' representative again wrote the CEO of Caliber, advising him that a phone call had been received from an employee of Caliber earlier that day in which they advised that Caliber would not be responding to or addressing any of the concerns relayed to them in Plaintiffs' previous correspondence concerning the dispute over the ownership of the loan or the amount of the debt actually owed by Plaintiffs.  Further, in that phone call Caliber told Plaintiffs' representative that notwithstanding the clear disputes regarding who in fact was the legal owner of the loan, not to mention the amount of the alleged debt due, Caliber had decided to pursue its normal servicing function related to the loan (*i.e.* to seek foreclosure).  Plaintiffs' representative strongly disagreed with this assessment and warned the CEO that Caliber's failure to timely acknowledge or respond to Plaintiffs' written inquiries were violations of law, specifically RESPA, the Rosenthal Act and FDCPA, as well as California statutes enumerated in the Homeowners Bill of Rights.  A copy of this letter is attached hereto as Exhibit "RR."

99.     On September 27, 2016 Caliber sent Plaintiffs a letter acknowledging receipt of Plaintiffs' September 26, 2016 letter to the CEO and stating that it would perform the necessary research and respond within the time period required by law.  A copy of this letter is attached hereto as Exhibit "SS."

100.   On October 6, 2016, Plaintiffs' representative sent yet another letter to the CEO of Caliber, advising that it had been more than 60 days since Plaintiffs had sent the QWR to Caliber on July 27, 2016, that Caliber had still not provided the written response to which Plaintiffs were legally entitled, and that, as a result, Caliber was still in violation of the provisions of RESPA.  Plaintiffs' representative again advised Caliber that if it began any foreclosure related activities against the property they would be in direct violation of the California Homeowners Bill of Rights.  A copy of this letter is attached hereto as Exhibit "TT."

101.   On October 6, 2016, Caliber wrote Plaintiffs a letter in a partial and incomplete response to Plaintiffs' August 31, 2016 and September 7, 2016 Qualified Written Requests. Caliber first denied receipt of Plaintiffs' QWR dated July 27, 2016, despite their letter of July 27, 2016 acknowledging its receipt, and asserting accordingly that there was no RESPA violation.  A copy of this letter is attached hereto as Exhibit "UU."  Next, Caliber said that the admissions of Ocwen that they did not have a full and complete payment history of the loan was not a concern for Caliber, notwithstanding that the reliance by Ocwen and then Caliber upon an incomplete payment history threw into question the legal ability of either servicer to certify the correct amount due under the loan, a prerequisite for their ability to seek to validate and collect on the alleged debt.  Caliber continued by stating that if Plaintiffs believed that those issues concerned the servicing activities of Caliber, Plaintiffs should provide Caliber with that information, ignoring that in Plaintiffs' QWR's Caliber had been repeatedly advised that based on this admission Caliber could not substantiate the debt by relying on an incomplete payment history received from Ocwen upon transfer of the loan file.

102.   Regarding Plaintiffs' concerns about the differing amounts stated to cure the default, Caliber chose not to directly address this issue, instead merely stating, incorrectly, that the amount of $828,122.94 listed on the mortgage

1    statement was the amount to cure the default and the amount of $866,125.14 was

2    the total outstanding due on the loan.  They offered no explanation as to why the

3    monthly mortgage statement reflected that the amount to cure the alleged default

4    was listed as $251,882.57, not $828,122.94, or why the monthly statement

5    reflecting that the total amount due and owing on the loan was $828,122.94, while

6    the debt validation letter had the differing amount of $866,125.14.

7        103.    Regarding the assignment chain, Caliber admitted that Plaintiffs were

8    correct and that there were indeed gaps in the assignment chain.  Remarkably,

9    Caliber then stated that they intended, just as Ocwen had tried to do, to create a

10    new "corrective assignment" to back-fill this gap.  Further, they needed to

11    "complete a title search prior to Caliber filing the Assignments in question for

12    recording."  And that **once the title search is complete, a follow up response**

13    **will be sent to you under separate cover at which point we will be able to**

14    **provide further clarification on the legal owner of the loan, etc.**"  See Exhibit

15    "UU." At this point in time Caliber had still not provided Plaintiffs with the

16    documents requested in the QWR's of July 27, 2016 and August 31, 2016 nor

17    timely responded to Plaintiffs' concerns as required under RESPA pursuant to 12

18    U.S. Code 2605(e)(B)(2).

19        104.    On October 13, 2016, Plaintiffs' representative responded to Caliber's

20    letter of October 6, 2016 with another QWR.  A copy of this letter is attached

21    hereto as Exhibit "VV."  First, Plaintiffs' representative reminded Caliber that

22    Caliber's claim that it had not received the July 27, 2016 QWR was not true, as

23    Caliber itself had acknowledged its receipt in writing that very day, July 27, 2016.

24    Plaintiffs' representative again reminded Caliber that it was in violation of RESPA

25    because of its failure to respond to Plaintiffs' QWR and reiterated Plaintiffs'

26    demand that Caliber respond fully and completely to the previous request.

27        105.    Regarding the discrepancies in the amount of the alleged debt,

28    Plaintiffs' representative repeated and reiterated Plaintiffs' concerns and pointed

1  out that Caliber's cursory response was difficult to decipher, and requested that

2  Caliber provide a detailed and understandable explanation of the difference in the

3  amount of debt stated on various documents sent by Caliber to Plaintiffs.

4  Plaintiffs' representative again requested that Caliber provide a complete copy of

5  the full payment history of the loan and an itemized breakdown of the amounts,

6  including all fees and expenses that Caliber claimed were owed on the loan –

7  information that had been requested from Caliber on several prior occasions, and

8  to which Plaintiffs were legally entitled.

9      106.   Plaintiffs' representative continued by stating that Caliber's

10  admission that there were gaps in the assignment chain demonstrated that Caliber

11  lacked the ability to identify the actual legal owner of the loan, yet Caliber was

12  continuing to seek to collect on the alleged debt.  Caliber was again reminded that

13  seeking to collect on a debt on behalf of someone who is not the true legal owner

14  violated the Homeowners Bill of Rights as well as the Rosenthal Act and FDCPA.

15  Finally, Caliber was reminded, yet again, that Ocwen earlier had attempted to go

16  down the path of recreating missing documents as Caliber said it now planned to

17  do, and that these attempts by Ocwen smacked of fraud, which would be how any

18  similar attempt by Caliber would inevitably be regarded.  See Exhibit "VV."

19  Caliber did not timely acknowledge receipt of this QWR as required by RESPA,

20  12 U.S.C § 2605(e)(1)(A).

21      107.   On October 17, 2016, Caliber sent a letter to Plaintiffs acknowledging

22  once again Plaintiffs' letter of September 26, 2017, stating that Caliber was

23  "diligently researching your request and requires additional time to fully complete

24  our review….You may expect a follow up response to be sent within fifteen (15)

25  days."  A copy of this letter is attached as Exhibit "WW."

26      108.   On October 20, 2016, Caliber sent Plaintiffs a letter entitled "Changes

27  to Your Mortgage Interest Rate and Payments on December 1, 2016".  Herein,

28  Caliber asserted that the current Principal and Interest payment was in the amount

of $1,638.67, a figure that was at odds with the May 24, 2016 Notice of Final Escrow, Exhibit "XX" hereto wherein the Principal and Interest payment was listed by Ocwen as being $1,442.03.  Further, by this document Caliber asserted that Plaintiffs former monthly payment of $2,343.60 would now be increased to $4,288.84, effective December 1, 2016 over the remaining two hundred forty (240) months of the loan, as the initial ten (10) year loan term was interest only. The letter also reflected that the amount remaining due under the loan at this point in time was $617,956.96. This alleged amount is at odds with the Debt Validation Letter of June 3, 2016, Exhibit "HH," which reflected a Principal Balance of $629,249.51, as well as the monthly statements sent to Plaintiffs.

109.    On October 27, 2016, Caliber wrote to Plaintiffs advising them that it had received Plaintiffs' letters of October 6, 2016 and October 13, 2016 and that Caliber was "diligently researching your request and requires additional time to fully complete our review…You may expect a follow up response to be sent within fifteen (15) days."  A copy of this letter is attached at Exhibit "YY."

110.    On November 1, 2016, Caliber sent a letter to Plaintiffs acknowledging that they had in fact received a Qualified Written Request for information regarding the loan on July 27, 2016 from Plaintiffs' representative and stating that their previous correspondence of October 6, 2016 in which they denied its receipt was in error, conceding they had not timely responded to the QWR as required by RESPA, 12 U.S.C. § 2605(e)(B)(2).  A copy of this letter is attached hereto as Exhibit "ZZ."

111.    Caliber then advised that they had now completed the endorsement chain on the Note to its investor, the LSF9 Trust, which they said "represents the investor's ownership and authority to enforce the note".  Caliber continued: "While the completed endorsement chain is in place, we are still pending the completion of a corrective Assignment as referenced in our previous correspondence dated October 6, 2016."  "The title search is still pending, which

1   must be completed before Caliber can file the Assignments in question for

2   recording." "As a reminder, due to the outstanding Assignments and the pending

3   title search, Caliber is unable to further review a settlement offer on the loan."

4   Ignoring all admonitions, Caliber had gone down the same deceptive path as

5   Ocwen, creating their own documents to try and fill in the clear gaps in the chain

6   of title. Caliber concluded by saying that it was still conducting research regarding

7   Plaintiffs' concerns about the disputed amounts on the loan – this, over three

8   months after Plaintiffs' first challenged the accuracy of Caliber's debt collection

9   activities. See Exhibit "ZZ." Caliber still did not provide the complete payment

10  history requested by Plaintiffs beginning in July 27, 2006, in continued

11  contravention of their obligations to do so under RESPA, 12 U.S.C. §

12  2605(e)(B)(2).

13      112.   Rather than providing clear proof of the loan being owned by the

14  LSF9 Trust and clearly establishing their legal ability to cause a Notice of Default

15  to be filed on the loan, the "completed" Note endorsements and allonges provided

16  by Caliber instead raised even more concerns over the chain of title.

17      113.   A review of the "endorsements" reveals that the same person,

18  Elizabeth Willard (who also was a signatory to the November 12, 2010 assignment

19  transferring the loan from MTGLQ to Resi) executed two of the endorsements

20  Caliber relied upon. Her signature first appears on an undated allonge where she

21  supposedly endorsed a transfer of the Note from MTGLQ to Resi. Her signature

22  appears again on the bottom of the Note itself, supposedly endorsing the Note

23  from CitiMortgage to MTGLQ. This signature was also undated.

24      114.   Certain problems are presented by these documents. The first is that

25  Elizabeth Willard's signatures on these two supposed endorsements do not match.

26  While her signature on the November 12, 2010 assignment matches her signature

27  on the endorsement from MTGLQ to Resi, it clearly does not match her signature

28  on the endorsement from CitiMortgage to MTGLQ. This is most curious and

raises an inference that one of these signatures was affixed by someone other than Ms. Willard. The second problem is that based on the recorded assignments, the endorsement from MTGLQ to Resi which is reflected on the allonge, had to occur prior to the alleged endorsement from CitiMortgage to MTGLQ. This raises the question of how the endorsement from CitiMortgage to MTGLQ appears on the bottom of the Note as opposed to on a subsequent allonge after the endorsement to Resi. The only thing that makes sense is that in their haste to provide an endorsement chain that might support Caliber's stated position as to the ownership of the loan, whoever was recreating the documents got the order wrong.

115. In addition, the supposed endorsement chain provided by Caliber has gaps in the chain of endorsements, lacking endorsements from certain necessary parties in order to establish that the LSF9 trust is in fact the legal owner of the loan. For instance, there is no endorsement from MTGLQ to Invesco, there is no endorsement from Invesco to Altisource and there is no endorsement from Altisource to ALRP. Nor, if Resi was the owner of the loan as reflected in the Assignment chain, is there any endorsement from Resi to either Invesco or Altisource, or from Altisource to the ARLP 2014-2 trust. It is impossible to establish from the documents provided and relied upon by Caliber that the LSF9 Master Participation Trust is, in fact, the legal owner of the loan and thus has the legal authority to seek to collect under the Note or to enforce its terms via the initiation of non-judicial foreclosure.

116. On November 3, 2016, Plaintiffs' representative responded to Caliber's letter of November 1, 2016 with another QWR, again requesting that Caliber provide the documents that Plaintiffs had been seeking for months, namely: (1) copies of all assignments; (2) the results of Caliber's complete title examination; and (3) a full and complete copy of the payment history of the loan and a detailed breakdown of the amounts claimed to be due under the loan. A copy of this letter is attached hereto as Exhibit "AAA." On that same day,

1   Plaintiffs' representative also sent to Caliber a request to provide Plaintiff with

2   copies of the TILA required Transfer of Ownership letters for the following

3   entities; CitiMortgage, Inc., MTGLQ Investors, LP, Resi Whole Loan IV LLC,

4   Altisource Residential LP, Wilmington Trust as Trustee for the ARLP-2 Trust,

5   Invesco IV, and LSF9. These letters, as previously noted, are required to be sent

6   whenever there is a change of ownership of a borrower's mortgage loan, and on

7   Plaintiffs' information and belief, would normally be included in and part of the

8   loan file related to the loan.  See Exhibit "AAA." Caliber never acknowledged

9   receipt of this further request for information.

10       117.   On November 10, 2016, Caliber sent a follow-up letter to Plaintiffs,

11  attached hereto as Exhibit "BBB," in which they reiterated that Caliber had in fact

12  received Plaintiffs' Qualified Written Request on July 27, 2016, that previously

13  they had determined that there was a gap in the claim of Assignments, and that

14  Caliber intended to complete a "corrective" Assignment to fill in those gaps.

15  Further, Caliber reiterated that the endorsement chain to Caliber's investor, U.S.

16  Bank Trust, N.A. as Trustee for the LSF9 Master Participation Trust, had been

17  completed, and a copy of the Note and alloonges had been provided to Plaintiffs.

18  These, Caliber again asserted, represented the investors' ownership and authority

19  to enforce the note.

20       118.   Caliber went on to say that the title search was still pending and had

21  to be completed before Caliber could file the "corrective" assignments for

22  recording.  Caliber also stated that as of the date of this letter "we have no

23  additional documentation to provide concerning the matter, and believe we have

24  provided adequate clarification relating to our concerns.  **Furthermore, we are**

25  **only able to provide you with documents that have been provided to us by the**

26  **previous servicer Ocwen Loan Servicing LLC.  Caliber did not originate this**

27  **loan, nor are we able to provide a complete payment history of the loan since**

28  **the time of origination."** (Emphasis added). There is no reason that Caliber had to

wait until this time to admit that it did not have the payment history requested by

Plaintiffs repeatedly in several QWR's to Caliber beginning July 27, 2015. Their

violation of 12 U.S.C. § 2605(e)(B)(2) in this regard cannot be clearer or more

apparent. Nor can it be any more clearly conceded that they lacked the

documentation necessary to accurately validate the nature and amount of

Plaintiffs' alleged debt, a necessary legal predicate for their attempts at collection.

119.   Caliber then turned to Plaintiffs' continuing concerns regarding the

various and contradictory amounts that Caliber had sought to collect from

Plaintiffs and finally admitted that the amounts stated in their October 6, 2016

letter were incorrect.  Caliber also admitted, as Plaintiffs had asserted on several

occasions, that the debt validation letter and the monthly billing statements mailed

on June 3, 2016 "were substantially different in the amounts owed" passing it off

"as a result of an inadvertent clerical error." Tellingly, Caliber continued, "We

appreciate that you have brought these concerns to our attention, and will be

implementing the necessary steps to ensure corrections are made to our monthly

mortgage statements moving forward." This suggests that Caliber had a systemic

issue, not just involving Plaintiffs' loan but with all loans they were servicing,

calling generally into question the accuracy and validity of their debt validation

letters as compared with the mortgage statements they were sending.

Notwithstanding these admissions, Caliber did not take steps to correct these errors

as required by RESPA, 12 U.S.C. § 2605(e)(B)(2)(A). Finally, with this letter,

Caliber provided a copy of a Caliber-prepared partial payment history that

documented various transfers of ownership of the loan which were not reflected by

either the recorded assignments or the endorsement chain on the Note. See Exhibit

"M."  Caliber never addressed Plaintiffs November 3, 2016 request for copies of

the Transfer of Ownership records.

120.   On November 21, 2016, Plaintiffs' representative sent another QWR

to Caliber.   Plaintiffs' representative reminded Caliber that it had still not

1   adequately responded to Plaintiffs' QWR of July 2016 as Caliber had not provided

2   the documentation needed to substantiate the nature and amount of the debt it

3   sought to collect, nor had they provided a full and complete assignment chain and

4   endorsement chain necessary to establish that LSF9 was in fact the true legal

5   owner of the loan.  This letter took issue with Caliber's repeatedly inconsistent

6   positions and Caliber's decision to recreate documents in an attempt to fix the

7   clearly demonstrated gaps in the chain of title.   It advised Caliber that Plaintiffs

8   believed that Elizabeth Willard's signature had been fabricated on one of the

9   endorsements and challenged the authenticity and validity of the endorsements

10  made by Resi and Caliber in connection with the loan.  Once again, Caliber was

11  admonished that it was acting in direct contravention of California law.  A copy of

12  this letter is attached hereto as Exhibit "CCC." Caliber did not timely acknowledge

13  this new QWR as required by 12 U.S.C. § 2605(e)(1)(A).

14      121.   On December 9, 2016, Caliber wrote again to Plaintiffs'

15  representative advising Plaintiffs that Caliber had no further information or

16  documentation to provide, that they believed that they had addressed all of

17  Plaintiffs' multiple concerns, and that Caliber had already fully performed their

18  duty of investigation.  A copy of this letter is attached as Exhibit "DDD."  As of

19  the point in time this letter was received, Caliber had never fully responded to

20  Plaintiffs' QWR as required under RESPA. Caliber still had not provided to

21  Plaintiffs copies of all assignments, the results of Caliber's complete title

22  examination or a full and complete copy of the payment history of the loan and a

23  detailed breakdown of the amounts claimed to be due under the loan.  Caliber was

24  in violation of 12 U.S.C. § 2605(e)(B)(2).

25      122.   On or about January 25, 2017, the Deed of Trust (but not the Note)

26  was assigned by Wilmington Trust as Trustee for the ALRP 2014-2 Master

27  Participation Trust to U.S. Bank, N.A. as Trustee for LSF9.  Plaintiffs received no

28  notice of this change of ownership from ALRP in violation of Section 131g of

1  TILA, 15 U.S.C. §1641g.  A copy of this Assignment is attached hereto as Exhibit

2  "EEE."

3      123.    On February 9, 2017, unbeknownst to Plaintiffs, a Notice of Default

4  and Election to Sell Under Deed of Trust, with a supporting Declaration of

5  Compliance was recorded by Caliber.  A copy of this NOD is attached hereto as

6  Exhibit "FFF." Included in the NOD was a statement by the Trustee's

7  representative attesting that the loan servicer of Plaintiffs loan, Caliber, had

8  fulfilled its obligations under California Civil Code § 2923.55, (the fulfillment of

9  which is a necessary predicate to being able to legally record a NOD in California)

10  by executing a Declaration of Compliance to the Notice of Default, which

11  Declaration was attached and recorded. A review of the Declaration of

12  Compliance reveals however that it was not executed by Caliber, the present loan

13  servicer, on behalf of the present purported owner of the loan, LSF9.  Rather, the

14  Declaration was executed back in August 2015 by Ocwen, a predecessor servicer,

15  on behalf of the ARLP trust. Further, this Declaration of Compliance was

16  regarding a former NOD recorded by Ocwen and subsequently rescinded. As such

17  both the Trustees attestation as well as the Declaration of Compliance attached to

18  the NOD were invalid, as they failed to comply with the provisions of California

19  Civil Code § 2923.55, and California Civil Code § 2924.17(a), rendering the NOD

20  void. The Notice of Default was not mailed until February 27, 2017.

21      124.    Pursuant to Paragraph 22 of the Deed of Trust, any foreclosure related

22  activity including the recording of a NOD can only be taken after the borrower has

23  been sent a Notice of Intent to Accelerate and the period of time for the borrower

24  to cure has expired.  Accordingly, the filing by Caliber of the NOD on the property

25  on February 9, 2017, prior to receipt of any Notice of Intent to Accelerate, was

26  premature and invalid under the terms of the Deed of Trust.

27      125.    On February 10, 2017, Plaintiffs' representative, unaware that the

28  NOD had been recorded, sent a new Qualified Written Request to Caliber. A copy

of this NOD is attached hereto as Exhibit "GGG."  He noted the history of their communications and reminded Caliber that (1) it still had not complied with the QWR's sent to Caliber beginning five (5) months before; (2) based on its previous contradictory responses Caliber could clearly not validate the accuracy of the debt allegedly owed which they were continuing to seek to collect upon; (3) there were new and additional issues and questions regarding the calculations of the monthly payment and the amortization rate used, additional inconsistencies in the monthly payments alleged as due, and concerns over Caliber's attempt to collect fees and late charges in the amount of $17,948.57 and $4,023.21, respectively, which the partial payment history provided by Caliber reflected as being waived; and (4) Caliber had not responded to Plaintiffs' concerns about the chain of title or endorsement issues related to the loan, including the possibility that documents had been forged and that it appeared from the Caliber supplied partial payment history that there were six (6) additional changes of ownership which occurred between April 12, 2013 and March 24, 2016 that were not reflected within the assignment chain or by endorsements on the Note.

126.   That same day Caliber acknowledged receipt of the communication from Plaintiffs' representative, promising to "perform the necessary research and respond within the time period required by law." A copy of this letter is attached as Exhibit "HHH."

127.   On February 24, 2017, Caliber wrote to Plaintiffs acknowledging receipt from them of communications informing Caliber that Plaintiffs were no longer represented by an attorney.  A copy of this letter is attached as Exhibit "III."  Plaintiffs sent no such letter or communication to Caliber.

128.   On March 1, 2017, Caliber sent Plaintiffs a Notice of Default and Intent to Accelerate the loan.  A copy of this Notice is attached hereto as Exhibit "JJJ."  Pursuant to Paragraph 22 of the Deed of Trust, this Notice must be sent to a borrower and the period of time to cure the breach must pass before any act related

1    to non-judicial foreclosure can be initiated, including the recording of a Notice of

2    Default.  Thus, the recording of the NOD in February 9, 2017 was invalid and

3    violated the terms of the Deed of Trust.

4        129.   Ironically, the Notice of Default and Intent to Accelerate also advised

5    Plaintiffs that they had the right to receive from Caliber copies of any assignments

6    of the borrower's mortgage or deed of trust as well as a copy of the borrower's

7    payment history since the time when the borrower was less than sixty (60) days

8    past due -- the very same documents that Plaintiffs had been requesting of Caliber

9    for over six (6) months and which Caliber had still never provided.  See Exhibit

10   "JJJ."

11       130.   On March 3, 2017, Caliber sent Plaintiffs' representative a letter in

12   response to his of February 10, 2017.  The response ignored the new issues raised

13   in Plaintiffs' February 10, 2017 QWR, and incorrectly advised Plaintiffs that

14   Caliber had "addressed all of your concerns in our previous correspondence, dated

15   November 10, 2016 and November 16, 2016".  A copy of this letter is attached as

16   Exhibit "KKK."  As of this point in time, Caliber had still not provided Plaintiffs

17   with copies of all assignments representing a full assignment chain, the results of

18   Caliber's complete title examination or a full and complete copy of the payment

19   history of the loan ad a detailed breakdown of the amounts claimed to be due

20   under the loan. Once again, the statutory time period in which Caliber was

21   obligated to respond pursuant to RESPA has expired.

22       131.   As of the date of the filing of this Complaint, Caliber had still not

23   provided Plaintiffs with copies of all assignments representing a full assignment

24   chain, the results of Caliber's complete title examination; and a full and complete

25   copy of the payment history of the loan and a detailed breakdown of the amounts

26   claimed to be due under the loan, all as required under RESPA, 12 U.S.C. §

27   2605(e)(B)(2). Nor have they responded to Plaintiffs' questions on the loan,

28   explained or corrected financial discrepancies in its billing or statements and

accounting, or provided Plaintiffs with copies of the Transfer of Ownership Notices required under TILA.

132. As of the time of the filing of this Complaint, the Notice of Default on Gigi's property remains part of the public record, a Notice of Trustee's Sale issued on May 16, 2017 and a trustee's sale of the home has now been set for June 16, 2017. A copy of the Notice of Trustee's Sale is attached as Exhibit "LLL."

**FIRST CLAIM FOR RELIEF**

(Violation of the California Homeowner Bill of Rights,

Cal. Civ. Code § 2920 et seq.)

(By Plaintiffs Against Defendants Caliber, US Bank, LSF9, Zieve and

Certain Doe Defendants)

133. Plaintiffs incorporate all preceding and succeeding allegations by reference as if fully set forth herein.

134. Plaintiffs bring this action pursuant to the California Homeowner Bill of Rights, California Civil Code Section 2920.5 et seq. (the "HBOR").

135. Plaintiffs are "borrowers" as that term is defined by the HBOR.

136. Section 2924(a)(6) of the California Civil Code provides that no entity shall record or cause a notice of default to be recorded unless "it is the holder of the beneficial interest under the mortgage or deed of trust, the original trustee or the substituted trustee under the deed of trust, or the designated agent of the holder of the beneficial interest." The Section further provides that "No agent of the holder of the beneficial interest under the mortgage or deed of trust, original trustee or substituted trustee under the deed of trust may record a notice of default or otherwise commence the foreclosure process except when acting within the scope of authority designated by the holder of the beneficial interest."

137. Section 2924.17(a) of the California Civil Code mandates "A declaration recorded pursuant to Section 2923.5 or, until January 1, 2018, pursuant to Section 2923.55, a notice of default, notice of sale, assignment of a deed of

1   trust, or substitution of trustee recorded by or on behalf of a mortgage servicer in

2   connection with a foreclosure subject to the requirements of Section 2924, or a

3   declaration or affidavit filed in any court relative to a foreclosure proceeding shall

4   be accurate and complete and supported by competent and reliable evidence."

5   138.   Section 2924.17(b) of the California Civil Code provides that "Before

6   recording or filing any of the documents described in subdivision (a), a mortgage

7   servicer shall ensure that it has reviewed competent and reliable evidence to

8   substantiate the borrower's default and the right to foreclose, including the

9   borrower's loan status and loan information."

10   139.   Section 2923.55 of the California Civil Code provides in pertinent

11   part that a mortgage servicer, mortgagee, trustee, beneficiary, or authorized agent

12   may **not** record a notice of default pursuant to Section 2924 until thirty (30) days

13   after contact is made with the borrower to assess the borrower's financial

14   condition and explore options for the borrower to avoid foreclosure or thirty (30)

15   days after satisfying the due diligence requirement with regard to contacting or

16   attempting to contact the borrower.   In addition, before recording a notice of

17   default, the mortgage servicer must also notify the borrower that they may request

18   a copy of the promissory note, the deed of trust, all assignments of the deed of

19   trust and a copy of the payment history on the loan.

20   140.   As alleged in detail above, Defendants' actions are contrary to the

21   provisions and requirements of the HBOR. In addition to their own admissions

22   regarding the absence of competent and reliable evidence, a simple review of the

23   assignment chain, the endorsement chain, the payment history, the prior recorded

24   and rescinded notices of default, the loan file received from the predecessor

25   servicer (Ocwen), correspondence received from Plaintiffs, and even a basic

26   comparison of signatures on said documents would have revealed significant gaps

27   in the assignment chain and the endorsement chain as well as signature

28   irregularities on necessary title documents such that Defendants lacked competent

and reliable evidence demonstrating that they had  the right, power or authority to record notices of default or otherwise commence foreclosure proceedings on Plaintiffs property.

141.    Defendants, prior to taking the foreclosure related actions herein alleged, did not ensure, as required by statute, that they had reviewed competent and reliable evidence substantiating their legal authority to record, either themselves or as the beneficiary's agent, the Notice of Default.  Indeed, at the time the NOD was recorded and the Notice of Trustee's Sale issued, in addition to the foregoing failures, Defendants also knew or from a review of competent and reliable evidence should have known, that the NOD was recorded despite the failure to first provide Plaintiffs with the required Notice of Default and Intent to Accelerate and the requisite time to cure the alleged default as required by the DOT.

142.    In addition, as part of the NOD recorded on February 9, 2017, Michael Busby, the purported representative for the Trustee defendant Zieve, attested that "The loan servicer has fulfilled its obligations under either California Civil Code section 2923.5 or 2923.55 (as applicable). Please see Declaration of Compliance attached hereto."  A copy of the Trustee's attestation is attached as Exhibit "FFF."

143.    A review of the Declaration of Compliance attached to the NOD reveals that it was neither accurate nor complete.  First, it was not executed by Caliber, the then loan servicer, on behalf of the then purported owner of the loan, LSF9.  Instead, the declaration was executed back in August 2015 by Ocwen, the predecessor servicer to Caliber, and was executed not on behalf of LSF9, but on behalf of another entity altogether, the ARLP trust. Exhibit "FFF." Second, this declaration was executed in connection with and as support for a wholly separate and prior NOD that was recorded by and subsequently rescinded by Ocwen. The recording of the present NOD by Caliber was required to be accurate and

1  complete, and supported by competent and reliable evidence. Caliber also had to

2  comply with the provisions contained within Civil Code section 2923.55. They did

3  neither.

4      144.   Caliber and LSF9 cannot support the current NOD with an almost

5  two (2) year old declaration executed by a different servicing entity on behalf of a

6  different purported owner.  Nor can Caliber and LSF9 support the current NOD

7  with an almost two (2) year old declaration that supported a now rescinded NOD.

8  There is also no basis for defendant Zieve's attestation or any possible way that

9  either they as Trustee or the loan servicer, Caliber, fulfilled their obligations under

10  Civil Code § 2923.55, and Civil Code Section 2924.17.  For these reasons the

11  recording of the NOD by Caliber on behalf of LSF9 was on its face void and

12  invalid. Despite these serial and material HBOR violations, and despite the lack of

13  competent and reliable evidence, Defendants nevertheless proceeded to record the

14  NOD.

15      145.   Although required to do so prior to recording a notice of default,

16  Caliber failed to provide Plaintiffs with notice of their right to request a copy of

17  the promissory note, the deed of trust, all assignments of the deed of trust and a

18  copy of the payment history on the loan.  Nor did Caliber attempt to contact the

19  Plaintiffs to assess their financial condition as required to be attested to in the

20  Declaration in support of the NOD.

21      146.   Defendants' actions as alleged herein constitute material violations of

22  the HBOR and were carried out by Defendants intentionally, recklessly or were

23  the result of willful misconduct by Defendants.  Defendants admitted that there

24  were gaps in the chain of title and were aware that there was a myriad of other

25  problems which made were at odds with the requirement that they have competent

26  and reliable evidence.  Additionally, had Defendants reviewed competent and

27  reliable evidence before recording the NOD and issuing the Notice of Trustee's

28  Sale, they would have seen the errors and irregularities in the documents and

1   ownership and would have recognized they did not have the legal right or standing

2   to take the actions they took. They would have also realized that they had not

3   complied with the provisions of Civil Code section 2923.55 and accordingly

4   lacked the ability to record the NOD or issue the Notice of Trustee's Sale.

5        147.   Plaintiffs have suffered actual economic damages as a direct and

6   proximate result of Defendants' misconduct.  Accordingly, Plaintiffs are entitled to

7   all relief provided by the HBOR, including attorneys' fees. See Cal. Civ. Code §

8   2924.12(I).  In addition, Plaintiffs are entitled to injunctive relief pursuant to

9   Section 2924.12(a)(2), with said injunction remaining in place until such time as

10  the defendants have corrected and remedied the various violations of the HBOR as

11  set forth herein.

12              **SECOND CLAIM FOR RELIEF**

13        (Violation of Rosenthal Fair Debt Collection Practices Act)

14   (By Plaintiffs Against Defendants Caliber, US Bank, LSF9 and Certain Doe

15                      Defendants)

16        148.   Plaintiffs incorporate all preceding and succeeding allegations by

17  reference as if fully set forth herein.

18        149.   California's Rosenthal Fair Debt Collection Practices Act ("Rosenthal

19  Act") prohibits creditors and debt collectors from, among other things, making

20  false, deceptive, or misleading representations in an effort to collect a debt. Cal.

21  Civ. Code Section 1788, et seq.

22        150.   Plaintiffs are "debtor[s]" as that term is defined by California Civil

23  Code Section 1788.2(h).  Under the Rosenthal Act, a "debt collector" is defined as

24  "any person who, in the ordinary course of business, regularly, on behalf of

25  himself or herself or others, engages in debt collection." *Id.* at § 1788.2(c).

26  Defendants are "debt collectors" as that term is defined in California Civil Code

27  Section 1788.2(c) because they regularly sent or directed to be sent mortgage bills,

28

communications and other notices seeking to collect money from Plaintiffs and acted as the servicer(s) of Plaintiffs mortgage loan.

151.   California Civil Code Section 1788.17 provides that "every debt collector collecting or attempting to collect a consumer debt shall comply with the provisions of Sections 1692b to 1692j, inclusive, of, and shall be subject to the remedies in Section 1692k of, Title 15 of the United States Code."  Cal. Civ. Code § 1788.17.  Thus, the Rosenthal Act incorporates the provisions of the federal Fair Debt Collection Practices Act (hereinafter "FDCPA") and a plaintiff may state a claim for violation of the Rosenthal Act by showing that a defendant violated any of several provisions of the FDCPA.

152.   Section 1692e of the FDCPA provides that a debt collector may not use any "false, deceptive, or misleading representation or means in connection with the collection of any debt including: (2) The false representation of (A) the character, amount or legal status of any debt…." 15 U.S.C. § 1692e(2)(A). Section 1692e(10) further provides that "[t]he use of any false representation or deceptive means to collect or attempt to collect any debt..." is conduct in violation of that Section. *Id.* at § 1692e(10).

153.   On information and belief, and as alleged herein, Defendants knew or had reason to know that documents and information, including but not limited to the assignments of the deed of trust and endorsements of the Promissory Note, were not valid to establish their legal right to collect payments from Plaintiffs.

154.   Defendants, by their own admission, also knew: a) that there were discrepancies between the amounts stated as due in their debt validation letters and the monthly mortgage statements sent to Plaintiffs; and b) that there were discrepancies in the amounts they were seeking to collect based on alleged fees and costs that had been waived according to their own payment history. Consequently, Caliber knew that it clearly lacked the ability to accurately know and thus validate the nature and true amount of the alleged debt owed by Plaintiffs.

155.   Without the ability to establish their legal right to collect payments, or to validate the nature and true amount of the debt allegedly owed by Plaintiffs, Defendants have engaged in debt collection activities in violation of the Rosenthal Act, California Civil Code Section 1788.10 et seq., and by implication, the FDCPA, by, among other things:  (a) misstating the character, amount or legal status of the debt they collected or sought to collect from Plaintiffs; (b) threatening to take or taking action (filing a Notice of Default to initiate non judicial foreclosure) that cannot be legally taken given their inability to establish their authority to do so; and (c) using false representations or deceptive means (representing they had standing to take the actions they were taking when the rights they seek to enforce were not assigned to them) to collect or attempt to collect the debt from Plaintiffs.

156.   As alleged herein Defendants also falsely represented the character and amount of debts to the Plaintiffs and used false representations or deceptive means to collect or attempt to collect those debts in that they could not demonstrate that they had the legal right to collect any debt on behalf of the purported owner of the underlying Note or Deed of Trust, nor could they validate and confirm the accuracy of the debt amounts allegedly owed.

157.   Plaintiffs reasonably relied at the time on Defendants' representations of the character, amount, and validity of the debt allegedly owed and the Defendants' authority to act in the capacity of debt collectors on behalf of the legal owner of the Promissory Note.

158.   Defendants' acts as described above were done willfully and knowingly within the meaning of California Civil Code Section 1788.30(b).  As alleged herein, Defendants knew they did not have the documentation necessary and required to establish their right to collect payments from Plaintiffs, to initiate foreclosure on the Property, or to validate the nature and amount of the debt allegedly owed, yet they continued to do so as though they did.

159.    The payments demanded by Defendants on the mortgage purportedly owed by Plaintiffs are "debt[s]" within the meaning of California Civil Code Section 1788.2(d), because they are "money, property or their equivalent which [are] due or owing or alleged to be due or owing from a natural person to another person."

160.    As a result of Defendants' actions herein, Plaintiffs have been damaged and Plaintiffs seek all available relief under the California Rosenthal Fair Debt Collection Practices Act.  Pursuant to California Civil Code Section 1788.17, Plaintiffs are entitled to recover actual damages sustained because of Defendants' violations of the Rosenthal Act, which incorporates the FDCPA.  Such damages include, without limitation, monetary losses and damages.  Additionally, because Defendants' violations of the Rosenthal Act were committed willingly and knowingly, Plaintiffs are entitled to recover statutory damages in the amount of $1,000 for each violation.  See Cal. Civ. Code § 1788.17 and 15 U.S.C. 1692k(a)-(c).

161.    Pursuant to California Civil Code Section 1788.17 and Section 1629k of Title 15 of the United States Code, Plaintiffs are entitled to recover all attorneys' fees, costs, and expenses incurred in the bringing of this action.

**THIRD CLAIM FOR RELIEF**

(Violation of Rosenthal Fair Debt Collection Practices Act)

(By Plaintiffs Against Defendants Ocwen, Resi, Altisource, Wilmington Trust, ARLP and Certain Doe Defendants)

162.    Plaintiffs incorporate all preceding and succeeding allegations by reference as if fully set forth herein.

163.    California's Rosenthal Fair Debt Collection Practices Act ("Rosenthal Act") prohibits creditors and debt collectors from, among other things, making false, deceptive, or misleading representations in an effort to collect a debt. Cal. Civ. Code Section 1788, et seq.

164.   Plaintiffs are "debtor[s]" as that term is defined by California Civil Code Section 1788.2(h).  Under the Rosenthal Act, a "debt collector" is defined as "any person who, in the ordinary course of business, regularly, on behalf of himself or herself or others, engages in debt collection."  *Id.* at § 1788.2(c). Defendants are "debt collectors" as that term is defined in California Civil Code Section 1788.2(c) because they regularly sent or directed to be sent mortgage bills, communications and other notices seeking to collect money from Plaintiffs and acted as the servicer(s) of Plaintiffs mortgage loan.

165.   California Civil Code Section 1788.17 provides that "every debt collector collecting or attempting to collect a consumer debt shall comply with the provisions of Sections 1692b to 1692j, inclusive, of, and shall be subject to the remedies in Section 1692k of, Title 15 of the United States Code."  Cal. Civ. Code § 1788.17.  Thus, the Rosenthal Act incorporates the provisions of the federal Fair Debt Collection Practices Act (hereinafter "FDCPA") and a plaintiff may state a claim for violation of the Rosenthal Act by showing that a defendant violated any of several provisions of the FDCPA.

166.   Section 1692e of the FDCPA provides that a debt collector may not use any "false, deceptive, or misleading representation or means in connection with the collection of any debt including: (2) The false representation of (A) the character, amount or legal status of any debt…." 15 U.S.C. § 1692e(2)(A). Section 1692e(10) further provides that "[t]he use of any false representation or deceptive means to collect or attempt to collect any debt..." is conduct in violation of that Section. *Id.* at § 1692e(10).

167.   On information and belief, and as alleged herein, Defendants knew or had reason to know that documents and information, including but not limited to the assignments of the deed of trust and endorsements of the Promissory Note, were not valid to establish their legal right to collect payments from Plaintiffs.

168.   On information and belief, and as alleged herein they further knew or should have known that Plaintiffs loan was an interest only loan for the first ten (10) years of its term.  Yet, despite knowing this, Defendants repeatedly and consistently sent monthly mortgage statements to Plaintiffs seeking to collect payments consisting of principal and interest as if a principal payment was required. This not only contradicted by the express terms of the Promissory Note, but also rendered the accounting on the loan fatally flawed and inaccurate as it did not correctly reflect the true amount due under the loan. Considering this, every mortgage statement, every debt validation letter and every escrow analysis sent by Ocwen to Plaintiffs during the time period when Ocwen was servicing the debt was materially inaccurate and incorrect. Ocwen accordingly lacked the ability to accurately know and thus validate the nature and true amount of the alleged debt owed by Plaintiffs.

169.   Without the ability to establish their legal right to collect payments, or to validate the nature and true amount of the debt allegedly owed by Plaintiffs, Defendants have engaged in debt collection activities in violation of the Rosenthal Act, California Civil Code Section 1788.10 et seq., and by implication, the FDCPA, by, among other things:  (a) misstating the character, amount or legal status of the debt they collected or sought to collect from Plaintiffs; (b) threatening to take or taking action (filing a Notice of Default to initiate non judicial foreclosure) that cannot be legally taken given their inability to establish their authority to do so; and (c) using false representations or deceptive means (representing they had standing to take the actions they were taking when the rights they seek to enforce were not assigned to them) to collect or attempt to collect the debt from Plaintiffs.

170.   As alleged herein, Defendants also falsely represented the character and amount of debts to the Plaintiffs and used false representations or deceptive means to collect or attempt to collect those debts in that they could not

1    demonstrate that they had the legal right to collect any debt on behalf of the

2    purported owner of the underlying Note or Deed of Trust. Nor could they validate

3    and confirm the accuracy of the debt amounts allegedly owed.

4        171.   Plaintiffs reasonably relied at the time on Defendants' representations

5    of the character, amount, and validity of the debt allegedly owed and the

6    Defendants' authority to service the debt and collect payments on behalf of the

7    legal owner of the Promissory Note.

8        172.   Defendants' acts as described above were done willfully and

9    knowingly within the meaning of California Civil Code Section 1788.30(b). As

10   alleged herein, Defendants knew they did not have the documentation necessary

11   and required to establish their right to collect payments from Plaintiffs, to initiate

12   foreclosure on the Property, or to validate the nature and amount of the debt

13   allegedly owed, yet they continued to do so as though they did.

14       173.   The payments demanded by Defendants on the mortgage purportedly

15   owed by Plaintiffs are "debt[s]" within the meaning of California Civil Code

16   Section 1788.2(d), because they are "money, property or their equivalent which

17   [are] due or owing or alleged to be due or owing from a natural person to another

18   person."

19       174.   As a result of Defendants' actions herein, Plaintiffs have been

20   damaged and Plaintiffs seek all available relief under the California Rosenthal Fair

21   Debt Collection Practices Act. Pursuant to California Civil Code Section 1788.17,

22   Plaintiffs are entitled to recover actual damages sustained because of Defendants'

23   violations of the Rosenthal Act, which incorporates the FDCPA. Such damages

24   include, without limitation, monetary losses and damages. Additionally, because

25   Defendants' violations of the Rosenthal Act were committed willingly and

26   knowingly, Plaintiffs are entitled to recover statutory damages in the amount of

27   $1,000 for each violation. See Cal. Civ. Code § 1788.17 and 15 U.S.C. 1692k(a)-

28   (c).

175.   Pursuant to California Civil Code Section 1788.17 and Section 1629k of Title 15 of the United States Code, Plaintiffs are also entitled to recover all attorneys' fees, costs, and expenses incurred in the bringing of this action.

## FOURTH CLAIM FOR RELIEF

(Slander of Title)

(By Gigi Against Ocwen, Wilmington Trust, ARLP and Certain Doe Defendants)

176.   Plaintiffs incorporate all preceding and succeeding allegations by reference as if fully set forth herein.

177.   Gigi is the holder of title to the Property and has held title thereto since receiving it by way of quitclaim deed in September 2008.

178.   Defendants Ocwen, Wilmington and ARLP harmed Gigi by taking actions that cast doubt about Gigi's ownership of the real property.  More specifically, Defendants first created false and misleading chain of title documents including Note endorsements and assignments of the DOT which they recorded in an attempt to substantiate their ownership of the loan. Next, based on these documents, they caused to be recorded as part of the public record a NOD with respect to Gigi's Property and did so even though they lacked competent and reliable evidence upon which to do so and even though Gigi is not a borrower under the Promissory Note.  The NOD also does not state the proper amount allegedly due or identify the true owner of the note and, as such, the NOD, in addition to being baseless, contains false and misleading information.

179.   These actions by these defendants were not privileged, but were malicious and taken with knowledge of or with reckless disregard for the truth as to whether or not they had an interest in the property or for whether the information they were making part of the public record was true or false, accurate or misleading.  Indeed, Defendants were on notice of the fact that the chain of title

on the property was seriously and substantially deficient such that they could not establish ownership of the loan or any rights therein.  Defendants acknowledged and admitted to creating these suspect documents years after the fact in an attempt to back-fill the chain of title in an attempt to secure the property to which they had no legitimate claim.

180.   Defendants knew or should have known or recognized that others might act in reliance upon the NOD they caused to be recorded in the public record and that this could result in actual harm or financial loss to Gigi, including but not limited to her having to incur attorneys' fees and costs to address the NOD, which has already happened.  Indeed, Gigi received both written and verbal inquiries regarding the Property wherein the person making the contact references the recorded NOD.

181.   Defendants' conduct was a substantial factor in causing Gigi's harm.

**FIFTH CLAIM FOR RELIEF**

(Slander of Title)

(By Gigi Against Caliber, US Bank, LSF9, Zieve and Certain Doe Defendants)

182.   Plaintiffs incorporate all preceding and succeeding allegations by reference as if fully set forth herein.

183.   Gigi is the holder of title to the Property and has held title thereto since receiving it by way of quitclaim deed in September 2008.

184.   Defendants Caliber, US Bank, Zieve and LSF9 harmed Gigi by taking actions that cast doubt about Gigi's ownership of the real property.  More specifically, Defendants Caliber, U.S. Bank and LSF9 first created false and misleading chain of title documents including assignments of the DOT, which they recorded, in an attempt to substantiate their ownership of the loan. Next, based on these documents, they, with the assistance of Defendant Zieve who improperly attested to their compliance with Civil Code 2923.55, caused to be recorded as part of the public record a NOD with respect to Gigi's Property and issued a Notice of

Trustee's Sale even though they lacked competent and reliable evidence upon which to do so and even though Gigi is not a borrower under the Promissory Note. The NOD and Notice of Trustee's Sale also do not state the proper amount allegedly due or identify the true owner of the note and, as such, the NOD and the Notice of Trustee's Sale, in addition to be baseless, contain false and misleading information.

185.   These actions by these defendants were not privileged, but were malicious and taken with knowledge of or with reckless disregard for the truth as to whether or not they had an interest in the property or whether the information they were making part of the public record was true or false, accurate or misleading.  Indeed, Defendants were on notice of the fact that the chain of title on the property was seriously and substantially deficient such that they could not establish ownership of the loan or any rights therein.  Defendants acknowledged and admitted to creating these suspect documents years after the fact in an attempt to back-fill the chain of title in an attempt to secure the property to which they had no legitimate claim.

186.   Defendants knew or should have known or recognized that others might act in reliance upon the NOD and the Notice of Trustee's Sale they issued and caused to be recorded in the public record and that this could result in actual harm or financial loss to Gigi, including but not limited to her having to incur attorneys' fees and costs to address the NOD and Notice of Trustee's Sale, which has already happened.  Indeed, Gigi has received both written and verbal inquiries regarding the Property wherein the person making the contact references the recorded NOD.

187.   Defendants' conduct was a substantial factor in causing Gigi's harm.

## SIXTH CLAIM FOR RELIEF

### (Negligence)

(By Plaintiffs Against Caliber, US Bank, LSF9, Zieve and Certain Doe Defendants)

188.   Plaintiffs incorporate all preceding and succeeding allegations by reference as if fully set forth herein.

189.   On Plaintiffs' information and belief, Caliber was servicing the mortgage loan at the request of and at the direction of US Bank and LSF9, and was instructed by them to seek to collect payments on the mortgage loan from Plaintiffs as well as to initiate non-judicial foreclosure on their behalf. On Plaintiffs further information and belief Zieve was acting as the foreclosure trustee on behalf of LSF9 and instructed by them to execute the attestation contained in the NOD.

190.   Section 2924(a)(6) of the California Civil Code provides that no entity shall record or cause a notice of default to be recorded unless "it is the holder of the beneficial interest under the mortgage or deed of trust, the original trustee or the substituted trustee under the deed of trust, or the designated agent of the holder of the beneficial interest."  The Section further provides that "No agent of the holder of the beneficial interest under the mortgage or deed of trust, original trustee or substituted trustee under the deed of trust may record a notice of default or otherwise commence the foreclosure process except when acting within the scope of authority designated by the holder of the beneficial interest."

191.   Section 2924.17(a) of the California Civil Code provides that "A declaration recorded pursuant to Section 2923.5 or, until January 1, 2018, pursuant to Section 2923.55, a notice of default, notice of sale, assignment of a deed of trust, or substitution of trustee recorded by or on behalf of a mortgage servicer in connection with a foreclosure subject to the requirements of Section 2924, or a declaration or affidavit filed in any court relative to a foreclosure proceeding shall be accurate and complete and supported by competent and reliable evidence."

192.   Section 2924.17(b) of the California Civil Code provides that "Before recording or filing any of the documents described in subdivision (a), a mortgage servicer shall ensure that it has reviewed competent and reliable evidence to substantiate the borrower's default and the right to foreclose, including the borrower's loan status and loan information."

193.   Thus, according to California statute, Caliber had a duty to exercise reasonable care to ensure that prior to recording the DOT it had reviewed competent and reliable evidence substantiating the alleged default and the right to foreclose, as well as LSF9's legal ownership of the loan and its ability to direct Caliber to initiate non-judicial foreclosure proceedings.

194.   Caliber breached this duty as alleged herein by failing to review competent and reliable evidence as to LSF9's ownership of the loan and their ability to initiate a non-judicial foreclosure on the property. Had it done so, Caliber would have realized that there were serious deficiencies in the chain of title of the Note and DOT, gaps they themselves acknowledged existed, thus calling the legal ownership of the loan into question as well as their ability to institute a non-judicial foreclosure on behalf of LSF9. This breach of duty was compounded by Caliber's proceeding to create documents out of whole cloth years after the fact in an attempt to fill the gaps in the chain of title.

195.   Further, also according to California statute, Zieve had a duty to exercise reasonable care to ensure that prior to executing the attestation in the NOD they reviewed competent and reliable evidence substantiating the accuracy and completeness of the NOD and the Declaration of Compliance.

196.   Zieve breached its duty as alleged herein by failing to review competent and reliable evidence as to accuracy and completeness of the NOD, including the Declaration of Compliance. Had they done so Zieve would have realized that the Declaration of Compliance was executed not by Caliber, but a

1  year and half earlier by Ocwen, a totally different party and not the current

2  servicer of the loan.

3      197.   Defendants were also under a duty to comply with the requirements

4  of Section 2923.55.  However, Defendants Caliber, US Bank, LSF9 and Zieve

5  instead short cut the process and the protections Section 2923.55 is intended to

6  provide by recording on February 9, 2017, a Notice of Default and Intent to

7  Accelerate which was supported by a Declaration of Compliance (the accuracy of

8  which Zieve attested to as required by Civil Code § 2924.17(a)) that was not

9  executed by Caliber (the present loan servicer) on behalf of the present purported

10  owner of the loan (LSF9), but instead the Declaration was executed back in

11  August 2015 by Ocwen (a predecessor servicer) on behalf of the ARLP trust (the

12  alleged predecessor owner of the loan). Making matters worse, this Declaration

13  was executed in support of a prior NOD recorded by Ocwen which was

14  subsequently rescinded. As such the attestation signed by defendant Zieve as well

15  as the Declaration of Compliance attached to the NOD were invalid, as they failed

16  to comply with the provisions of California Civil Code § 2923.55, and California

17  Civil Code § 2924.17(a), rendering the NOD void.

18      198.   On November 1, 2016, Caliber sent a letter to Plaintiffs

19  acknowledging that they had in fact received a Qualified Written Request for

20  information regarding the loan from Plaintiffs' representative.  Having received

21  such a QWR, Caliber was under a duty and legal obligation to respond both timely

22  and completely to the request.  Caliber responded, but rather than providing clear

23  proof of the loan being owned by the LSF9 Trust and clearly establishing their

24  legal ability to cause a Notice of Default to be filed on the loan, it provided

25  "completed" Note endorsements and allonges which on their face raised even

26  more concerns over the chain of title.

27      199.   A review of the "endorsements" reveals that the same person,

28  Elizabeth Willard (who also was a signatory to the November 12, 2010 assignment

1    transferring the loan from MTGLQ to Resi) executed two of the endorsements

2    Caliber relied upon.  Her signature first appears on an undated allonge where she

3    supposedly endorsed a transfer of the Note from MTGLQ to Resi.  Her signature

4    appears again on the bottom of the Note itself, supposedly endorsing the Note

5    from CitiMortgage to MTGLQ.  This signature was also undated.

6        200.    Certain problems are presented by these documents.  The first is that

7    Elizabeth Willard's signatures on these two supposed endorsements do not match.

8    While her signature on the November 12, 2010 assignment matches her signature

9    on the endorsement from MTGLQ to Resi, it clearly does not match her signature

10   on the endorsement from CitiMortgage to MTGLQ.  This is most curious and

11   raises an inference that one of these signatures was affixed by someone other than

12   Ms. Willard.  The second problem is that based on the recorded assignments, the

13   endorsement from MTGLQ to Resi which is reflected on the allonge, had to occur

14   prior to the alleged endorsement from CitiMortgage to MTGLQ.  This raises the

15   question of how the endorsement from CitiMortgage to MTGLQ appears on the

16   bottom of the Note as opposed to on a subsequent allonge after the endorsement to

17   Resi.  The only thing that makes sense is that in their haste to provide an

18   endorsement chain that might support Caliber's stated position as to the ownership

19   of the loan, whoever was recreating the documents got the order wrong.

20       201.    In addition, the supposed endorsement chain provided by Caliber has

21   gaps in the chain of endorsements, lacking endorsements from certain necessary

22   parties in order to establish that the LSF9 trust is in fact the legal owner of the

23   loan.  For instance, there is no endorsement from MTGLQ to Invesco, there is no

24   endorsement from Invesco to Altisource and there is no endorsement from

25   Altisource to ALRP. Nor, if Resi was the owner of the loan as reflected in the

26   Assignment chain, is there any endorsement from Resi to either Invesco or

27   Altisource, or from Altisource to the ARLP 2014-2 trust.  It is impossible to

28   establish from the documents provided and relied upon by Caliber that the LSF9

Master Participation Trust is, in fact, the legal owner of the loan and thus has the legal authority to seek to collect under the Note or to enforce its terms via the initiation of non-judicial foreclosure.

202.   Caliber was put on notice of the material problems with the endorsements, but Caliber ignored these substantial issues and went ahead and recorded an NOD with the Orange County Recorder's Office on February 9, 2017, doing so, upon information and belief, without examining the endorsements which would have revealed the material problems with the chain of title that precluded such a recording.  Caliber then compounded this wrongful behavior by issuing a Notice of Trustee's Sale on May 16, 2017 setting a sale date of June 16, 2017.

203.   On Plaintiffs' information and belief, US Bank and LSF9 were aware that there were serious deficiencies in the chain of title of the Note and DOT, calling their ownership of the loan into question as well as their ability to allow Caliber to initiate a non-judicial foreclosure on their behalf. On Plaintiffs' further information and belief, US Bank and LSF9 were also aware that Caliber intended to and had created and recorded after-the-fact assignments in an attempt to correct these title deficiencies. Despite having such knowledge, US Bank and LSF9 failed to properly supervise Caliber and allowed them to negligently proceed as alleged herein.

204.   Additionally, Caliber had a duty to exercise reasonable care to ensure that they did not use any "false, deceptive, or misleading representation or means in connection with the collection of any debt including: (2) The false representation of (A) the character, amount or legal status of any debt…." 15 U.S.C. § 1692e(2)(A).

205.   On information and belief, and as alleged herein, Caliber knew or had reason to know that documents and information, including but not limited to the assignments of the deed of trust and endorsements of the Promissory Note, were

not valid to establish their legal right to collect payments from Plaintiffs on behalf of LSF9.

206.   Caliber, by its own admission, also knew that they did not possess a full, complete, and accurate payment history of the loan from its inception and also that there were errors and discrepancies in their debt validation letters as well as monthly statements sent to Plaintiffs. They also knew that there were discrepancies between the amounts they asserted were owed by Plaintiffs and the same amounts being reflected as waived in their payment history of the loan. Additionally, they were aware that the information on the amounts allegedly due which was obtained from Ocwen was inaccurate as they were based on amortization tables which included principal payments during the first ten (10) years of the loan when the terms of the loan were interest only for that period. Accordingly, Caliber lacked the ability to accurately know or determine and thus validate the nature and true amount of the alleged debt owed by Plaintiffs.

207.   Caliber breached its duty as alleged herein by failing to ensure that LSF9 had the legal right to collect payments from Plaintiffs, and that it could validate the nature and true amount of the debt allegedly owed by Plaintiffs, prior to attempting to collect the debt as evidenced by the mortgage loan.

208.   On Plaintiffs' information and belief, US Bank and LSF9 had actual or constructive knowledge of Caliber's actions as described herein and their inability to validate the nature and amount of the debt and that based on this their attempts to collect these sums from the Plaintiff were improper and illegal. Despite having such knowledge, US Bank and LSF9 failed to properly supervise Caliber and allowed them to negligently proceed as alleged herein.

209.   As a direct and proximate result of the actions herein alleged Plaintiffs have suffered and continued to suffer damage and injury in an amount and of a degree subject to proof.

**SEVENTH CLAIM FOR RELIEF**

(Quiet Title)

(By Gigi Against All Defendants and All Persons Unknown, Claiming Any Legal or Equitable Right, Title, Estate, Lien, or Interest in the Property Described in the Complaint Adverse to Plaintiff's Title, Or Any Cloud on Plaintiff's Title Thereto and Certain Doe Defendants)

210.   Plaintiffs incorporate all preceding and succeeding allegations by reference as if fully set forth herein.

211.   Gigi isthe legal owner of the Property which has the following legal description:

PARCEL 1:
LOT 45 OF TRACT NO. 8384, IN THE CITY OF LAKE FOREST, COUNTY OF ORANGE, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 390, PAGES 11 TO 13 INCLUSIVE OF MISCELLANEOUS MAPS IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

PARCEL 2:
AN UNDIVIDED 1/55TH INTEREST IN LOT AA THROUGH QQ INCLUSIVE OF SAID TRACT NO. 8384.  EXCEPT THEREFROM FROM ALL OIL, GAS, MINERALS AND OTHER HYDROCARBON SUBSTANCES LYING BELOW A DEPTH OF 500 FEET FROM THE SURFACE OF SAID LAND, BUT WITH NO RIGHT OF SURFACE ENTRY AS PROVIDED IN DEEDS OF RECORD.

(together, the "Property").

212.   Gigi seeks to quiet title against the claims of all Defendants and ALL PERSONS UNKNOWN, CLAIMING ANY LEGAL OR EQUITABLE RIGHT, TITLE, ESTATE, LIEN, OR INTEREST IN THE PROPERTY DESCRIBED IN THE COMPLAINT ADVERSE TO PLAINTIFF'S TITLE, OR ANY CLOUD ON PLAINTIFF'S TITLE THERETO; and Certain Doe Defendants (collectively referred to herein as the "Title Defendants") as the Title Defendants hold themselves out as entitled to fee simple ownership of the Property.  In fact, the Title Defendants have no right to title or interest in the Property and no right to

entertain any rights of ownership including the right to foreclosure, offering the Property for sale at a trustee's sale, demanding possession or filing cases for unlawful detainer.  Nevertheless, it appears by having recorded a Notice of Default and issuing the Notice of Trustee's Sale setting a sale date of June 16, 2017 that the Title Defendants intend to proceed with a non-judicial foreclosure sale illegally and with unclean hands.

213.    Gigi seeks to quiet title as of the date of the recording of the Quitclaim deed to her from Robert, which is believed to be on or about September 23, 2008, because the subsequent assignments and transfer of the DOT were fraudulent, void, ineffective and without proper legal basis.  Gigi seeks a judicial declaration that the title to the Property is vested in Gigi alone and that the Title Defendants and each of them be declared to have no interest estate, right, title or interest in the subject property and that the Title Defendants, their agents and assigns, be forever enjoined from asserting any estate, right title or interest in the Property adverse to Gigi' rights.

214.    Gigi is not required to tender any sums allegedly in default by Robert under the terms of the original Promissory Note encumbering the property to any of the defendants named in this cause of action because: a) it would be inequitable to require tender, especially in light of the defendants' inability to substantiate their beneficial ownership of the loan, their inability to confirm and validate the amount of the alleged debt owed, and their alleged fraudulent endorsements of the Promissory Note; b) she is not the borrower or obligee under the Promissory Note; c)  she is not in default under the Promissory Note; d) the assignments of the DOT are void, not merely voidable, as a result of intrinsic fraud in their creation and utilization, thus obviating the need for any tender by Gigi as a tender would constitute an affirmation thereof; and e) Gigi's damage claim acts as a set-off.

## EIGHTH CLAIM FOR RELIEF

(To set aside and rescind the Notice of Default and Notice of Trustee's Sale)

(By Plaintiffs against Defendants Caliber, US Bank, LSF9, Zieve and Certain Doe
Defendants)

215.    Plaintiffs incorporate all preceding and succeeding allegations by
reference as if fully set forth herein.

216.    The recording of the DOT by Defendant Caliber on February 9, 2017
before the March 1, 2017 mailing of the Notice of Default and Intent to Accelerate
to Plaintiffs and the expiration of the thirty (30) day cure period violated the
express provisions of Paragraph 22 of the DOT. As such the filing and recording
of the DOT was invalid and void *ab initio*.

217.    Section 2924(a)(6) of the California Civil Code provides that no
entity shall record or cause a notice of default to be recorded unless "it is the
holder of the beneficial interest under the mortgage or deed of trust, the original
trustee or the substituted trustee under the deed of trust, or the designated agent of
the holder of the beneficial interest."

218.    Section 2924.17(a) of the California Civil Code mandates "A
declaration recorded pursuant to Section 2923.5 or, until January 1, 2018, pursuant
to Section 2923.55, a notice of default, notice of sale, assignment of a deed of
trust, or substitution of trustee recorded by or on behalf of a mortgage servicer in
connection with a foreclosure subject to the requirements of Section 2924, or a
declaration or affidavit filed in any court relative to a foreclosure proceeding shall
be accurate and complete and supported by competent and reliable evidence."

219.    Section 2924.17(b) of the California Civil Code provides that "Before
recording or filing any of the documents described in subdivision (a), a mortgage
servicer shall ensure that it has reviewed competent and reliable evidence to
substantiate the borrower's default and the right to foreclose, including the
borrower's loan status and loan information."

220.    In addition to their own admissions, a simple review of the
assignment chain, the endorsement chain, the payment history, the loan file

received from the predecessor servicer, correspondence received from Plaintiffs, and even a cursory comparison of signatures on said documents would have revealed significant gaps in the assignment chain and the endorsement chain as well as signature irregularities regarding necessary title documents. This would have informed Defendants Caliber, US Bank and LSF9 that they lacked competent and reliable evidence demonstrating that they had the right, power or authority to record the NOD or otherwise commence foreclosure proceedings on Plaintiffs property.

221.   Further still, Defendants Caliber, US Bank, LSF9 and Zieve failed to comply with Civil Code § 2923.55.  Section 2923.55 provides in pertinent part that a mortgage servicer, mortgagee, trustee, beneficiary, or authorized agent may ***not*** record a notice of default pursuant to Section 2924 until thirty (30) days after contact is made with the borrower to assess the borrower's financial condition and explore options for the borrower to avoid foreclosure or thirty (30) days after satisfying the due diligence requirement with regard to contacting or attempting to contact the borrower.  In addition, before recording a notice of default, the mortgage servicer must also notify the borrower that they may request a copy of the promissory note, the deed of trust, all assignments of the deed of trust and a copy of the payment history on the loan.

222.   Despite this express requirement, rather than comply with the letter and spirit of Section 2923.55, Defendants Caliber, US Bank, LSF9 and Zieve instead short cut the process and the protections it is intended to provide by recording on  February 9, 2017, a Notice of Default and Intent to Accelerate which was supported by a Declaration of Compliance that was not executed by Caliber (the present loan servicer) on behalf of the present purported owner of the loan (LSF9), but instead the Declaration was executed back in August 2015 by Ocwen (a predecessor servicer) on behalf of the ARLP trust (the alleged predecessor owner of the loan). Making matters worse, this Declaration was executed in

support of a prior NOD recorded by Ocwen which was subsequently rescinded. As such both Zieve's attestation as well as the Declaration of Compliance attached to the NOD were invalid, as they failed to comply with the provisions of California Civil Code § 2923.55, and California Civil Code § 2924.17(a), rendering the NOD void.

223.    Defendants Caliber, US Bank, LSF9 and Zieve, prior to filing the NOD, did not ensure, as required by statute, that they had reviewed competent and reliable evidence substantiating their legal authority to record, either themselves or on their behalf, the Notice of Default.

224.    Despite these material HBOR violations, Defendants nevertheless had the NOD recorded and issued the Notice of Trustee's Sales setting a June 16, 2017 sale date.  Defendants did not correct or remedy these violations despite being repeatedly provided information questioning the validity of their actions.

225.    As Caliber, US Trust, LSF9 and Zieve lacked reliable and competent evidence substantiating that LSF9 was the true legal owner of the loan at the time the NOD was filed and recorded, such recording violated the provisions of the HBOR referenced. As it could not be conclusively shown that the Note and DOT had been properly endorsed and assigned to LSF9 from the original lender, they could not provide a basis for a Notice of Default, or any attempt at non-judicial foreclosure, and as such the recording of the NOD was improper, illegal, and void *ab initio* as was the issuance of the Notice of Trustee's Sale.

226.    Accordingly, Plaintiff hereby requests an order of this Court that the Notice of Default and the Notice of Trustee's Sale are legally void and should be ordered rescinded and set aside as invalid.

### NINTH CLAIM FOR RELIEF

(Fraudulent Concealment)

(By Plaintiffs Against Ocwen and Certain Doe Defendants)

227.   Plaintiffs incorporate all preceding and succeeding allegations by reference as if fully set forth herein.

228.   On information and belief, in or about October 2011, Ocwen acquired all the assets and liabilities of Litton Loan Servicing and obtained all of the loan files and related documentation from Litton, including those related to Plaintiffs' loan.

229.   As alleged herein, Plaintiffs sent multiple QWRs pursuant to the Real Estate Settlement Practices Act (RESPA), 12 U.S.C. § 2605 to Ocwen during the time Ocwen was acting as the servicer of the loan.

230.   Although legally obligated to do so, Ocwen failed and refused to provide full and complete responses to the QWRs, including but not limited to its failure to provide documentation evidencing any endorsements and transfers of the Note.

231.   Plaintiffs also sent QWRs to Caliber after it became the servicer.  In response to Plaintiffs' QWRs pursuant to RESPA, Caliber ultimately provided an endorsement chain for the promissory note to Plaintiffs – something Ocwen had failed and refused to provide, concealing it from Plaintiffs.

232.   Had Plaintiffs been provided with the endorsements on the note it would have revealed several material issues.  First, a review of the "endorsements" reveals that the same person, Elizabeth Willard (who also was a signatory to the November 12, 2010 assignment transferring the loan from MTGLQ to Resi) executed two of the endorsements.  Her signature first appears on an undated allonge where she supposedly endorsed a transfer of the Note from MTGLQ to Resi.  Her signature appears again on the bottom of the Note itself, supposedly endorsing the Note from CitiMortgage to MTGLQ.  This signature was also undated.

233.   In addition, Elizabeth Willard's signatures on these two supposed endorsements do not match.  While her signature on the November 12, 2010

assignment matches her signature on the endorsement from MTGLQ to Resi, it clearly does not match her signature on the endorsement from CitiMortgage to MTGLQ. This is most curious and raises an inference that one of these signatures was affixed by someone other than Ms. Willard.

234. Furthermore, based on the recorded assignments, the endorsement from MTGLQ to Resi which is reflected on the allonge, had to occur prior to the alleged endorsement from CitiMortgage to MTGLQ. This raises the question of how the endorsement from CitiMortgage to MTGLQ appears on the bottom of the Note as opposed to on a subsequent allonge after the endorsement to Resi.

235. Ocwen, by failing and refusing to provide the endorsements as required under RESPA (something Plaintiffs could not have discovered on their own and did not know of), knowingly and intentionally concealed the deficiencies and errors in the chain of title from Plaintiffs.

236. Had Ocwen been forthcoming and provided Plaintiffs with the documentation it was legally required to provide in response to the QWRs, Plaintiffs would have behaved differently with respect to the loan and the attempts being made to collect upon it and foreclose upon the property it secured. Ocwen's concealment of the true facts precluded and negatively impacted Plaintiffs' ability to ascertain who may have had adverse ownership claims to the Property or interests in the Note and DOT and, in turn, prevented, impeded and inhibited Plaintiffs from communicating with the appropriate parties about resolution of issues surrounding the loan and the Property.

237. It was reasonably foreseeable to Ocwen (which was in the loan servicing business) that the flawed endorsements on the note would be used and relied upon by others. Indeed, these endorsements have been relied upon by, among others, Defendant Caliber which relied on the endorsements in order to record, on behalf of its beneficiary, a Notice of Default in the Orange County Recorder's Office as a foundational step in the non-judicial foreclosure process.

238.   By its actions herein, Ocwen intended to deceive not only Plaintiffs but everyone else relying upon the validity of the endorsements, chain of title and the recorded documents in the Orange County Recorder's Office.

239.   As a direct and proximate result, Plaintiffs have suffered damages in an amount to be proven at trial, including reasonable attorneys' fees and costs. Plaintiffs have further suffered equitable harm for which legal damages are insufficient.

240.   As set forth herein, Ocwen's acts were taken in conscious disregard of Plaintiffs' rights and with the intent to vex, injure or annoy, sufficient to constitute fraud, oppression, or malice under Cal. Civ. Code § 3294, therefore entitling Plaintiffs to an award of punitive damages in an amount appropriate to deter and punish Ocwen.

## TENTH CLAIM FOR RELIEF

(Declaratory Relief By Plaintiffs Against Caliber, US Trust, LSF9 and Certain Doe Defendants)

241.   Plaintiffs incorporate all preceding and succeeding allegations by reference as if fully set forth herein.

242.   When LSF9 purportedly took ownership of the Note and DOT, it became a party and subject to the terms and conditions set out in those agreements.

243.    On February 9, 2017 Caliber recorded a Notice of Default on the property and did so at the direction of, US Bank and LSF9. Exhibit "FFF."

244.   On March 1, 2017, Caliber sent Plaintiffs a Notice of Default and Intent to Accelerate the loan.  Exhibit "JJJ."

245.    Paragraph 22 of the Deed of Trust, to which both Plaintiffs are parties, governs the giving of notices of intent to accelerate and the recording of notices of default.   Paragraph 22 requires the lender to give notice to the borrower prior to acceleration of the debt and that such notice specify "(a) the default; (b) the act required to cure the default; (c) a date, not less than 30 days from the date

the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration may result in acceleration of the sums secured by this Security Instrument and sale of the Property."

246.    The notice must also notify the borrower that "If the default is not cured on or before the date specified in the notice, Lender, at its option may require immediate payment in full of all the sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law."

247.    The requirements of Paragraph 22 continue and further provide that "If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located."

248.    Thus, pursuant to Paragraph 22 of the Deed of Trust, an NOD can only be recorded *after*: a) a borrower has been sent a Notice of Intent to Accelerate; and b) the period of time permitted therein for the borrower to cure has expired. Caliber's recording of the NOD on February 9, 2017 violates the terms of the NOD because that recording was done *prior* to Caliber's issuance of the required Notice of Intent to Accelerate and prior to the expiration of the required time period in which Plaintiffs could cure the alleged default.  As such, the NOD was not authorized, thus rendering it invalid and a beach of the express terms of the Deed of Trust.

249.    An actual dispute and controversy has arisen and now exists between Plaintiffs, on the one hand, and Defendants Caliber, US Trust and LSF9, on the other hand, concerning their respective rights, duties and obligations relative to the DOT and Notice of Default.  Specifically, Plaintiffs contend the Notice of Default is void and ineffective because it was issued and recorded in contravention of

Paragraph 22 of the DOT which requires that Defendants provide Plaintiffs with written notice of default and intent to accelerate the loan and to provide Plaintiffs the requisite time to cure the alleged default *before* issuing and recording the Notice of Default.

250.    Plaintiffs are informed and believe that Caliber, US Trust and LSF9 deny Plaintiffs' contentions, as evidenced by their issuance and recording of the NOD and their intention to proceed with the foreclosure sale of the Property as evidenced by their issuance of  Notice of Trustee's Sale setting a sale date of June 16, 2017.

251.    Plaintiffs desire a judicial determination whether Caliber, US Trust and LSF9 have the legal right to foreclose on the Property when they have failed to adhere to the express terms and conditions of the DOT, specifically Paragraph 22 thereof, by issuing and recording the NOD (which remains in effect as of this filing) which Defendants rely upon as the foundation for their non-judicial foreclosure activity, including but not limited to their Notice of Trustee's Sale.

252.    A judicial declaration is necessary and appropriate at this time under the circumstances in order that Plaintiffs may ascertain their rights and interests relative to the DOT and the NOD.

### DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury.

**WHEREFORE**, Plaintiffs pray for judgment as follows:

1. On all claims for relief for compensatory damages;

2. On the Ninth Claim for Relief, for exemplary damages pursuant to Section 3294 of the California Civil Code;

3. On the Tenth Claim for Relief for a judicial declaration that Caliber, US Trust and LSF9 do not have the legal right to foreclose on the Property because they have failed to adhere to the

express terms and conditions of Paragraph 22 of the Deed of Trust by issuing and recording the Notice of Default before giving Plaintiffs' the required written notice of default and intent to accelerate the loan and providing Plaintiffs the requisite time to cure the alleged default;

4.  On the Eighth Claim for Relief for an order setting aside and cancelling the Notice of Default recorded against the Property on February 7, 2017 and the Notice of Trustee's Sale issued on May 16, 2017;

5.  On the Seventh Claim for Relief for an order quieting title in favor of Gigi and against all Defendants as of September 23, 2008;

6.  On the First Claim for Relief for an injunction restraining the material violations of the HBOR by the Defendants, including an injunction preventing Defendants from proceeding with any foreclosure, foreclosure related activity or trustee's sale with respect to the Property until such time as Defendants have corrected and remedied the material violations of the HBOR as set forth herein;

7.  On all claims for relief for costs of suit incurred herein;

8.  For civil penalties pursuant to statute and/or reasonable attorneys' fees where provided for by law and according to proof; and

9.  For any and all other and further relief as the court deems just and proper.

DATED:  May 23, 2017                    LAW OFFICES OF DAVID N. LAKE


                                        By:  /s/ David N. Lake
                                        DAVID N. LAKE
                                        Attorneys for Plaintiffs