CHRISTOPHER P. RIDOUT (SBN 143931)
  Email: christopher.ridout@zimmreed.com
ZIMMERMAN REED, LLP
2381 Rosecrans Ave., Suite 328
Manhattan Beach, CA 90245
(877) 500-8780 Telephone
(877) 500-8781 Facsimile

DAVID N. LAKE (SBN 180775)
  Email: david@lakelawpc.com
LAW OFFICES OF DAVID N. LAKE, APC
16130 Ventura Boulevard, Suite 650
Encino, CA 91436
(818) 788-5100 Telephone
(818) 788-5199 Facsimile

Attorneys for Plaintiffs ROBERT K. RUEGSEGGER, JR.
and GIGI E. RUEGSEGGER

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA – SANTA ANA DIVISION

| | |
|---|---|
| ROBERT K. RUEGSEGGER, Jr., an individual, and GIGI E. RUEGSEGGER, an individual, <br><br> Plaintiffs, <br><br> v. <br><br> CALIBER HOME LOANS, INC.; U.S. BANK TRUST, N.A. AS TRUSTEE FOR THE LSF9 MASTER PARTICIPATION TRUST; LSF9 MASTER PARTICIPATION TRUST; LAW OFFICES OF LES ZIEVE; OCWEN LOAN SERVICING, LLC; WILMINGTON TRUST, N.A.; ARLP SECURITIZATION TRUST, SERIES 2014-2; RESI WHOLE LOAN IV LLC; ALTISOURCE RESIDENTIAL CORPORATION, ALL PERSONS UNKNOWN, CLAIMING ANY LEGAL OR EQUITABLE RIGHT, TITLE, ESTATE, LIEN, OR | CASE NO.: 8:17-cv-0907 <br><br> **FIRST AMENDED COMPLAINT (CLASS ACTION)** <br><br> 1. Violation of the California Homeowner Bill of Rights (Cal. Civ. Code § 2920 *et seq.*) (Class Claim); <br><br> 2. Violation of the Rosenthal Fair Debt Collection Practices Act (Cal. Civ. Code § 1788 *et seq.*) (Class Claim); <br><br> 3. Violation of the Rosenthal Fair Debt Collection Practices Act (Cal. Civ. Code § 1788 *et seq.*) (Class Claim); <br><br> 4. Violation of the Real Estate Settlement Practices Act (12 U.S.C. § 2605)(Class Claim); <br><br> 5. Violation of the Real Estate Settlement Practices Act (12 U.S.C. § 2605)(Class Claim); |

INTEREST IN THE PROPERTY DESCRIBED IN THE COMPLAINT ADVERSE TO PLAINTIFF'S TITLE, OR ANY CLOUD ON PLAINTIFF'S TITLE THERETO; AND DOES 1-20, INCLUSIVE,

Defendants.

6.  Violation of the Truth In Lending Act (Class Claim);

7.  Breach of Written Contract (Class Claim);

8.  Violation of the Unfair Competition Law (Cal. Bus. & Prof. Code § 17200 *et seq.*) (Class Claim);

9.   Violation of the Unfair Competition Law (Cal. Bus. & Prof. Code § 17200 *et seq.*)(Individual Claim);

10. Violation of the California Homeowner Bill of Rights (Cal. Civ. Code § 2920 *et seq.*) (Individual Claim);

11. Violation of the Rosenthal Fair Debt Collection Practices Act (Cal. Civ. Code § 1788 *et seq.*) (Individual Claim);

12. Slander of Title (Individual Claim);

13. Slander of Title (Individual Claim);

14. Negligence (Individual Claim);

15. Quiet Title (Individual Claim);

16. To Set Aside and Rescind The Notice of Default and Notice of Trustee's Sale (Individual Claim);

17. Fraudulent Concealment (Individual Claim); and

18. Declaratory Relief (Individual Claim)

(Jury Trial Demanded)

Plaintiffs Robert K. Ruegsegger, Jr. ("Robert") and Gigi E. Ruegsegger ("Gigi") (together "Plaintiffs") bring this Complaint individually and on behalf of

all others similarly situated,, and allege, upon personal knowledge as to their own actions and their counsel's investigations, and on information and belief as to all other matters, as follows:

## NATURE OF THE CASE

1.     The class claims set forth in this First Amended Complaint seek to redress Defendants' knowing and serial failures to adhere to the express requirements of California and Federal law.  Defendants admit they lacked full and complete payment histories of the loans they were servicing, and thus were unable to validate the amount of the mortgage debts they claim exist, but have nevertheless actively sought to collect these debts from class members despite lacking the most basic evidence necessary to do so.  Defendants also knew there were discrepancies between the amounts stated as due in their debt validation letters and the monthly mortgage statements they were sending to the class members and, in doing so, misstated the amount, character and/or legal status of the debt they were seeking to collect.

2.     The class claims further seek to redress Defendants' knowing use of deficient and inaccurate Certificates of Compliance, a required condition precedent under California Civil Code section 2923.55 to the recording of Notices of Default on the class members' homes and the subsequent foreclosure on such properties based on the invalidly recorded Notices of Default.

3.     The class claims further seek to redress Defendants' knowing, intentional and defective recording of Notices of Default on class members' homes (and using such Notices of Default to wrongfully initiate non-judicial foreclosures on their homes) without first providing class members the Notice of Intent to Accelerate and opportunity to cure as required pursuant to Paragraph 22 of the Deed of Trust.

4.     Finally, the class claims further seek to redress Defendants' knowing and serial failures to acknowledge or to respond, either timely or in some instances

1   at all, to qualified written requests submitted to them by members of the class.

2   Defendants further failed to provide required notices to the class members upon

3   servicing or ownership transfers—notices that are required under law.

4       5.    The individual claims set forth in this First Amended Complaint seek

5   to redress violations of both California and Federal law for and related to (1) the

6   wrongful filing and recording of a Notice of Default ("NOD") and Notice of

7   Trustee's Sale against Gigi's home and through such filing the initiation of non-

8   judicial foreclosure against her property by persons or entities lacking standing to

9   assert such claims; (2) the wrongful attempt to collect monies on a mortgage debt

10  that the parties seeking to collect do not own and which cannot be validated or

11  substantiated in terms of the nature, extent, or amount of the debt; (3) Defendants'

12  knowing and repeated failure to timely provide Plaintiffs specific documentation

13  substantiating their standing to initiate a non-judicial foreclosure, as well as their

14  ability to validate the amount of mortgage debt allegedly owed under the mortgage

15  loan; (4) the apparent fabrication and forgery of documents upon which

16  Defendants now rely for the authority to act; and (5) the wrongful attempt to assert

17  an invalid ownership interest in contravention of Gigi's clear title.

18                    **FACTUAL ALLEGATIONS AND BACKGROUND**

19      6.    Since 2013, the California Homeowner Bill of Rights ("HBOR") has

20  placed on entities initiating non-judicial foreclosure proceedings, including the

21  filing and recording of a NOD in the property records, certain affirmative

22  obligations aimed at protecting homeowners.  One such obligation is to verify their

23  standing and legal authority to initiate and record the NOD, taking care to review

24  evidence supporting their ability to take such action and formally recording a NOD

25  only after completing a review of competent and reliable evidence which supports

26  the veracity of that authority.  Defendants sued herein failed to meet these

27  obligations.

28

7.     To record a NOD as a predicate to instituting a non-judicial foreclosure in California, the foreclosing party (usually a bank or similar entity) must, at the time it records the NOD, validly hold the mortgage note and the beneficial interest under the deed of trust. If the entity does not hold such ownership interest, any recording of the NOD is invalid.  In this case, Defendant Caliber, presumably at the request and direction of Defendant US Bank (themselves acting on behalf of Defendant LSF9 Trust), recorded a NOD on Gigi's home as the first step towards carrying out a non-judicial foreclosure.  As will be discussed herein, Caliber did this even though the LSF9 Trust did not have the legal standing or authority to do so because the LSF9 trust did not own the loan at the time Caliber recorded the NOD.

8.     Defendant LSF9 held itself out as the owner of the underlying Promissory Note and the holder of the beneficial interest under the deed of trust. Ostensibly, it held the interest by virtue of assignments of the original Promissory Note and Deed of Trust from the original lenders.  In truth, LSF9 was not the owner of or in possession of the Promissory Note or a holder of the beneficial interest under Plaintiffs' deed of trust because the Promissory Note and Deed of Trust, and accordingly the beneficial interest under such instruments were never properly or legally transferred from the original lender to LSF9.

9.     Moreover, Defendant Caliber, as servicer of the loan and acting as the agent for and at the behest of Defendants US Bank and LSF9, had an affirmative duty and obligation under the law to independently review competent and reliable evidence (including at a minimum the Note and Deed of Trust Assignment and Endorsement Chain, as well as the mortgage loan file received from prior loan servicers) to ensure that the LSF9 Trust was, in fact, the valid legal owner and thus entitled to direct them to actually record the NOD. Such review, which US Bank and LSF9 should have insisted upon, would have revealed that there were significant gaps and discrepancies in the respective Note and Deed of Trust

Assignment and Note Endorsement chains of title, and, as a result, that real questions existed as to whether or not the LSF9 Trust was, in fact, the valid owner of the underlying Promissory Note and the holder of the beneficial interests at the time the NOD was recorded and at the time the Notice of Trustee's Sale was issued.

10.     Indeed, prior to the NOD recording, Defendant Caliber had been put on notice, both by a review of the loan file received from the prior loan servicer as well as by repeated communications with Plaintiffs' representative, of the existence of serious gaps and deficiencies in the chain of title of the loan (information that US Bank as well as LSF9 had either actual or constructive notice of) and that, as a result, there were serious questions as to who actually owned the loan.  This included information that (1) the prior servicer, Ocwen, had itself determined that there were serious gaps in the chain of title placing legal ownership of the loan in dispute; (2) that Ocwen had "recreated" documents after-the-fact in the form of so-called "corrective assignments" in an attempt to legitimize and sanitize an otherwise invalid and toxic chain of title on the loan; and (3) that Ocwen, just before transferring servicing to Caliber, in recognition that their unusual and suspect activities were only serving to highlight that the chain of title was incomplete and thus the true ownership of the loan in question, rescinded and withdrew the Notice of Default it had recorded.

11.     Upon this servicing transfer, Plaintiffs' representative contacted Defendant Caliber, alerted them to the chain of title problems, and urged Caliber to exercise restraint in reinitiating any non-judicial foreclosure actions against the property considering the serious title issues presented. On Plaintiffs' information and belief, Caliber advised both US Bank and LSF9 of these communications. Plaintiffs, as was their statutory right, also requested that Defendant Caliber provide documents substantiating the legal ownership by LSF9 of the Note and Deed of Trust, including the Note and Deed of Trust Assignment and Endorsement

Chain on the loan -- a request that Caliber only partially complied with and not within the time limits imposed by law, in violation of the provisions of the Real Estate Settlement Practices Act (RESPA) 12 U.S.C. §2605.  Eventually Caliber conceded this failure in writing.

12.   Caliber also admitted, in writing, that it too had found gaps in the documented chain of title, but remarkably advised that it intended to "recreate" endorsement chains and "corrective" assignments to fill in the acknowledged gaps. With full knowledge of these legal deficiencies and the absence of competent and reliable evidence of the legal authority of LSF9 or their representative Defendant U.S. Bank to do so, Caliber still proceeded to record a NOD on Gigi's home and to issue a Notice of Trustee's Sale.

13.   Additionally, Caliber had the wrong party execute the Certificate of Compliance required under Civil Code 2923.55, and the trustee representing the purported owner nevertheless attested to its accuracy despite the error being readily apparent on the face of the document. Compliance with the provisions of Civil Code 2923.55 is a pre-requisite to the ability to record a NOD, thus this failure to comply rendered such recording void and invalid.

14.   Caliber's knowing and intentional actions go far beyond simple negligence. Caliber abrogated and rejected its affirmative obligations under law. In failing to fulfill and discharge their statutory obligations, Defendants violated the HBOR and subjected Gigi to the wrongful recording of a NOD on her home, the issuance of a baseless Notice of Trustee's Sale and thus the wrongful initiation of a non-judicial foreclosure.

15.   Further, because the mortgage loan was not owned by LSF9, Defendants Caliber, US Bank and LSF9 lacked the legal authority to collect on the alleged debt.   Nevertheless, they continued to send mortgage statements to Plaintiffs to collect on a debt not owed to LSF9. Caliber also sought to collect on a debt it could not validate, nor could it ascertain how much was supposedly owed

under said debt, as it conceded in writing that it lacked a full and complete payment history on the loan (documentation needed for Caliber, US Bank, and LSF9 to validate the amount of the alleged debt).  Rather, Caliber relied on what it had received (albeit incomplete) from the prior servicer, Ocwen. Caliber then, despite acknowledging that there were unexplained financial discrepancies in the debt validation statements, mortgage statements and other demands for payment it had sent to Plaintiffs on behalf of Defendants US Bank and LSF9, nevertheless attempted to collect the debt as if it had the authority to do so and as if the amount was validated and undisputed.  These actions violated California's Rosenthal Fair Debt Collection Practices Act ("Rosenthal Act") and provisions of the federal Fair Debt Collection Practices Act ("FDCPA").

16.   Finally, in reliance on flawed and inconsistent chain of title documents as well as deceptive and imaginatively created (if not outright fraudulently manufactured) documents, Defendants slandered Gigi's title to her home and seek to impose a superior ownership in contravention of her clear title to the property. This too is improper.

## THE PARTIES

17.   Plaintiff Robert K. Ruegsegger, Jr. ("Robert") is, and at all times mentioned herein was, an individual residing in the State of California, County of Orange, and is the former husband of Plaintiff Gigi E. Ruegsegger.

18.   Plaintiff Gigi E. Ruegsegger ("Gigi") is, and at all times mentioned herein was, an individual residing in the State of California, County of Orange, and is the former wife of Gigi is the sole current record owner of the Property, a single family residence, located at 22442 Cassia Ln, Lake Forrest, California 92630, with a legal description of:

PARCEL 1:
LOT 45 OF TRACT NO. 8384, IN THE CITY OF LAKE FOREST, COUNTY OF ORANGE, STATE OF CALIFORNIA, AS PER MAP RECORDED IN

BOOK 390, PAGES 11 TO 13 INCLUSIVE OF MISCELLANEOUS MAPS IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

PARCEL 2:
AN UNDIVIDED 1/55TH INTEREST IN LOT AA THROUGH QQ INCLUSIVE OF SAID TRACT NO. 8384.  EXCEPT THEREFROM FROM ALL OIL, GAS, MINERALS AND OTHER HYDROCARBON SUBSTANCES LYING BELOW A DEPTH OF 500 FEET FROM THE SURFACE OF SAID LAND, BUT WITH NO RIGHT OF SURFACE ENTRY AS PROVIDED IN DEEDS OF RECORD.

(together, the "Property").

19.    Defendant Caliber Home Loans, Inc. ("Caliber") is, and at all times mentioned herein was, a corporation organized and existing under and pursuant to the laws of the State of Delaware, and doing business in Orange County, California.   Based upon information and belief, Caliber's principal place of business is located in Irving, Texas.  From approximately May 2016 to the present time Caliber was the loan servicer on the mortgage loan and during said time period was acting at the request and on behalf of Defendants U.S. Bank Trust, N.A. and the LSF9 Master Participation Trust.

20.    Defendant U.S. Bank Trust, N.A. ("U.S. Bank") is and at all times herein mentioned was an organization of unknown type doing business in Orange County, California.   Based upon information and belief, U.S. Bank's principal place of business is St. Paul, Minnesota.   On Plaintiffs' information and belief during the acts complained of herein Defendant U.S. Bank was acting as Trustee for and on behalf of the LSF9 Master Participation Trust and engaged Defendant Caliber to service the loan at their request, on their behalf, and under their instruction and direction.

21.    Defendant LSF9 Master Participation Trust ("LSF9") is, on information and belief, and at all times herein mentioned was a securitized trust organized and existing under the laws of the State of Delaware.  Based upon information and belief, LSF9 was created by Lone Star Funds whose principal

place of business is Dallas, Texas. Based upon further information and belief the Certificate Holders of LSF9 are citizens of states other than California. LSF9 purports to be the current legal owner of a Promissory Note executed by Robert Ruegsegger in 2006, secured by a Deed of Trust executed by the Plaintiffs also in 2006.

22.    Defendant Ocwen Loan Servicing, LLC ("Ocwen") is and at all times mentioned herein was a limited liability company organized and existing under and pursuant to the laws of the State of Delaware, with its principal place of business at 1661 Worthington Road, Suite 100, West Palm Beach, Florida 33409, and was doing business in Orange County, California. Based upon information and belief, partners of Ocwen are citizens of states other than California.   From approximately 2012 until approximately May 2016 Ocwen was the loan servicer on the mortgage loan, and was acting at the request and on behalf of Defendant Wilmington Trust, National Association as Trustee for the ARLP 2014-2 Securitized trust and under their instruction and direction.

23.    Defendant Wilmington Trust, N.A. ("Wilmington") is and at all times herein mentioned was an organization of unknown type which conducted business in Orange County, California.  Based upon information and belief, Wilmington's principal place of business is Wilmington, Delaware.

24.    Defendant Law Offices of Les Zieve ("Zieve") is and at all times herein mentioned was a California professional corporation with its principal place of business at 30 Corporate Park, Suite 450, Irvine, CA 92606.  Zieve regularly conducts business within the State of California and is the current Trustee under the DOT.

25.    Defendant ARLP Securitization Trust, Series 2014-2 ("ARLP") is, on information and belief, and at all times herein mentioned was, a securitized trust, which conducted business in Orange County, California.  Based upon information and belief, ARLP was organized by Altisource Residential ,L.P, a Delaware

limited partnership with its principal place of business in Christiansted, United States Virgin Islands. Based upon further information and belief the Certificate Holders of ARLP are citizens of states other than California.

26.     Defendant Resi Whole Loan IV LLC ("Resi") is and at all times herein mentioned was a limited liability company organized and existing under the laws of the State of Delaware and which conducted business in Orange County, California. Based upon information and belief, Resi's principal place of business is Wilmington, Delaware. Based upon information and belief, partners of Resi are citizens of states other than California.

27.     Defendant Altisource Residential Corporation ("Altisource") is and at all times herein mentioned was, a corporation organized and existing under and pursuant to the laws of the State of Maryland and doing business in Orange County, California. On Plaintiffs information and belief, Altisource conducts its business through its wholly owned subsidiary, Altisource Residential ,L.P, a Delaware limited partnership, with its principal place of business in Christiansted, United States Virgin Islands.. Based upon further information and belief, partners of Altisource Residential L.P. are citizens of states other than California.

28.     Plaintiffs do not know the true names and capacities of the defendants sued herein as DOES 1 through 20 ("DOE Defendants"), inclusive, and therefore sues said DOE Defendants by fictitious names. Plaintiffs are informed and believe and based on such information and belief allege that each of the DOE Defendant is contractually, strictly, negligently, intentionally, vicariously liable and or otherwise legally responsible in some manner for the acts and omissions described herein. Plaintiffs will amend this Complaint to set forth the true names and capacities of each DOE Defendant when same are ascertained.

29.     Plaintiffs are informed and believe and based on such information and belief allege that Defendants Caliber, U.S. Bank, Ocwen, and Wilmington Trust and DOES Defendants 1 through 10, inclusive, and each of them, are and at all

material times have been, the agents, servants or employees of each other, purporting to act within the scope of said agency, service or employment in performing the acts and omitting to act as averred herein.  Each of the Defendants named herein are believed to, and are alleged to have been acting in concert with, as employee, agent, co-conspirator or member of a joint venture of, each of the other Defendants, and are therefore alleged to be jointly and severally liable for the claims set forth herein, except as otherwise alleged.

## JURISDICTION AND VENUE

30.    Jurisdiction in this matter is based on 28 U.S.C. § 1332 as there is complete diversity between the parties in that Plaintiffs and Defendants are citizens of different states and the amount in controversy exceeds the sum of $75,000.

31.    This Court has personal jurisdiction over Defendants because Defendants conduct business in the State of California, a substantial portion of the wrongdoing alleged by Plaintiffs occurred in the State of California and this District, Defendants have sufficient minimum contacts with and/or otherwise has purposefully availed themselves of the markets of the State of California and this District such that it is fair and just for Defendants to adjudicate this dispute in this District.

32.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events and omissions giving rise to the claims occurred in this District and, as a corporation subject to personal jurisdiction in this District, Defendants conduct business in this District.

## HISTORY OF THE MORTGAGE LOAN AND PROPERTY OWNERSHIP

33.    In or around October 1998, Gigi and her then husband Robert purchased their home in Lake Forrest, California.  They resided in the home with their two small children.

34.    In October 2006, Robert decided that he wanted to refinance the mortgage on the family home.  He submitted a loan application in his own name through a mortgage broker, Pacific Southwest Lending & Realty who, in turn, submitted his information to a possible lender, MortgageIT, who ultimately approved the loan.

35.    MortgageIT requested Robert execute a Promissory Note in the amount of $630,000 in its favor, which he did on October 13, 2006 (the "Note"). MortgageIT did not ask his wife Gigi to sign the Note and indeed only Robert's name appears on it as the sole Borrower.  A copy of the Promissory Note is attached hereto as Exhibit "A."

36.    The Promissory Note was secured by a Deed of Trust (hereafter "DOT") also executed on the same day, October 13, 2006.  The DOT was executed by both Robert and Gigi, and in the DOT the "Borrower" was defined as "Robert K. Ruegsegger and Gigi E. Ruegsegger, Husband and Wife as Joint Tenants," thus both Robert and Gigi were parties to the agreement.  Paragraph 13 of the DOT specifically stated that Gigi was not obligated to pay the sums secured by the DOT: "However, any Borrower who co-signs this Security Instrument but does not execute the Note (a 'co-signer'):…(b) is ***not personally obligated to pay the sums secured by this Security Instrument***…." (Emphasis added).  A copy of the DOT is attached hereto as Exhibit "B."

37.    On or about February 1, 2007, Robert and Gigi were advised that CitiMortgage, Inc. ("Citi") would be taking over Robert's loan from MortgageIT. They were not told if Citi was simply taking over the servicing of the loan on behalf of MortgageIT, or whether they had purchased the loan from MortgageIT. They continued to make their payments, but now remitted them to Citi.

38.    In September 2008, Gigi contacted Citi to see whether she could modify the loan because she and Robert were going through a divorce and she was facing financial hardship.   On September 14, 2008, Robert signed over the

Property to Gigi, and the quitclaim deed was recorded in Gigi's name on September 23, 2009.  A copy of the Quitclaim Deed is attached hereto as Exhibit "C".

39.    On or about November 26, 2008, Plaintiffs' divorce became final.  As part of the divorce decree and property settlement, Gigi never agreed to and did not assume any of the obligations under the October 13, 2006 Promissory Note executed by Robert on behalf of the original lender, MortgageIT.

40.    Between her initial conversation with Citi in September 2008 and February 2009, Gigi continued to make payments to Citi and each payment post-divorce consisted of her separate property.  Gigi also made numerous telephone calls trying to find out the process for a loan modification, but was transferred to multiple agents, and many times calls would drop or she would be put on hold for inordinate amounts of time and had to hang up and try again.  When Gigi did finally speak with someone, she was told she was ineligible for modification as the loan was current and that Citi was doing trial modifications only for those in arrears.  On Gigi's information and belief, this statement was inaccurate as the HAMP and other government sponsored loan modification programs for which Gigi was inquiring had no such requirement, and a borrower did not need to be in arrears or default to qualify for a loan modification.

41.    In March of 2009, Gigi continued to make calls to Citi to get information regarding mortgage assistance.  At this time, Gigi reminded the Citi representative that only her ex-husband was on the loan, but she wanted to continue living in the home and would be the one making the payments.  She explained that she needed to modify the loan payment in order to afford the house payment alone.  She was informed that Citi could defer her payments for three months and put it on the "back end" of the loan.  This sounded like a good interim resolution as it would give Gigi three months of non-payment and time to pursue the loan modification, so she accepted this option.   Gigi was told by the Citi

representative that she would receive a call in a couple of weeks from Citi to start the modification process.  Based on what she had been told, Gigi stopped making payments for the deferment period.

42.    Citi subsequently established a "forbearance payment plan" for Gigi for three months, starting July 26, 2009 and concluding on September 26, 2009, where her payment would be reduced to $2,743.29 per month.

43.    Citi sent Gigi the Home Affordable Modification Trial Period Plan paperwork on or around August 21, 2009 indicating that the loan had been approved for at trial payment plan under the HAMP program.  Gigi called Citi to ask about how the documents should be completed and was told to sign her name on the forms wherever a signature was required.  Gigi completed this package on September 1, 2009 and returned the signed documents to Citi.

44.    As she had been instructed to do, Gigi, on October 1, 2009 made her first loan modification trial period payment of $2,743.29.  Gigi made her second loan modification trial period payment of $2,743.29 to Citi on October 30, 2009 (for November 2009).

45.    On December 1, 2009, Gigi made another loan modification payment of $2.743.29 – the third of the three required trial period payments as instructed by Citi.  By law, under HAMP and United States Department of Treasury directives, Citi was obligated at this point to offer a permanent modification of the loan. This Citi did not do. Rather, notwithstanding Gigi's adherence to the trial payment plan established by Citi, and unbeknownst to her, on this same date, based on its receipt of the reduced payment that Citi had directed Gigi to pay during the trial modification period, Citi nevertheless determined the loan was in default and used this as the basis for issuing a Notice of Default.

46.    As reflected in Citi's records, Gigi called in on December 17, 2009, to check on the status of the modification and was transferred to loss mitigation.  She was told the modification was awaiting review.

47.   On December 29, 2009, Gigi called Citi again.   According to its records, Gigi called Citi this time in response to a letter from Citi that stated, contrary to what she had been told before, that the loan modification application needed to be signed by her ex-husband Robert as well.   Despite the contrary information she had been given by Citi before, Gigi obtained the signatures and returned the new packet on February 13, 2010, along with a copy of the previous packet which she had submitted on September 1, 2009.

48.   In the meantime, Plaintiff made another trial period payment on January 2, 2010 which was followed by yet another $2,743.29 payment on February 2, 2010.

49.   Gigi made another payment in March 2010.   On March 11, 2010, Citi's records reflect all of Gigi's trial period payments had been received and the file was ready for review for a final modification.

50.   The March payment was followed by another call by Gigi to Citi inquiring about the status of the loan modification.   Gigi was told the application was still waiting for review.   Gigi, at the same time as the March 2010 payment, arranged for the April 2010 payment to be made, and it was made as well.

51.   Citi's records reflect that on May 24, 2010 Gigi had returned all documents required for a modification.

52.   Gigi called Citi again on May 28, 2010 to try and get some answers about the status of the permanent modification.   However, this time Citi refused to speak with Gigi stating she was "not on the loan".

53.   A few weeks later, Gigi received a letter from Citi dated June 17, 2010, stating they were unable to offer her a loan modification because of "incomplete documents."   Gigi called and explained to the Citi agent that she had already submitted all the documents requested.   The agent examined the notes on the account and reported to Gigi that the notes reflected a notation on May 24,

1   2010 saying, "client returned all docs required for modification."  A case number

2   was assigned (0067163097) for document review.

3       54.    According to its records, on June 29, 2010, Gigi contacted Citi again

4   about the modification and was told again that it was under review.  Citi's internal

5   notes reflect an inquiry on this date, wanting to know why the account was "set

6   back up on HAMP TPP and then taken off."

7       55.    In mid-July 2010, Gigi again called Citi to check on the status of the

8   modification.   Again, the agent confirmed that the notes reflected that the

9   documents were received in May and Gigi was told she would hear from Citi

10  regarding its decision.

11      56.    On July 30, 2010, Gigi called Citi again to inquire about the status of

12  the modification and was again told it remained under review.

13      57.    On August 4, 2010, Gigi called Citi again to check on the status of

14  her modification and was again told it was still in review. On this same date,

15  however, Citi's records state there are missing documents, and that the file was

16  closed on August 9, 2010. However, Gigi placed another call to Citi on August 30,

17  2010 when she was again told the file was under review. By this time, Gigi had

18  made over ten payments to Citi under the auspices of the modification program,

19  totaling $27,472.90.

20      58.    Gigi called yet again on September 24, 2010 and this time was told all

21  the documents were in order and they were just waiting for a negotiator to be

22  assigned to the case.   Despite this, on September 27, 2010, Citi's records state

23  Plaintiff's file was referred to foreclosure.

24      59.    On or about September 30, 2010, Mortgage Electronic Registration

25  Systems, Inc. executed an Assignment of the Note and the DOT pursuant to which

26  the Note and DOT were allegedly transferred to Citi. This assignment was

27  recorded on October 5, 2010 and was signed on behalf of MERS by Lisa Markham

28

("Markham"), its Assistant Secretary, and was notarized by Kristin B. Lindner ("Lindner").  This assignment is attached hereto as Exhibit "D".

60.    The same day, September 30, 2010, Citi also executed a Substitution of Trustee ("Substitution") naming CR Title as Substitute Trustee under the DOT, a copy of which is attached hereto as Exhibit "E."  The Substitution is also notarized by Lindner who supposedly witnessed the signature of Citi Assistant Vice President, who as it turns out is the same Lisa Markham, thus making her Citi's Assistant Vice President and MERS' Assistant Secretary on the very same day and at the exact same moment in time.

61.    The Citi employee and notary involved, Ms. Lindner had a well-documented history of abusing her notary license requirements and legal responsibilities, and assisting in the preparation of fraudulent documents.  Indeed, Lindner's notary commission was revoked by the Arizona Secretary of State in December 2010, barely two months after executing the assignment and SOT related to Plaintiff's property, after an investigation stemming from a complaint against her alleging that certain documents she notarized in another matter (also an Assignment of Deed of Trust and Substitution of Trustee) were improper because the signer was not present.

62.    In an extensive discussion, the Arizona Secretary of State concluded that Lindner had "failed to properly perform the acknowledgement and executed a notarial certificate containing a false statement…."  The revocation of Lindner's commission was expressly based on her failure to record requisite journal information, her failure to record notarization fees in journal records, her failure to accept satisfactory evidence of identity, her failure to properly perform the acknowledgement, her failure to state her commission-expiration date in the notarial certificate, her knowing execution of a false statement, and her failure to discharge fully and faithfully the duties of a notary public.  A copy of the official findings from the Arizona Secretary of State is attached hereto as Exhibit "F."

63.     Ms. Lindner nevertheless continued to notarize documents after the date of the revocation of her notary license.

64.     Under cover of the aforementioned documents, on or around October 5, 2010, a Notice of Default ("NOD") was recorded. Gigi was unaware of this occurrence as she believed, based on the representations being made to her by Citi, that her loan modification was proceeding.  Although the DOT had already been assigned to Citi according to the September 30, 2010 assignment, the NOD says it is being recorded on behalf of MERS.  This could not be true because it was MERS that assigned the DOT to Citi in the first instance and MERS had no rights upon the assignment to Citi.

65.     On October 21, 2010 MERS Inc. on behalf of the original lender MortgageIT, executed an Assignment of the Note and DOT, assigning it to MTGLQ Investors, L.P.  ("MTGLQ"). This purported assignment was invalid and void because the Note and DOT had been previously assigned to Citi on September 30, 2010. A copy of this October 21, 2010 assignment is attached hereto as Exhibit "G". On Plaintiffs' information and belief, notice of this purported transfer of ownership was never provided to them by MTGLQ, in violation of Section 131g of the federal Truth In Lending Act ("TILA"), 15 U.S.C. § 1641g.

66.     On November 12, 2010 MTGLQ recorded an assignment of the DOT to RESI Whole Loan IV LLC ("Resi").  However, MTGLQ lacked the legal authority to do so based on the previous assignment to Citi in September 2010. Further, this assignment impermissibly bifurcated the Note and DOT, only purporting to assign the latter. A copy of this assignment is attached hereto as Exhibit "H". On Plaintiffs' information and belief, notice of this purported transfer of ownership was never provided to them by Resi, in violation of Section 131g of TILA, 15 U.S.C. §1641g.

67. On January 7, 2011, Gigi returned home to find a Notice of Trustee's Sale posted to her front door. A true and correct copy of the Notice of Trustee's Sale is attached hereto as Exhibit "I." A Trustee's Sale was scheduled for January 27, 2011.

68. On January 27, 2011 Citi purported to assign the Note and DOT to MTGLQ. A copy of this assignment is attached hereto as Exhibit "J." On Plaintiffs' information and belief, notice of this purported transfer of ownership was never provided to them by MTGLQ, in violation of Section 131g of TILA, 15 U.S.C. § 1641g.

69. This purported assignment is at odds with the previous assignments of October 21, 2010 from MERS, Inc. as nominee for MortgageIT to MTGLQ and the one that followed on November 12, 2010 from MTGLQ to Resi.

70. After finding the Notice of Trustee's Sale, Gigi attempted to call Citi but only received an automated recording stating that "CitiMortgage is no longer the servicer of record. Your mortgage was paid in full on November 1st, 2010." This was the first-time Gigi had heard that Citi was no longer the servicer of the loan she had been trying to modify with Citi for months.

71. Thereafter, Gigi called Citi again to find out who the new servicer of the loan was, and who owned the loan. Gigi was given the name Litton Loan Servicing and a customer service number of (800) 603-4953. When Gigi called this number, she reached another recording, this one stating, "welcome to Auction.com." On Plaintiff's information and belief, they received no written notice of the transfer of servicing to Litton Loan Servicing as required by the provisions of the Real Estate Settlement Practices Act ("RESPA"), 12 U.S.C. § 2605(e).

72. With a trustee's sale pending, Gigi filed suit on January 20, 2011 to prevent the loss of her home at a foreclosure sale.

73.     On January 7, 2013, the Notice of Default previously recorded on October 5, 2010 was rescinded at the instruction of the then loan servicer, Homeward Residential, Inc. f/k/a American Home Mortgage Servicing, Inc. A copy of this rescission is attached as Exhibit "K." As of this date Plaintiffs loan was not considered to be in default.

74.     In April 2013, Robert received a letter from Ocwen, the new servicer of the mortgage loan, advising that the owner of the loan was now an entity called Invesco IV ("Invesco").  A copy of this notification is attached hereto as Exhibit "L". On Plaintiffs' information and belief, they received no written notice of the transfer of servicing on the loan to Ocwen as required by the provisions of the Real Estate Settlement Practices Act ("RESPA"), 12 U.S.C. § 2605(b)(1). Additionally, on Plaintiffs' further information and belief, Invesco did not provide any notice of change of ownership of their loan to Plaintiffs as required by Section 131g of TILA, 15 U.S.C. §1641g.

75.     Although there was not any recorded assignment of the loan to Invesco, a change in ownership at or around this date is confirmed in the partial payment history of the loan provided by Defendant Caliber in November 2016. This document reflects that on April 12, 2013 there was a change of investor on the loan account.  A copy of this payment history is attached hereto as Exhibit "M."  On information and belief, it is standard practice in the loan servicing industry for all transfers of loan ownership or change of investors to be registered by the loan servicer handling the account in the payment history of the loan at or about the time of any change in ownership of the loan so as to properly allocate payments received and distribute them to the new owner/investor.

76.     The partial payment history provided by Caliber reflects yet another change of investor on the loan, this one on April 19, 2013, but again there is no recorded assignment reflecting who the new owner of the loan was, nor were

1    Plaintiffs advised of this change of ownership as required by Section 131g of
2    TILA, 15 U.S.C. § 1641g. See Exhibit "M."

3         77.    In June 2013, Ocwen sent a letter indicating that the loan was in
4    default and it intended to initiate foreclosure proceedings on the property.  A copy
5    of this letter is attached hereto as Exhibit "N."   On Plaintiff's information and
6    belief the loan was not in default at this time because Ocwen, in the form of
7    required servicer advances, had been paying to the purported owner of the loan all
8    monthly payments of principal and interest supposedly due under the terms of the
9    Promissory Note and Deed of Trust.

10        78.    The partial payment history provided by Caliber reflects that there
11   was another change of investor on the loan, this one on October 23, 2014. See
12   Exhibit "M."  On Plaintiffs' information and belief, the loan was sold on or around
13   this     date     to     Altisource     Residential,     LP     ("Altisource").
14   (http://ir.altisourceresi.com/sec.cfm?SortOrder=Type%20Ascending&DocType=&
15   DocTypeExclude=&Year=&FormatFilter=&CIK= ) A copy of the August 10,
16   2015 10Q filed by Altisource Residential Corp is attached as Exhibit "O.".  There
17   is, however, no recorded assignment of the Note and Deed of Trust from Invesco
18   to Altisource. On Plaintiffs' information and belief, they were not provided with
19   any notice of change of ownership by Altisource as required by Section 131g of
20   TILA, 15 U.S.C. § 1641g.

21        79.    On October 28, 2014, the partial payment history provided by
22   Caliber, Exhibit "M," reflects that there was another change of investor on the
23   loan, followed, on October 31, 2014, by yet another change of investor. There are
24   no assignments or other documentation indicating who these new investors are.
25   Nor were Plaintiffs provided any notices of change of ownership as required by
26   Section 131g of TILA, 15 U.S.C. § 1641g.

27        80.    According to page 7 of the Altisource 10Q filed with the SEC on
28   November 24, 2014, the loan was purportedly transferred to the ARLP Series

2014-2 securitized trust. There is no recorded assignment of the loan from Altisource to the ARLP Series 2014-2 Trust, nor is this transfer reflected in the partial payment history provided by Caliber. Exhibit "M." On Plaintiffs' information and belief, they were not provided with notice of this transfer of ownership by ARLP Series 2014-2 Trust in violation of Section 131g of TILA, 15 U.S.C. § 1641g.

81.    On November 20, 2014 Ocwen sent a letter to Plaintiffs advising them that the loan was delinquent and threatening the initiation of foreclosure proceedings. A copy of this letter is attached as Exhibit "P." On Plaintiff's information and belief the loan was not in default at this time because Ocwen, in the form of required servicer advances, had been paying to the purported owner of the loan all monthly payments of principal and interest supposedly due under the terms of the Promissory Note and Deed of Trust.

82.    In response to Ocwen's letter, on December 12, 2014 counsel for Plaintiffs sent Ocwen a Qualified Written Request (QWR) pursuant to the Real Estate Settlement Practices Act (RESPA), 12 U.S.C. § 2605 advising Ocwen that 1) the property and the subject loan were currently in litigation; 2) that there was a *lis pendens* on the property; 3) that there was a dispute regarding the validity of certain transfers of the Note and DOT rendering the chain of title questionable; 4) that a dispute existed over who the correct legal owner of the Note and DOT were and who was the proper party with the legal right to initiate any foreclosure proceedings; and 5) questioning whether Ocwen had the legal right to initiate foreclosure proceedings at that time.  Further, the QWR specifically requested that Ocwen provide Plaintiffs with 1) a copy of the original note; 2) a copy of the original deed of trust; 3) copies of any assignments of the note since the inception of the loan to the present time;  4) copies of any assignments of the DOT since the inception of the loan to the present time;   5) copies of any documents which demonstrate the right of Ocwen to institute foreclosure on the property; 6) a copy

of the payment history of the loan; and 7) the name and contact details for the current trust a  or other owner of the loan on whose behalf Ocwen was servicing the loan. A copy of this letter is attached hereto as Exhibit "Q."

83.    Pursuant to the requirements of RESPA, Ocwen was required to acknowledge receipt of Plaintiffs' QWR within five (5) days (see 12 U.S.C. § 2605(e)(1)(A)), to provide the identity and contact details of the new owner within ten (10) business days (see 12 U.S.C. § 2605(k)(1)(D)), and to act with respect to Plaintiffs' inquiry within thirty (30) days (see 12 U.S.C. § 2605(B)(2)). Ocwen did none of these. When Ocwen failed to either acknowledge receipt of Plaintiffs' QWR, provide the identity of the new owner of the loan, or timely respond to the questions in the QWR, counsel for Plaintiffs sent them another QWR on January 16, 2015. A copy of this letter is attached hereto as Exhibit "R."    Ocwen also did not provide any acknowledgement of receipt to Plaintiffs' January 16, 2015 as required by 12 U.S.C. § 2605(e)(1)(A).

84.    On January 27, 2015, Ocwen sent a letter to Plaintiffs advising them that the loan was delinquent and threatening the initiation of foreclosure proceedings. A copy of this letter is attached as Exhibit "S." On Plaintiff's information and belief the loan was not in default at this time because Ocwen, in the form of required servicer advances, had been paying to the purported owner of the loan all monthly payments of principal and interest supposedly due under the terms of the Promissory Note and Deed of Trust.

85.    On January 31, 2015 Ocwen wrote a letter to Plaintiffs which only stated the date the loan was originated, that Ocwen was obligated to service the loan in accordance with the terms of the Note and Mortgage and that a review of the Note indicated to Ocwen that the loan was valid. Ocwen also provided what it called a Detailed Payment Reconciliation History supposedly reflecting all credits and disbursements made on the loan and the resulting loan status. However, a review of this document reveals that it did not reflect the full payment history of

the loan from inception as requested but rather only from the period from on or around March 1, 2013, the date when Ocwen apparently took over servicing of the loan. Ocwen did not provide any of the other information requested in Plaintiffs' first or second QWRs or explain why they were unable to provide it. Here Ocwen was in violation of 12 U.S.C. § 2605 (e)(B)(2) and 12 U.S.C. § 2605(k)(1)(D). A copy of this letter is attached as Exhibit "T."

86.     On March 4, 2015 counsel for Plaintiffs sent Ocwen yet another QWR reminding them of the QWR's sent on December 12, 2014 and January 16, 2015, advising them that they still had not answered any of the questions posed to them in said QWR's or provided the requested documentation.  This letter also pointed out the inadequacy of Ocwen's response of January 31, 2015, and again requested that they comply with their obligations under RESPA. A copy of this letter is attached hereto as Exhibit "U."

87.     Ocwen failed to timely acknowledge receipt of Plaintiffs' March 4, 2015 QWR, in violation of 12 U.S.C. § 2605(e)(1)(A), and failed to respond to Plaintiffs' inquiry within the time limits required by the statute, again in violation of 12 U.S.C. § 2605 (e)(B)(2) and 12 U.S.C. 2605(k)(1)(D).

88.     On April 9, 2015, Ocwen acknowledged receipt of Plaintiffs' correspondence without identifying which of Plaintiffs' three (3) separate QWR's it was referring to, simply stating that: "we have determined additional time is required to review the details pertaining to your specific request. As a result, we are unable to respond within the 30-day anticipated timeline. Under the Real Estate Settlement Procedures Act (RESPA) we are afforded an additional 15 days to complete our research and provide a response."  A copy of this letter is attached as Exhibit "V."  This acknowledgment was both untimely under RESPA and failed to comply with the requirements of 12 U.S.C § 2605 (e)(C)(i) in that it did not explain why the information Plaintiffs had requested was either unavailable or could not be obtained by Ocwen.  By this point in time over ninety (90) days had

passed since Plaintiffs' first QWR dated December 12, 2014 had been received by Ocwen.

89.    On April 13, 2015 Ocwen wrote a letter to Plaintiffs' counsel acknowledging that they had received a QWR, again without noting which of the QWR's they were referring to. Rather than fully responding to the questions that had been raised by Plaintiffs on three (3) occasions now, or providing the documents requested, Ocwen merely parroted its January 31, 2015 letter providing the date the loan originated, stating again that they were obligated to service the loan in accordance with the terms of the Note and DOT, that a review of the Note indicated that the borrower is responsible for the debt and therefore the loan is valid, and they had already provided a Detailed Payment Reconciliation History reflecting all credits and disbursements to the loan.  The letter further indicated that foreclosure proceedings had been initiated on April 1, 2013 and they were unable to cancel the current foreclosure status on the loan. A copy of this letter is attached hereto as Exhibit "W." Yet again Ocwen had ignored their duties and obligations under RESPA.

90.    On April 27, 2015 Ocwen wrote to Plaintiffs advising them that effective June 1, 2015 the escrow payment on the loan would be changed to $1,996.56, broken down as a Principal and Interest payment of $1,376.48 and an escrow payment of $620.08. A copy of this notice is attached as Exhibit "X." This violated the terms of the Promissory Note which was interest only for the first ten (10) years. Additionally, on Plaintiffs information and belief, all monthly mortgage statements sent to Plaintiffs by Ocwen during the time period they were servicing Plaintiffs loan were inaccurate in that they sought both a Principal and Interest Payment. A copy of the Interest Only Addendum to the Promissory Note is attached as Exhibit "A."

91.    On June 3, 2015, a Corporate Assignment of Deed of Trust was prepared by Ocwen and recorded on June 19, 2015 purportedly assigning the DOT

(but not the Note) from Resi to the Wilmington Trust as Trustee of the ARLP Securitization Trust Series 2014-2 (ARLP).  A copy of this assignment is attached hereto as Exhibit "Z."  This attempted transfer is not reflected in the partial payment history provided by Caliber nor were Plaintiffs ever advised by ARLP that such transfer had taken place, in violation of Section 131g of TILA, 15 U.S.C. § 1641g.

92.    Irrespective, this attempted transfer is invalid on its face because Resi was not the legal owner of the loan at the time of the alleged transfer. Further, this attempted transfer also fails because it impermissibly sought to bifurcate the Note and DOT, only transferring the latter.  Additionally, on Plaintiffs' information and belief, Stratus Asset Management Group, who executed the assignment on behalf of RESI, did not have a Power of Attorney allowing them to execute documents on behalf of RESI at this time.

93.    On June 25, 2015, yet another Corporate Assignment of Deed of Trust was prepared by Ocwen and subsequently recorded, this time purportedly assigning the loan from MTGLQ to Wilmington Trust as Trustee for the ARLP Securitization Trust Series 2014-2 (ARLP).  The stated purpose of this assignment was to "correct assignee on assignment recorded 3/31/2011", where previously MTGLQ had assigned the DOT to Resi. A copy of this "corrected" assignment is attached hereto as Exhibit "AA."  Ocwen had recognized that there were gaps in the chain of title of the loan and was attempting to address this by creating a new document to fill in the gaps four years after the fact. This June 25, 2015 assignment was invalid because MTGLQ had no authority to make this assignment, first because MTGLQ had already assigned the loan four years earlier but also because the loan had been previously purchased by Altisource.  Here, too, the assignment sought to impermissibly bifurcate the Note and DOT, only seeking to transfer the latter. Plaintiffs never received written notice of this transfer of

ownership from ARLP, again in violation of Section 131g of TILA, 15 U.S.C. § 1641g.

94.    On information and belief, on or about August 27, 2015, defendant Zieve was substituted in as the trustee under the DOT.

95.    On August 27, 2015 Ocwen, on behalf of Wilmington Trust as Trustee for ARLP, recorded a new Notice of Default and Election to Sell Under Deed of Trust on the property. A copy of this notice is attached hereto as Exhibit "BB." On Plaintiff's information and belief the loan was not in default at this time because Ocwen, in the form of required servicer advances, had been paying to the purported owner of the loan all monthly payments of principal and interest supposedly due under the terms of the Promissory Note and Deed of Trust. Further, pursuant to Paragraph 22 of the Deed of Trust, a Notice of Intent to Accelerate in the event of default must be sent to a borrower and the period of time to cure the breach must pass before any act related to non-judicial foreclosure can be initiated, including the recording of a Notice of Default. This did not happen. Thus, the recording of this NOD was invalid and violated the terms of the Deed of Trust.

96.    On October 6, 2015 counsel for Plaintiffs sent Ocwen (who to this point in time had never properly responded to Plaintiffs' previous Qualified Written Requests of December 14, 2014, January 16, 2015, and March 4, 2015 respectively) another QWR under RESPA requesting that Ocwen provide a copy of the original note, the original deed of trust, all assignments or endorsements of the note since the inception of the loan to the present, copies of any assignments of the deed of trust since the inception of the loan, copies of any documents demonstrating the right of Ocwen to institute foreclosure on the property, the payment history of the loan from the period of time the loan was last less than sixty (60) days delinquent to the present, and the name and contact details for the current owner of the loan on whose behalf Ocwen was servicing the loan.  A copy

of the October 6, 2015 QWR is attached hereto as Exhibit "CC."  Ocwen, again in violation of RESPA, failed to timely acknowledge Plaintiffs' QWR or timely provide the requested documents.

97.     Later that month a representative for Plaintiffs, who had decades of experience in the mortgage loan servicing industry, spoke with an attorney for Ocwen who by happenstance he had been working with on other, unrelated, mortgage loan issues. He advised Ocwen's attorney that he had reviewed the assignment chain on the loan and saw several significant gaps, that he believed that ownership of the loan by Wilmington Trust was in serious question,  that in his view Ocwen's attempts to recreate "corrective" assignments to address these gaps was suggestive of improper and potentially fraudulent behavior and that, as a result, there was no proper legal basis for Ocwen to have recorded a Notice of Default on behalf of Wilmington Trust and ARLP.

98.     Ocwen's attorney agreed to review the situation, including the chain of title, and after doing so conceded that there were significant gaps which called into question whether ALRP was in fact the current legal owner of the loan. Accordingly, he advised Plaintiffs' representative in early November 2015 that he would be recommending to Ocwen that the filing and maintenance of the NOD was improper and lacked legal basis and should be rescinded. The notice of rescission was recorded on November 16, 2015.  A copy of the rescission is attached hereto as Exhibit "DD."

99.     The partial payment history provided by Caliber, Exhibit "M," reflects that on March 24, 2016 there was another change in the investor purportedly owning the loan.  There is no recorded document reflecting any assignment of the loan as of this time.

100.   On April 29, 2016, Ocwen advised Plaintiffs that the servicing of the mortgage loan was being transferred from Ocwen to Caliber, effective May 19, 2016.  A copy of this Notice of Servicing Transfer is attached hereto as Exhibit

"EE." As of the time of this transfer Ocwen still had not provided Plaintiffs any of the information they requested in the four (4) QWR's.

101.   On May 24, 2016, Ocwen provided Plaintiffs with a document entitled "Final Escrow Account Disclosure Statement Account History".   The escrow statement incorrectly reflected, as the first ten (10) years of the loan were interest only, that the monthly mortgage payment on the loan was $2,182.81, of which $1,442.03 was for principal and interest and $740.78 was allocated to the escrow account. In addition to corroborating that the terms of the Promissory Note had been breached, the principal and interest and escrow payment amounts were higher than those contained on the Escrow Analysis of April 27, 2015, Exhibit "X."   No explanation was offered for these discrepancies.   A copy of this Final Escrow statement is attached as Exhibit "FF."

102.   On May 31, 2016, Plaintiffs received a letter from Caliber advising that Caliber had replaced Ocwen as loan servicer on the loan effective May 17, 2016.  The letter was accompanied by a Notice of Servicing Transfer reflecting the same information.  A copy of the letter is attached hereto as Exhibit "GG." As of the time of this letter Ocwen still had not provided to Plaintiffs any of the information requested of them in the four QWR's sent to them.

103.   On Plaintiffs' information and belief, based on servicing industry standards, at the time that Caliber took over the servicing of the loan, Caliber was provided by Ocwen with its entire loan file which should have included, but would not be limited to, the original Note (with a full set of endorsements to the current purported investor), the Deed of Trust (along with all assignments from the date of loan origination to the current time), a full and complete payment history on the loan from its inception, copies of monthly remittance reports from Ocwen to the purported owner of the loan reflecting all servicer advances made by Ocwen to said purported owner while Ocwen was servicing the loan, and full correspondence files between the Plaintiffs and Ocwen regarding the loan

1   (including Plaintiff's challenges to the completeness and accuracy of the chain of

2   title, as well as to who was, in fact, the legal owner of the loan, as well as copies of

3   all the QWR's sent to Ocwen and Ocwen's responses thereto in regards to the

4   loan).

5        104.  On June 3, 2016, Plaintiffs received a Debt Validation Notice from

6   Caliber advising them that the LSF9 Master Participation Trust was now the owner

7   of the loan. Pursuant to this notice, the Principal Balance was $629,249.51 and the

8   total debt was $866,125.14. Included in this total amount was Accrued Interest

9   through 6/2/2016 in the amount of $165,746.09. This amount appears overstated

10   based on the $1,609.64 monthly interest amount reflected in the mortgage

11   statements. This purported change of ownership is not reflected on the partial

12   payment history provided by Caliber, and there was no recorded assignment of the

13   loan to LSF9.  A copy of this Debt Validation Notice is attached hereto as Exhibit

14   "HH."

15        105.  On July 18, 2016, Plaintiffs received a letter from Caliber in which

16   Caliber acknowledged receipt of Plaintiffs' written request to cease further

17   communications with them regarding the loan, and stating that accordingly Caliber

18   would no longer communicate with them in this regard.  A copy of this letter is

19   attached hereto as Exhibit "II." Plaintiffs, however, had never sent Caliber such a

20   request.

21        106.  On July 27, 2016 Plaintiffs' representative sent Caliber a Qualified

22   Written Request disputing that the LSF9 Trust was the true legal owner of the

23   loan, and asserting that it could not establish that it was legally entitled to either

24   collect on the debt or to seek to foreclose on the property.  This was based on the

25   recorded assignment chain which indicated that there were significant gaps in the

26   chain of title. The letter also advised Caliber that Ocwen had admitted that it did

27   not have a full and complete payment history of the loan in its files, which threw

28   into question its ability to certify the correct amounts due under the loan.  As such

1    a request was made to Caliber to provide Plaintiffs with a full and complete

2    payment history as well as an itemized breakdown of all amounts Caliber asserted

3    were due and owing on the loan. A copy of this letter is attached as Exhibit "JJ."

4    107.   Defendant   Caliber   acknowledged   receipt   of   Plaintiffs'

5    correspondence on July 27, 2016 and again on July 28, 2016. Copies of these

6    letters are attached hereto as collective Exhibit "KK.". However, Caliber did not

7    timely respond within 30 days to Plaintiffs' request for information or provide the

8    documents requested, as required by RESPA, 12 U.S.C. § 2605e(B)(2).

9    108.   When Caliber did not otherwise respond to Plaintiffs' July 27, 2016

10   QWR, on August 31, 2016 Plaintiffs' representative sent another QWR, this time

11   to Caliber's CEO, Sanjiv Das, providing him with copies of the July 27, 2016

12   QWR and asking him to please have someone in his company respond to

13   Plaintiffs' expressed concerns.  A copy of this letter is attached hereto as Exhibit

14   "LL."

15   109.   On   September   1,   2016   Defendant   Caliber   sent   Plaintiffs'

16   representative a letter acknowledging receipt of his August 31, 2016 email, and

17   stating that it would provide the requested information within the time limits

18   provided by statute for them to respond.  A copy of this letter is attached hereto as

19   Exhibit "MM."

20   110.   On September 7, 2016, Plaintiffs' representative again wrote to

21   Defendant Caliber describing (1) why he was believed that LSF9 Trust could not

22   demonstrate that it was the true owner of the loan; (2) why the LSF9 trust could

23   not demonstrate that it was the appropriate legal entity to either seek to collect on

24   the alleged debt or to initiate any foreclosure related activity; (3) that Caliber was

25   unable to validate the amount it claimed was due under the loan as required by

26   Consumer Protection Finance Board Regulations as well as the Fair Debt

27   Collection Practices Act (FDCPA); (4) that the initial letter of July 27, 2016,

28   which served as a Qualified Written Request (QWR) under the same statutes, had

specifically disputed Caliber's right to collect on the debt; (5) that Caliber had not provided any response to said QWR in violation of RESPA and had failed to validate the debt as required under the provisions of the FDCPA; (6) reminded Caliber that Ocwen had acknowledged there were serious title deficiencies in terms of the ownership of the loan, had attempted to create and file "corrected" assignments to try and fix these issues, and rescinded the NOD once it realized that it was unable to correct these title issues; (7) that Caliber would have the same difficulties in establishing a legal basis for recording any NOD on the home; (8) that Ocwen had already advised that it had lacked possession of a complete payment history of the loan and thus could not substantiate the debt during the time when t when it was the servicer; (9) that because Caliber had only received a partial payment history from Ocwen, it too would not be able to provide a complete payment history as required to collect on the debt; (10) that Caliber had already sent Plaintiffs contradictory demands for payment reflecting different amounts in different documents; (*i.e.* the mortgage statement of June 3, 2016 reflected a total amount due under the loan of $828,122.94, yet the Debt Validation letter dated the same day stated that the total amount due was $886,125.14); and (10) that Caliber could not meet its burden under law to substantiate the amount of the debt in order to either to seek to collect or to initiate any actions for alleged non-payment under the Note. A copy of this letter is attached hereto as Exhibit "NN."

111.   On September 7, 2016, Caliber sent Robert a letter stating it was "in response to your inquiry regarding the owner of your mortgage loan" and stating that the owner was LSF9.  A copy of this letter is attached hereto as Exhibit "OO." This response was untimely in that such information had to be provided by Caliber within ten (10) business days pursuant to 12 U.S.C. § 2605(k)(1)(D).

112.   On September 12, 2016 Caliber responded to Plaintiffs' letter of September 7, 2016, by mischaracterizing it as a request by Plaintiffs for a short

1   sale, and without addressing even one of the points raised in the letter. Instead, the

2   response advised that their investor would not approve the loss that Plaintiffs'

3   short sale offer would produce if accepted. A copy of this letter is attached as

4   Exhibit "PP." Plaintiffs never made a short sale offer.

5        113. On September 21, 2016, Caliber sent Plaintiffs a letter

6   acknowledging, once again, the letter sent to Caliber by Plaintiffs representative

7   on August 31, 2016 and asserting that it was diligently researching the request and

8   would send a follow up response to Plaintiffs within 15 days. A copy of this letter

9   is attached as Exhibit "QQ."

10       114. On September 26, 2016, Plaintiffs' representative again wrote the

11   CEO of Caliber, advising him that a phone call had been received from an

12   employee of Caliber earlier that day in which they advised that Caliber would not

13   be responding to or addressing any of the concerns relayed to them in Plaintiffs'

14   previous correspondence concerning the dispute over the ownership of the loan or

15   the amount of the debt actually owed by Plaintiffs. Further, in that phone call

16   Caliber told Plaintiffs' representative that notwithstanding the clear disputes

17   regarding who in fact was the legal owner of the loan, not to mention the amount

18   of the alleged debt due, Caliber had decided to pursue its normal servicing

19   function related to the loan (*i.e.* to seek foreclosure). Plaintiffs' representative

20   strongly disagreed with this assessment and warned the CEO that Caliber's failure

21   to timely acknowledge or respond to Plaintiffs' written inquiries were violations of

22   law, specifically RESPA, the Rosenthal Act and FDCPA, as well as California

23   statutes enumerated in the Homeowners Bill of Rights. A copy of this letter is

24   attached hereto as Exhibit "RR."

25       115. On September 27, 2016 Caliber sent Plaintiffs a letter acknowledging

26   receipt of Plaintiffs' September 26, 2016 letter to the CEO and stating that it

27   would perform the necessary research and respond within the time period required

28   by law. A copy of this letter is attached hereto as Exhibit "SS."

116.   On October 6, 2016, Plaintiffs' representative sent yet another letter to the CEO of Caliber, advising that it had been more than 60 days since Plaintiffs had sent the QWR to Caliber on July 27, 2016, that Caliber had still not provided the written response to which Plaintiffs were legally entitled, and that, as a result, Caliber was still in violation of the provisions of RESPA.   Plaintiffs' representative again advised Caliber that if it began any foreclosure related activities against the property they would be in direct violation of the California Homeowners Bill of Rights.   A copy of this letter is attached hereto as Exhibit "TT."

117.   On October 6, 2016, Caliber wrote Plaintiffs a letter in a partial and incomplete response to Plaintiffs' August 31, 2016 and September 7, 2016 Qualified Written Requests. Caliber first denied receipt of Plaintiffs' QWR dated July 27, 2016, despite their letter of July 27, 2016 acknowledging its receipt, and asserting accordingly that there was no RESPA violation.   A copy of this letter is attached hereto as Exhibit "UU."   Next, Caliber said that the admissions of Ocwen that they did not have a full and complete payment history of the loan was not a concern for Caliber, notwithstanding that the reliance by Ocwen and then Caliber upon an incomplete payment history threw into question the legal ability of either servicer to certify the correct amount due under the loan, a prerequisite for their ability to seek to validate and collect on the alleged debt.   Caliber continued by stating that if Plaintiffs believed that those issues concerned the servicing activities of Caliber, Plaintiffs should provide Caliber with that information, ignoring that in Plaintiffs' QWR's Caliber had been repeatedly advised that based on this admission Caliber could not substantiate the debt by relying on an incomplete payment history received from Ocwen upon transfer of the loan file.

118.   Regarding Plaintiffs' concerns about the differing amounts stated to cure the default, Caliber chose not to directly address this issue, instead merely stating, incorrectly, that the amount of $828,122.94 listed on the mortgage

statement was the amount to cure the default and the amount of $866,125.14 was the total outstanding due on the loan.  They offered no explanation as to why the monthly mortgage statement reflected that the amount to cure the alleged default was listed as $251,882.57, not $828,122.94, or why the monthly statement reflecting that the total amount due and owing on the loan was $828,122.94, while the debt validation letter had the differing amount of $866,125.14.

119.   Regarding the assignment chain, Caliber admitted that Plaintiffs were correct and that there were indeed gaps in the assignment chain.  Remarkably, Caliber then stated that they intended, just as Ocwen had tried to do, to create a new "corrective assignment" to back-fill this gap.  Further, they needed to "complete a title search prior to Caliber filing the Assignments in question for recording."  And that "**once the title search is complete, a follow up response will be sent to you under separate cover at which point we will be able to provide further clarification on the legal owner of the loan, etc.**"  See Exhibit "UU."  At this point in time Caliber had still not provided Plaintiffs with the documents requested in the QWR's of July 27, 2016 and August 31, 2016 nor timely responded to Plaintiffs' concerns as required under RESPA pursuant to 12 U.S. Code 2605(e)(B)(2).

120.   On October 13, 2016, Plaintiffs' representative responded to Caliber's letter of October 6, 2016 with another QWR.  A copy of this letter is attached hereto as Exhibit "VV."  First, Plaintiffs' representative reminded Caliber that Caliber's claim that it had not received the July 27, 2016 QWR was not true, as Caliber itself had acknowledged its receipt in writing that very day, July 27, 2016.  Plaintiffs' representative again reminded Caliber that it was in violation of RESPA because of its failure to respond to Plaintiffs' QWR and reiterated Plaintiffs' demand that Caliber respond fully and completely to the previous request.

121.   Regarding the discrepancies in the amount of the alleged debt, Plaintiffs' representative repeated and reiterated Plaintiffs' concerns and pointed

out that Caliber's cursory response was difficult to decipher, and requested that Caliber provide a detailed and understandable explanation of the difference in the amount of debt stated on various documents sent by Caliber to Plaintiffs. Plaintiffs' representative again requested that Caliber provide a complete copy of the full payment history of the loan and an itemized breakdown of the amounts, including all fees and expenses that Caliber claimed were owed on the loan – information that had been requested from Caliber on several prior occasions, and to which Plaintiffs were legally entitled.

122. Plaintiffs' representative continued by stating that Caliber's admission that there were gaps in the assignment chain demonstrated that Caliber lacked the ability to identify the actual legal owner of the loan, yet Caliber was continuing to seek to collect on the alleged debt.  Caliber was again reminded that seeking to collect on a debt on behalf of someone who is not the true legal owner violated the Homeowners Bill of Rights as well as the Rosenthal Act and FDCPA. Finally, Caliber was reminded, yet again, that Ocwen earlier had attempted to go down the path of recreating missing documents as Caliber said it now planned to do, and that these attempts by Ocwen smacked of fraud, which would be how any similar attempt by Caliber would inevitably be regarded.   See Exhibit "VV." Caliber did not timely acknowledge receipt of this QWR as required by RESPA, 12 U.S.C § 2605(e)(1)(A).

123.   On October 17, 2016, Caliber sent a letter to Plaintiffs acknowledging once again Plaintiffs' letter of September 26, 2017, stating that Caliber was "diligently researching your request and requires additional time to fully complete our review.…You may expect a follow up response to be sent within fifteen (15) days."  A copy of this letter is attached as Exhibit "WW."

124.   On October 20, 2016, Caliber sent Plaintiffs a letter entitled "Changes to Your Mortgage Interest Rate and Payments on December 1, 2016".  Herein, Caliber asserted that the current Principal and Interest payment was in the amount

of $1,638.67, a figure that was at odds with the May 24, 2016 Notice of Final Escrow, Exhibit "XX" hereto wherein the Principal and Interest payment was listed by Ocwen as being $1,442.03. Further, by this document Caliber asserted that Plaintiffs former monthly payment of $2,343.60 would now be increased to $4,288.84, effective December 1, 2016 over the remaining two hundred forty (240) months of the loan, as the initial ten (10) year loan term was interest only. The letter also reflected that the amount remaining due under the loan at this point in time was $617,956.96. This alleged amount is at odds with the Debt Validation Letter of June 3, 2016, Exhibit "HH," which reflected a Principal Balance of $629,249.51, as well as the monthly statements sent to Plaintiffs.

125. On October 27, 2016, Caliber wrote to Plaintiffs advising them that it had received Plaintiffs' letters of October 6, 2016 and October 13, 2016 and that Caliber was "diligently researching your request and requires additional time to fully complete our review…You may expect a follow up response to be sent within fifteen (15) days." A copy of this letter is attached at Exhibit "YY."

126. On November 1, 2016, Caliber sent a letter to Plaintiffs acknowledging that they had in fact received a Qualified Written Request for information regarding the loan on July 27, 2016 from Plaintiffs' representative and stating that their previous correspondence of October 6, 2016 in which they denied its receipt was in error, conceding they had not timely responded to the QWR as required by RESPA, 12 U.S.C. § 2605(e)(B)(2). A copy of this letter is attached hereto as Exhibit "ZZ."

127. Caliber then advised that they had now completed the endorsement chain on the Note to its investor, the LSF9 Trust, which they said "represents the investor's ownership and authority to enforce the note". Caliber continued: "While the completed endorsement chain is in place, we are still pending the completion of a corrective Assignment as referenced in our previous correspondence dated October 6, 2016." "The title search is still pending, which

must be completed before Caliber can file the Assignments in question for recording." "As a reminder, due to the outstanding Assignments and the pending title search, Caliber is unable to further review a settlement offer on the loan." Ignoring all admonitions, Caliber had gone down the same deceptive path as Ocwen, creating their own documents to try and fill in the clear gaps in the chain of title. Caliber concluded by saying that it was still conducting research regarding Plaintiffs' concerns about the disputed amounts on the loan – this, over three months after Plaintiffs' first challenged the accuracy of Caliber's debt collection activities. See Exhibit "ZZ." Caliber still did not provide the complete payment history requested by Plaintiffs beginning in July 27, 2006, in continued contravention of their obligations to do so under RESPA, 12 U.S.C. § 2605(e)(B)(2).

128. Rather than providing clear proof of the loan being owned by the LSF9 Trust and clearly establishing their legal ability to cause a Notice of Default to be filed on the loan, the "completed" Note endorsements and allonges provided by Caliber instead raised even more concerns over the chain of title.

129. A review of the "endorsements" reveals that the same person, Elizabeth Willard (who also was a signatory to the November 12, 2010 assignment transferring the loan from MTGLQ to Resi) executed two of the endorsements Caliber relied upon. Her signature first appears on an undated allonge where she supposedly endorsed a transfer of the Note from MTGLQ to Resi. Her signature appears again on the bottom of the Note itself, supposedly endorsing the Note from CitiMortgage to MTGLQ. This signature was also undated.

130. Certain problems are presented by these documents. The first is that Elizabeth Willard's signatures on these two supposed endorsements do not match. While her signature on the November 12, 2010 assignment matches her signature on the endorsement from MTGLQ to Resi, it clearly does not match her signature on the endorsement from CitiMortgage to MTGLQ. This is most curious and

raises an inference that one of these signatures was affixed by someone other than Ms. Willard.  The second problem is that based on the recorded assignments, the endorsement from MTGLQ to Resi which is reflected on the allonge, had to occur prior to the alleged endorsement from CitiMortgage to MTGLQ.  This raises the question of how the endorsement from CitiMortgage to MTGLQ appears on the bottom of the Note as opposed to on a subsequent allonge after the endorsement to Resi.   The only thing that makes sense is that in their haste to provide an endorsement chain that might support Caliber's stated position as to the ownership of the loan, whoever was recreating the documents got the order wrong.

131.   In addition, the supposed endorsement chain provided by Caliber has gaps in the chain of endorsements, lacking endorsements from certain necessary parties in order to establish that the LSF9 trust is in fact the legal owner of the loan.  For instance, there is no endorsement from MTGLQ to Invesco, there is no endorsement from Invesco to Altisource and there is no endorsement from Altisource to ALRP. Nor, if Resi was the owner of the loan as reflected in the Assignment chain, is there any endorsement from Resi to either Invesco or Altisource, or from Altisource to the ARLP 2014-2 trust.  It is impossible to establish from the documents provided and relied upon by Caliber that the LSF9 Master Participation Trust is, in fact, the legal owner of the loan and thus has the legal authority to seek to collect under the Note or to enforce its terms via the initiation of non-judicial foreclosure.

132.  On November 3, 2016, Plaintiffs' representative responded to Caliber's letter of November 1, 2016 with another QWR, again requesting that Caliber provide the documents that Plaintiffs had been seeking for months, namely: (1) copies of all assignments; (2) the results of Caliber's complete title examination; and (3) a full and complete copy of the payment history of the loan and a detailed breakdown of the amounts claimed to be due under the loan.  A copy of this letter is attached hereto as Exhibit "AAA."  On that same day,

Plaintiffs' representative also sent to Caliber a request to provide Plaintiff with copies of the TILA required Transfer of Ownership letters for the following entities; CitiMortgage, Inc., MTGLQ Investors, LP, Resi Whole Loan IV LLC, Altisource Residential LP, Wilmington Trust as Trustee for the ARLP-2 Trust, Invesco IV, and LSF9. These letters, as previously noted, are required to be sent whenever there is a change of ownership of a borrower's mortgage loan, and on Plaintiffs' information and belief, would normally be included in and part of the loan file related to the loan.  See Exhibit "AAA." Caliber never acknowledged receipt of this further request for information.

133.   On November 10, 2016, Caliber sent a follow-up letter to Plaintiffs, attached hereto as Exhibit "BBB," in which they reiterated that Caliber had in fact received Plaintiffs' Qualified Written Request on July 27, 2016, that previously they had determined that there was a gap in the claim of Assignments, and that Caliber intended to complete a "corrective" Assignment to fill in those gaps. Further, Caliber reiterated that the endorsement chain to Caliber's investor, U.S. Bank Trust, N.A. as Trustee for the LSF9 Master Participation Trust, had been completed, and a copy of the Note and allonges had been provided to Plaintiffs. These, Caliber again asserted, represented the investors' ownership and authority to enforce the note.

134.   Caliber went on to say that the title search was still pending and had to be completed before Caliber could file the "corrective" assignments for recording.   Caliber also stated that as of the date of this letter "we have no additional documentation to provide concerning the matter, and believe we have provided adequate clarification relating to our concerns.  **Furthermore, we are only able to provide you with documents that have been provided to us by the previous servicer Ocwen Loan Servicing LLC.  Caliber did not originate this loan, nor are we able to provide a complete payment history of the loan since the time of origination."** (Emphasis added). There is no reason that Caliber had to

wait until this time to admit that it did not have the payment history requested by Plaintiffs repeatedly in several QWR's to Caliber beginning July 27, 2015. Their violation of 12 U.S.C. § 2605(e)(B)(2) in this regard cannot be clearer or more apparent. Nor can it be any more clearly conceded that they lacked the documentation necessary to accurately validate the nature and amount of Plaintiffs' alleged debt, a necessary legal predicate for their attempts at collection.

135.   Caliber then turned to Plaintiffs' continuing concerns regarding the various and contradictory amounts that Caliber had sought to collect from Plaintiffs and finally admitted that the amounts stated in their October 6, 2016 letter were incorrect.  Caliber also admitted, as Plaintiffs had asserted on several occasions, that the debt validation letter and the monthly billing statements mailed on June 3, 2016 "were substantially different in the amounts owed" passing it off "as a result of an inadvertent clerical error." Tellingly, Caliber continued, "We appreciate that you have brought these concerns to our attention, and will be implementing the necessary steps to ensure corrections are made to our monthly mortgage statements moving forward." This suggests that Caliber had a systemic issue, not just involving Plaintiffs' loan but with all loans they were servicing, calling generally into question the accuracy and validity of their debt validation letters as compared with the mortgage statements they were sending. Notwithstanding these admissions, Caliber did not take steps to correct these errors as required by RESPA, 12 U.S.C. § 2605(e)(B)(2)(A). Finally, with this letter, Caliber provided a copy of a Caliber-prepared partial payment history that documented various transfers of ownership of the loan which were not reflected by either the recorded assignments or the endorsement chain on the Note. See Exhibit "M."  Caliber never addressed Plaintiffs November 3, 2016 request for copies of the Transfer of Ownership records.

136.   On November 21, 2016, Plaintiffs' representative sent another QWR to Caliber.     Plaintiffs' representative reminded Caliber that it had still not

adequately responded to Plaintiffs' QWR of July 2016 as Caliber had not provided the documentation needed to substantiate the nature and amount of the debt it sought to collect, nor had they provided a full and complete assignment chain and endorsement chain necessary to establish that LSF9 was in fact the true legal owner of the loan.  This letter took issue with Caliber's repeatedly inconsistent positions and Caliber's decision to recreate documents in an attempt to fix the clearly demonstrated gaps in the chain of title.   It advised Caliber that Plaintiffs believed that Elizabeth Willard's signature had been fabricated on one of the endorsements and challenged the authenticity and validity of the endorsements made by Resi and Caliber in connection with the loan.  Once again, Caliber was admonished that it was acting in direct contravention of California law.  A copy of this letter is attached hereto as Exhibit "CCC." Caliber did not timely acknowledge this new QWR as required by 12 U.S.C. § 2605(e)(1)(A).

137.  On December 9, 2016, Caliber wrote again to Plaintiffs' representative advising Plaintiffs that Caliber had no further information or documentation to provide, that they believed that they had addressed all of Plaintiffs' multiple concerns, and that Caliber had already fully performed their duty of investigation.  A copy of this letter is attached as Exhibit "DDD."  As of the point in time this letter was received, Caliber had never fully responded to Plaintiffs' QWR as required under RESPA. Caliber still had not provided to Plaintiffs copies of all assignments, the results of Caliber's complete title examination or a full and complete copy of the payment history of the loan and a detailed breakdown of the amounts claimed to be due under the loan.  Caliber was in violation of 12 U.S.C. § 2605(e)(B)(2).

138.  On or about January 25, 2017, the Deed of Trust (but not the Note) was assigned by Wilmington Trust as Trustee for the ALRP 2014-2 Master Participation Trust to U.S. Bank, N.A. as Trustee for LSF9.  Plaintiffs received no notice of this change of ownership from ALRP in violation of Section 131g of

TILA, 15 U.S.C. §1641g.  A copy of this Assignment is attached hereto as Exhibit "EEE."

139.   On February 9, 2017, unbeknownst to Plaintiffs, a Notice of Default and Election to Sell Under Deed of Trust, with a supporting Declaration of Compliance was recorded by Caliber.  A copy of this NOD is attached hereto as Exhibit "FFF." Included in the NOD was a statement by the Trustee's representative attesting that the loan servicer of Plaintiffs loan, Caliber, had fulfilled its obligations under California Civil Code § 2923.55, (the fulfillment of which is a necessary predicate to being able to legally record a NOD in California) by executing a Declaration of Compliance to the Notice of Default, which Declaration was attached and recorded.   A review of the Declaration of Compliance reveals however that it was not executed by Caliber, the present loan servicer, on behalf of the present purported owner of the loan, LSF9.  Rather, the Declaration was executed back in August 2015 by Ocwen, a predecessor servicer, on behalf of the ARLP trust. Further, this Declaration of Compliance was regarding a former NOD recorded by Ocwen and subsequently rescinded. As such both the Trustees attestation as well as the Declaration of Compliance attached to the NOD were invalid, as they failed to comply with the provisions of California Civil Code § 2923.55, and California Civil Code § 2924.17(a), rendering the NOD void. The Notice of Default was not mailed until February 27, 2017. On Plaintiff's information and belief the loan was not in default at this time because Ocwen, and then Caliber, in the form of required servicer advances, had been paying to the purported owner of the loan all monthly payments of principal and interest supposedly due under the terms of the Promissory Note and Deed of Trust.

140.   Pursuant to Paragraph 22 of the Deed of Trust, any foreclosure related activity including the recording of a NOD can only be taken after the borrower has been sent a Notice of Intent to Accelerate and the period of time for the borrower to cure has expired.  Accordingly, the filing by Caliber of the NOD on the property

on February 9, 2017, prior to receipt of any Notice of Intent to Accelerate, was premature and invalid under the terms of the Deed of Trust.

141.   On February 10, 2017, Plaintiffs' representative, unaware that the NOD had been recorded, sent a new Qualified Written Request to Caliber. A copy of this NOD is attached hereto as Exhibit "GGG."  He noted the history of their communications and reminded Caliber that (1) it still had not complied with the QWR's sent to Caliber beginning five (5) months before; (2) based on its previous contradictory responses Caliber could clearly not validate the accuracy of the debt allegedly owed which they were continuing to seek to collect upon; (3) there were new and additional issues and questions regarding the calculations of the monthly payment and the amortization rate used, additional inconsistencies in the monthly payments alleged as due, and concerns over Caliber's attempt to collect fees and late charges in the amount of $17,948.57 and $4,023.21, respectively, which the partial payment history provided by Caliber reflected as being waived; and (4) Caliber had not responded to Plaintiffs' concerns about the chain of title or endorsement issues related to the loan, including the possibility that documents had been forged and that it appeared from the Caliber supplied partial payment history that there were six (6) additional changes of ownership which occurred between April 12, 2013 and March 24, 2016 that were not reflected within the assignment chain or by endorsements on the Note.

142.   That same day Caliber acknowledged receipt of the communication from Plaintiffs' representative, promising to "perform the necessary research and respond within the time period required by law." A copy of this letter is attached as Exhibit "HHH."

143.   On February 24, 2017, Caliber wrote to Plaintiffs acknowledging receipt from them of communications informing Caliber that Plaintiffs were no longer represented by an attorney.  A copy of this letter is attached as Exhibit "III."  Plaintiffs sent no such letter or communication to Caliber.

144.  On March 1, 2017, Caliber sent Plaintiffs a Notice of Default and Intent to Accelerate the loan.  A copy of this Notice is attached hereto as Exhibit "JJJ."  Pursuant to Paragraph 22 of the Deed of Trust, this Notice must be sent to a borrower and the period of time to cure the breach must pass before any act related to non-judicial foreclosure can be initiated, including the recording of a Notice of Default.  Thus, the recording of the NOD in February 9, 2017 was invalid and violated the terms of the Deed of Trust.

145.  Ironically, the Notice of Default and Intent to Accelerate also advised Plaintiffs that they had the right to receive from Caliber copies of any assignments of the borrower's mortgage or deed of trust as well as a copy of the borrower's payment history since the time when the borrower was less than sixty (60) days past due -- the very same documents that Plaintiffs had been requesting of Caliber for over six (6) months and which Caliber had still never provided.  See Exhibit "JJJ."

146.  On March 3, 2017, Caliber sent Plaintiffs' representative a letter in response to his of February 10, 2017.  The response ignored the new issues raised in Plaintiffs' February 10, 2017 QWR, and incorrectly advised Plaintiffs that Caliber had "addressed all of your concerns in our previous correspondence, dated November 10, 2016 and November 16, 2016".  A copy of this letter is attached as Exhibit "KKK."  As of this point in time, Caliber had still not provided Plaintiffs with copies of all assignments representing a full assignment chain, the results of Caliber's complete title examination or a full and complete copy of the payment history of the loan ad a detailed breakdown of the amounts claimed to be due under the loan. Once again, the statutory time period in which Caliber was obligated to respond pursuant to RESPA has expired.

147.  As of the date of the filing of this Complaint, Caliber had still not provided Plaintiffs with copies of all assignments representing a full assignment chain, the results of Caliber's complete title examination; and a full and complete

copy of the payment history of the loan and a detailed breakdown of the amounts claimed to be due under the loan, all as required under RESPA, 12 U.S.C. § 2605(e)(B)(2). Nor have they responded to Plaintiffs' questions on the loan, explained or corrected financial discrepancies in its billing or statements and accounting, or provided Plaintiffs with copies of the Transfer of Ownership Notices required under TILA.

148.   As of the time of the filing of this Complaint, the Notice of Default on Gigi's property remains part of the public record, a Notice of Trustee's Sale had been issued setting a trustee's sale of the home for June 16, 2017, which has since been continued to July 17, 2017. A copy of the Notice of Trustee's Sale is attached as Exhibit "LLL."

## CLASS ALLEGATIONS

149.   Plaintiffs bring certain Claims of this action on behalf of themselves and as a class action pursuant to the provisions of Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure.  Plaintiffs seek to represent a classes initially defined as:

All California residents whose loans were serviced by Caliber and whose home was either foreclosed upon or are presently awaiting foreclosure ("Caliber Class");

And

All California residents whose loans were serviced by Ocwen and whose home was either foreclosed upon or are presently awaiting foreclosure ("Ocwen Class").

150.   Plaintiffs also seek to represent a sub-class initially defined as:

All California residents whose loans were acquired by Caliber from Ocwen and whose home was either foreclosed upon or are presently awaiting foreclosure ("Sub-Class").

151.   The "Class Period" starts on January 1, 2013, or the earliest time permitted by the claims asserted herein, and continues through the present and the

date of judgment.  Specifically excluded from the Class are: (a) any officers, directors, or employees of Defendants; (b) any judge assigned to hear this case (or spouse or immediate family member of any assigned judge); (c) any employee of the Court; (d) any juror selected to hear this case; and (e) any attorneys of record and their employees.

152.  Plaintiffs reserve the right to modify, expand, or amend the above Class definition or seek certification of a class that is defined differently than above before any court determines whether certification is appropriate following discovery.

153.  *Numerosity*.  Members of the Class are so numerous that joinder of all members is impracticable.  While the number of Class members is unknown to Plaintiffs at this time, Plaintiffs are informed and believe that the Class numbers at least in the thousands.

154.  *Ascertainability*.  The community of interest among the Class members in the litigation is well defined and the proposed Class is ascertainable from objective criteria.  The identities of Class members can be obtained from Defendants' business records.  Class members can be notified of the pendency of Plaintiffs' Complaint by mail or published notice.  If necessary to preserve the case as a class action, the Court can redefine the Class and/or create subclasses.

155.  *Commonality and Predominance*.  There is a well-defined community of interest in the questions of law and fact affecting the parties to be represented in this action.  Common questions of law and fact that exist as to all members of the Class and predominate over any questions affecting only individual members, include, but are not limited to:

(a) Whether Defendants violated the California Homeowner Bill of Rights, California Civil Code Section 2924.6 by recording or causing to be recorded a notice of default when it was not the legal holder of the beneficial interest;

(b) Whether Defendants violated the California Homeowner Bill of Rights, California Civil Code Sections 2924.17(a) and 2923.55 by failing to provide an accurate and complete Certificate of Compliance when they recorded Notices of Default;

(c) Whether Defendants violated the California Homeowner Bill of Rights, California Civil Code Section 2924.17(b) by failing to review competent and reliable evidence to substantiate the borrower's default and the right to foreclose;

(d) Whether Defendants violated the Rosenthal Act;

(e) Whether Defendants violated RESPA;

(f) Whether Defendants violated TILA;

(g) Whether Defendants improperly recorded Notices of Default prior to providing a Notice of Intent to Accelerate to borrowers and an opportunity for them to cure any alleged default in violation of Paragraph 22 of the Deed of Trust;

(h) Whether Plaintiffs and Class members are entitled to damages and/or restitution and the proper measure of that loss;

(i) Whether Plaintiffs and Class members are entitled to an injunction;

(j) The appropriate Class-wide measure of damages.

156. *Typicality*. Each Plaintiff is a member of the Class and each's claims are typical of the claims of members of the Class. Typical of members of the Class, Plaintiffs' home were subject to a Notice of Default by Defendants during the Class Period. Plaintiff and Class members each sustained, and will continue to sustain, damages arising from Defendants' wrongful conduct, as alleged more fully herein. Plaintiffs' claims are founded on the same legal theories as those of the Class.

157. *Adequacy of Representation*. Each Plaintiff is an adequate representative of the Class because his and her interests do not conflict with the

interests of the other Class members and because Plaintiffs have retained counsel competent and experienced in complex class action and consumer litigation, including substantial experience in the types of claims alleged in this Complaint. Plaintiffs and their counsel will fairly and adequately protect the interests of the Class.

158. *Declaratory and Injunctive Relief.* Defendants have acted or refused to act on grounds generally applicable to Plaintiffs and other members of the Class, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the members of the Class.

159. *Superiority of Class Adjudication.* The certification of a class in this action is superior to the litigation of a multitude of cases by members of the Class. Class adjudication will conserve judicial resources and will avoid the possibility of inconsistent rulings. Moreover, there are Class members who are unlikely to join or bring an action due to, among other reasons, their reluctance to sue Defendants and/or their inability to afford a separate action. Equity dictates that all persons who stand to benefit from the relief sought herein should be subject to the lawsuit and hence subject to an order spreading the costs of the litigation among the Class members in relation to the benefits received. The damages, restitution, and other potential recovery for each individual member of the Class are modest, relative to the substantial burden and expense of individual prosecution of these claims. Given the amount of the individual Class members' claims, few, if any, Class members could afford to seek legal redress individually for the wrongs complained of herein. Individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties and the court system presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

160.   In the alternative, the above-referenced Class may be certified because:

    a.   The prosecution of separate actions by the individual members of the Class would create a risk of inconsistent or varying adjudication with respect to individual Class members' claims which would establish incompatible standards of conduct for Defendants;

    b.   The prosecution of separate actions by individual members of the Class would create a risk of adjudications which would as a practical matter be dispositive of the interests of other members of the class who are not parties to the adjudications, or which would substantially impair or impede the ability of other Class members to protect their interests; and,

    c.   Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final and injunctive relief with respect to the Class.

### FIRST CLAIM FOR RELIEF

**(Violation of the California Homeowner Bill of Rights,**

**Cal. Civ. Code § 2920 *et seq.*)**

(By Plaintiffs Against Defendants Caliber, Ocwen, US Bank and LSF9, Zieve and Certain Doe Defendants)

161.   Plaintiffs incorporate all preceding and succeeding allegations by reference as if fully set forth herein.

162.   Plaintiffs bring this claim individually and on behalf of the Caliber Class, Ocwen Class and Sub-Class pursuant to the California Homeowner Bill of Rights, California Civil Code Section 2920.5 *et seq.* (the "HBOR").

163.   Plaintiffs and all other Class members are "borrowers" as that term is defined by the HBOR.

164.   Section 2924.17(a) of the California Civil Code mandates "A declaration recorded pursuant to Section 2923.5 or, until January 1, 2018, pursuant to Section 2923.55, a notice of default, notice of sale, assignment of a deed of trust, or substitution of trustee recorded by or on behalf of a mortgage servicer in connection with a foreclosure subject to the requirements of Section 2924, or a declaration or affidavit filed in any court relative to a foreclosure proceeding shall be accurate and complete and supported by competent and reliable evidence."

165.   Section 2924.17(b) of the California Civil Code provides that "Before recording or filing any of the documents described in subdivision (a), a mortgage servicer shall ensure that it has reviewed competent and reliable evidence to substantiate the borrower's default and the right to foreclose, including the borrower's loan status and loan information."

166.   Section 2923.55 of the California Civil Code provides in pertinent part that a mortgage servicer, mortgagee, trustee, beneficiary, or authorized agent may *not* record a notice of default pursuant to Section 2924 until thirty (30) days after contact is made with the borrower to assess the borrower's financial condition and explore options for the borrower to avoid foreclosure or thirty (30) days after satisfying the due diligence requirement with regard to contacting or attempting to contact the borrower.  In addition, before recording a notice of default, the mortgage servicer must also notify the borrower that they may request a copy of the promissory note, the deed of trust, all assignments of the deed of trust and a copy of the payment history on the loan.

167.   Further, a notice of default recorded pursuant to Section 2924 shall include a declaration that the mortgage servicer has contacted the borrower, has tried with due diligence to contact the borrower as required by this section, or that no contact was required because the individual did not meet the definition of "borrower" pursuant to Section 2920.5(c).

168.   As alleged in detail above, Defendants' actions are contrary to the provisions and requirements of the HBOR. In addition to their own admissions regarding the absence of competent and reliable evidence, a simple review of the payment histories and the loan files received from the predecessor servicer (Ocwen) would have revealed that Defendants lacked competent and reliable evidence demonstrating that they had the right, power or authority to record notices of default or otherwise commence foreclosure proceedings on Plaintiffs' and other Class members' property.

169.   On information and belief, Defendants knew a) that there were discrepancies between the amounts stated as due in their debt validation letters and the monthly mortgage statements sent to Class members; b) they lacked a full and complete payment history of the loans they took over from Ocwen, as well as from other servicers, that they were seeking to collect upon from the Class members; and c) that as a result of servicer advances the alleged debts as well as purported default of the loans of class members could not be validated or substantiated . Consequently, Caliber knew that it clearly lacked the ability to accurately know and thus validate the nature and true amount of the alleged debt owed by Class members.

170.   Defendants, prior to taking the foreclosure related actions herein alleged, did not ensure, as required by statute, that they had reviewed competent and reliable evidence substantiating their legal authority to record, either themselves or as the beneficiary's agent, the Notice of Default.  Indeed, at the time the NOD was recorded, in addition to the foregoing failures, Defendants also knew or from a review of competent and reliable evidence should have known, that the NOD was recorded despite the failure to first provide Plaintiffs and other Class members with the required Notice of Default and Intent to Accelerate and the requisite time to cure the alleged default as required by the applicable DOTs.

171.   In addition, a review of the Declaration of Compliance attached to Plaintiffs' NOD reveals that it was neither accurate nor complete.  First, it was not executed by Caliber, the then loan servicer, on behalf of the then purported owner of the loan, LSF9.  Instead, the declaration was executed back in August 2015 by Ocwen, the predecessor servicer to Caliber, and was executed not on behalf of LSF9, but on behalf of another entity altogether, the ARLP trust. Exhibit "FFF." Second, this declaration was executed in connection with and as support for a wholly separate and prior NOD that was recorded by and subsequently rescinded by Ocwen. The recording of the present NOD by Caliber was required to be accurate and complete, and supported by competent and reliable evidence. Caliber also had to comply with the provisions contained within Civil Code section 2923.55. They did neither.   On information and belief, the Declarations of Compliance attached to the NOD's of other Class members are likewise inaccurate and/or incomplete.

172.   Caliber and LSF9 cannot support the current NOD with an almost two (2) year old declaration executed by a different servicing entity on behalf of a different purported owner.  Nor can Caliber and LSF9 support the current NOD with an almost two (2) year old declaration that supported a now rescinded NOD. There is no basis for the Trustee's attestation or any possible way that the loan servicer, Caliber, fulfilled its obligations under Civil Code § 2923.55, and Civil Code Section 2924.17.  For these reasons, the recording of the NOD by Caliber on behalf of LSF9 was on its face void and invalid. Despite these serial and material HBOR violations, and despite the lack of competent and reliable evidence, Defendants nevertheless proceeded to record the NOD.  On information and belief, these activities were conducted on a Class-wide basis.

173.   Although required to do so prior to recording a notice of default, Caliber failed to provide Plaintiffs and other Class members with notice of their right to request a copy of the promissory note, the deed of trust, all assignments of

the deed of trust and a copy of the payment history on the loan. Nor did Caliber attempt to contact the Plaintiffs or other Class members to assess their financial condition as required to be attested to in the Declarations in support of the NODs.

174. Further, based upon information and belief loan servicers, such as Caliber and/or Ocwen, of residential mortgages that are collateral for residential mortgage backed securitized trusts (RMBS) such as Plaintiffs and class members herein, as well as in some cases for loans that are held for whole loan investors, are required under the terms of the related servicing agreements to make servicer advances. These servicer advances provide continuity of payment to the investors and preserve the related collateral. Servicer advances typically cover, with respect to each mortgage, principal and interest payments on the underlying mortgages, property taxes and assessments and property insurance premiums. As a result of these servicer advances by parties unrelated to the underlying loan agreement, Plaintiffs' and other class members' obligations under the Promissory Note and the Deed of Trust have been met to the securitized trusts purportedly owning their loans and as such they are not and were not in default of their loan obligations. Accordingly, the filing of Notices of Default and the initiation of foreclosure proceedings on Plaintiff's and class member's loans subject to such servicer advances are invalid.

175. Defendants' actions as alleged herein constitute material violations of the HBOR and were carried out by Defendants intentionally, recklessly or were the result of willful misconduct by Defendants. Defendants admitted that there were gaps in the chain of title and were aware that there was a myriad of other problems, which made were at odds with the requirement that they have competent and reliable evidence. Additionally, had Defendants reviewed competent and reliable evidence before recording the NOD, they would have seen the errors and irregularities in the documents and ownership and would have recognized they did not have the legal right or standing to take the actions they took. They would have

also realized that they had not complied with the provisions of Civil Code section 2923.55 and accordingly lacked the ability to record the NOD, or issue the Notice of Trustee's Sale with respect to the Property.  On information and belief, these actions were conducted on a class-wide basis.

176.  Plaintiffs have suffered actual economic damages as a direct and proximate result of Defendants' misconduct.  Accordingly, Plaintiffs are entitled to all relief provided by the HBOR, including attorneys' fees. *See* Cal. Civ. Code § 2924.12(I).   In addition, Plaintiffs are entitled to injunctive relief pursuant to Section 2924.12(a)(2), with said injunction remaining in place until such time as the Defendants have corrected and remedied the various violations of the HBOR as set forth herein.  On information and belief, these actions were conducted on a class-wide basis.

## SECOND CLAIM FOR RELIEF

### (Violation of the Rosenthal Fair Debt Collection Practices Act, Cal. Civ. Code § 1788 *et seq.*)

(By Plaintiffs Against Defendants Caliber, US Bank, and LSF9 and Certain Doe Defendants)

177.  Plaintiffs incorporate all preceding and succeeding allegations by reference as if fully set forth herein.

178.  Plaintiffs bring this claim individually and on behalf of the Caliber Class and Sub-Class against Defendants Caliber, US Bank, LSF9 and Certain Doe Defendants only.

179.  California's Rosenthal Fair Debt Collection Practices Act ("Rosenthal Act") prohibits creditors and debt collectors from, among other things, making false, deceptive, or misleading representations in an effort to collect a debt. Cal. Civ. Code Section 1788 *et seq.*

180.  Plaintiffs and all Class members are "debtor[s]" as that term is defined by California Civil Code Section 1788.2(h).  Under the Rosenthal Act, a

"debt collector" is defined as "any person who, in the ordinary course of business, regularly, on behalf of himself or herself or others, engages in debt collection." *Id.* at § 1788.2(c). Defendants are "debt collectors" as that term is defined in California Civil Code Section 1788.2(c) because they regularly sent or directed to be sent mortgage bills, communications and other notices seeking to collect money from Plaintiffs and Class members and acted as the servicer(s) of Plaintiffs' and Class members' mortgage loans.

181. California Civil Code Section 1788.17 provides that "every debt collector collecting or attempting to collect a consumer debt shall comply with the provisions of Sections 1692b to 1692j, inclusive, of, and shall be subject to the remedies in Section 1692k of, Title 15 of the United States Code." Cal. Civ. Code § 1788.17. Thus, the Rosenthal Act incorporates the provisions of the federal Fair Debt Collection Practices Act (hereinafter "FDCPA") and a plaintiff may state a claim for violation of the Rosenthal Act by showing that a defendant violated any of several provisions of the FDCPA.

182. Section 1692e of the FDCPA provides that a debt collector may not use any "false, deceptive, or misleading representation or means in connection with the collection of any debt including: (2) The false representation of (A) the character, amount or legal status of any debt…." 15 U.S.C. § 1692e(2)(A). Section 1692e(10) further provides that "[t]he use of any false representation or deceptive means to collect or attempt to collect any debt…" is conduct in violation of that Section. *Id.* at § 1692e(10).

183. On information and belief, and as alleged herein, Defendants knew or had reason to know that documents and information, including but not limited to the assignments of the deed of trust and endorsements of the Promissory Note, were not valid to establish their legal right to collect payments from Plaintiffs.

184. Defendants, by their own admission, knew: a) that there were discrepancies between the amounts stated as due in their debt validation letters and

the monthly mortgage statements sent to Plaintiffs; b) that there were discrepancies in the amounts they were seeking to collect based on alleged fees and costs that had been waived according to their own payment history;  c) that they lacked a full and complete payment history on the loan; and d) that as a result of servicer advances the alleged debts as well as purported default of the loans of Plaintiffs and other class members could not be validated or substantiated. Consequently, Caliber knew that it clearly lacked the ability to accurately know and thus validate the nature and true amount of the alleged debt owed by Plaintiffs.

185. On information and belief, Defendants knew a) that there were discrepancies between the amounts stated as due in their debt validation letters and the monthly mortgage statements sent to Class members; b) they lacked a full and complete payment history of the loans they took over from Ocwen, as well as from other servicers, that they were seeking to collect upon from the Class members; and c) that as a result of servicer advances the alleged debts as well as purported default of the loans of Plaintiffs and other class members could not be validated or substantiated. Consequently, Caliber knew that it clearly lacked the ability to accurately know and thus validate the nature and true amount of the alleged debt owed by Class members.

186.  Without the ability to establish their legal right to collect payments, or to validate the nature and true amount of the debt allegedly owed by Plaintiffs and Class members, Defendants have engaged in debt collection activities in violation of the Rosenthal Act, California Civil Code Section 1788.10 *et seq*., and by implication, the FDCPA, by, among other things: (a) misstating the character, amount or legal status of the debt they collected or sought to collect from Plaintiffs and Class members; (b) threatening to take or taking action (filing notices of default to initiate non-judicial foreclosure) that cannot be legally taken given their inability to establish their authority to do so; and (c) using false representations or deceptive means (representing they had standing to take the actions they were

1     taking when the rights they seek to enforce were not assigned to them) to collect or

2     attempt to collect the debt from Plaintiffs and all other Class members.

3          187.   As alleged herein Defendants also falsely represented the character

4     and amount of debts to the Plaintiffs and Class members and used false

5     representations or deceptive means to collect or attempt to collect those debts in

6     that they could not demonstrate that they had the legal right to collect any debt on

7     behalf of the purported owner of the underlying Note or Deed of Trust on

8     Plaintiffs' and other Class members' homes, nor could they validate and confirm

9     the accuracy of the debt amounts allegedly owed.

10          188.   Plaintiffs and all other Class members reasonably relied at the time on

11    Defendants' representations of the character, amount, and validity of the debt

12    allegedly owed and the Defendants' authority to act in the capacity of debt

13    collectors on behalf of the legal owner of the Promissory Note.

14          189.  Defendants' acts as described above were done willfully and

15    knowingly within the meaning of California Civil Code Section 1788.30(b).   As

16    alleged herein, Defendants knew they did not have the documentation necessary

17    and required to establish their right to collect payments from Plaintiffs and all

18    other Class members, to initiate foreclosure on Plaintiffs' and other Class

19    members' properties, or to validate the nature and amount of the debt allegedly

20    owed, yet they continued to do so as though they did.

21          190.   The payments demanded by Defendants on the mortgage purportedly

22    owed by Plaintiffs and Class members are "debt[s]" within the meaning of

23    California Civil Code Section 1788.2(d), because they are "money, property or

24    their equivalent which [are] due or owing or alleged to be due or owing from a

25    natural person to another person."

26          191.   As a result of Defendants' actions herein, Plaintiffs and all other

27    Class members have been damaged and Plaintiffs, on behalf of all Class members,

28    seek all available relief under the California Rosenthal Fair Debt Collection

Practices Act.  Pursuant to California Civil Code Section 1788.17, Plaintiffs and all other Class members are entitled to recover actual damages sustained because of Defendants' violations of the Rosenthal Act, which incorporates the FDCPA. Such damages include, without limitation, monetary losses and damages. Additionally, because Defendants' violations of the Rosenthal Act were committed willingly and knowingly, Plaintiffs and all other Class members are entitled to recover statutory damages in the amount of $1,000 for each violation.  *See* Cal. Civ. Code § 1788.17 and 15 U.S.C. 1692k(a)-(c).

192.   Pursuant to California Civil Code Section 1788.17 and Section 1629k of Title 15 of the United States Code, Plaintiffs, on behalf of the Class, are entitled to recover all attorneys' fees, costs, and expenses incurred in the bringing of this action.

### THIRD CLAIM FOR RELIEF

### (Violation of the Rosenthal Fair Debt Collection Practices Act,

### Cal. Civ. Code § 1788 *et seq.*)

(By Plaintiffs Against Defendants Ocwen, Resi, Altisource, Wilmington Trust,

ARLP and Certain Doe Defendants)

193.   Plaintiffs incorporate all preceding and succeeding allegations by reference as if fully set forth herein.

194.   Plaintiffs bring this claim individually and on behalf of the Ocwen Class against Defendants Ocwen, Resi, Altisource, Wilmington Trust, ARLP and Certain Doe Defendants only.

195.   California's Rosenthal Act prohibits creditors and debt collectors from, among other things, making false, deceptive, or misleading representations in an effort to collect a debt. Cal. Civ. Code Section 1788 *et seq.*

196.   Plaintiffs and all Class members are "debtor[s]" as that term is defined by California Civil Code Section 1788.2(h).  Under the Rosenthal Act, a "debt collector" is defined as "any person who, in the ordinary course of business,

regularly, on behalf of himself or herself or others, engages in debt collection." *Id.* at § 1788.2(c).   Defendants are "debt collectors" as that term is defined in California Civil Code Section 1788.2(c) because they regularly sent or directed to be sent mortgage bills, communications and other notices seeking to collect money from Plaintiffs and Class members and acted as the servicer(s) of Plaintiffs' and Class members' mortgage loans.

197.   California Civil Code Section 1788.17 provides that "every debt collector collecting or attempting to collect a consumer debt shall comply with the provisions of Sections 1692b to 1692j, inclusive, of, and shall be subject to the remedies in Section 1692k of, Title 15 of the United States Code." Cal. Civ. Code § 1788.17.  Thus, the Rosenthal Act incorporates the provisions of the federal Fair Debt Collection Practices Act (hereinafter "FDCPA") and a plaintiff may state a claim for violation of the Rosenthal Act by showing that a defendant violated any of several provisions of the FDCPA.

198.   Section 1692e of the FDCPA provides that a debt collector may not use any "false, deceptive, or misleading representation or means in connection with the collection of any debt including: (2) The false representation of (A) the character, amount or legal status of any debt…." 15 U.S.C. § 1692e(2)(A). Section 1692e(10) further provides that "[t]he use of any false representation or deceptive means to collect or attempt to collect any debt..." is conduct in violation of that Section. *Id.* at § 1692e(10).

199.   On information and belief, and as alleged herein, Defendants knew or had reason to know that documents and information, including but not limited to the assignments of the deed of trust and endorsements of the Promissory Note, were not valid to establish their legal right to collect payments from Plaintiffs and all other Class members.  Nor, lacking complete payment histories of the loans, could they validate and confirm the accuracy of the debt amounts allegedly owed. Additionally, Ocwen was aware that as a result of servicer advances it had been

required to make the alleged debts as well as purported default of the loans of Plaintiffs and other class members could not be validated or substantiated

200.   Without the ability to establish their legal right to collect payments, or to validate the nature and true amount of the debt allegedly owed by Plaintiffs and Class members, Defendants have engaged in debt collection activities in violation of the Rosenthal Act, California Civil Code Section 1788.10 *et seq*., and by implication, the FDCPA, by, among other things:  (a) misstating the character, amount or legal status of the debt they collected or sought to collect from Plaintiffs and all other Class members; (b) threatening to take or taking action (filing a notices of default to initiate non judicial foreclosures) that cannot be legally taken given their inability to establish their authority to do so; and (c) using false representations or deceptive means (representing they had standing to take the actions they were taking when the rights they seek to enforce were not assigned to them) to collect or attempt to collect the debt from Plaintiffs and all other Class members.

201.   As alleged herein, Defendants also falsely represented the character and amount of debts to the Plaintiffs and Class members and used false representations or deceptive means to collect or attempt to collect those debts in that they could not demonstrate that they had the legal right to collect any debt on behalf of the purported owner of the underlying Note or Deed of Trust on Plaintiff and other Class members' homes.

202.   Plaintiffs and all other Class members reasonably relied at the time on Defendants' representations of the character, amount, and validity of the debt allegedly owed and the Defendants' authority to service the debt and collect payments on behalf of the legal owner of the Promissory Note.

203.   Plaintiffs only learned of the lack of accurate and complete payment histories and thus the inability to validate and substantiate the debt when it was revealed by Defendant Caliber in its late 2016 partial response to Plaintiffs' QWR

that it had not been provided with a complete payment history from Ocwen, the prior servicer, when Caliber took over servicing operations on the loans.

204. Defendants' acts as described above were done willfully and knowingly within the meaning of California Civil Code Section 1788.30(b). As alleged herein, Defendants knew they did not have the documentation necessary and required to establish their right to collect payments from Plaintiffs and other Class members, to initiate foreclosure on Plaintiffs' and all other Class members' properties, or to validate the nature and amount of the debt allegedly owed, yet they continued to do so as though they did.

205. The payments demanded by Defendants on the mortgage purportedly owed by Plaintiffs and Class members are "debt[s]" within the meaning of California Civil Code Section 1788.2(d), because they are "money, property or their equivalent which [are] due or owing or alleged to be due or owing from a natural person to another person."

206. As a result of Defendants' actions herein, Plaintiffs and all other Class members have been damaged and Plaintiffs, on behalf of all Class members, seek all available relief under the California Rosenthal Fair Debt Collection Practices Act. Pursuant to California Civil Code Section 1788.17, Plaintiffs and all other Class members are entitled to recover actual damages sustained because of Defendants' violations of the Rosenthal Act, which incorporates the FDCPA. Such damages include, without limitation, monetary losses and damages. Additionally, because Defendants' violations of the Rosenthal Act were committed willingly and knowingly, Plaintiffs and all other Class members are entitled to recover statutory damages in the amount of $1,000 for each violation. *See* Cal. Civ. Code § 1788.17 and 15 U.S.C. 1692k(a)-(c).

207. Pursuant to California Civil Code Section 1788.17 and Section 1629k of Title 15 of the United States Code, Plaintiffs, on behalf of the Class, are entitled

1   to recover all attorneys' fees, costs, and expenses incurred in the bringing of this

2   action.

### FOURTH CLAIM FOR RELIEF

3

### (Violation of the Real Estate Settlement Practices Act (RESPA),

4

### 12 U.S.C. § 2605)

5

(By Plaintiffs Against Ocwen)

6

7   208.   Plaintiffs incorporate all preceding and succeeding allegations by

8   reference as if fully set forth herein.

9   209.   Plaintiffs bring this claim individually and on behalf of the Ocwen

10   Class against Defendant Ocwen only.

11   210.   Ocwen is a servicer as defined in 15 U.S.C. § 2605(e)(i)(2).

12   Plaintiffs, as detailed herein, and Class members, on information and belief, sent

13   numerous written communications to Ocwen which were Qualified Written

14   Requests ("QWR") as defined in 12 U.S.C. § 2605(e)(B)(i).

15   211.   Pursuant to the requirements of RESPA, Ocwen was required to

16   acknowledge receipt of each of Plaintiffs' and Class members' QWR's within five

17   (5) days of their receipt and to take action with respect to Plaintiffs' and other

18   Class members' inquiries within thirty (30) days of their receipt.  In addition,

19   Ocwen was required under RESPA to respond within ten (10) business days to

20   Plaintiffs' and the Class members' request for the name and contact details of the

21   owner of the loan.  Ocwen did none of this.

22   212.   Plaintiffs and other Class members, as a result of the Defendant's

23   violations of RESPA and its failures to respond as required as set forth herein,

24   suffered actual damages and are entitled to recover their actual damages from

25   Ocwen.  In addition, due to Defendant's pattern and practice of RESPA violations,

26   Plaintiffs and other Class members are also entitled to recover additional damages

27   of up to two thousand dollars ($2,000) for each violation, as well as attorneys' fees

28   and costs.

# FIFTH CLAIM FOR RELIEF

## (Violation of the Real Estate Settlement Practices Act (RESPA), 12 U.S.C. § 2605)

### (By Plaintiffs Against Caliber)

213.   Plaintiffs incorporate all preceding and succeeding allegations by reference as if fully set forth herein.

214.   Plaintiffs bring this claim individually and on behalf of the Caliber Class and Sub-Class against Defendant Caliber only.

215.   Caliber is a servicer as defined in 15 U.S.C. § 2605(e)(i)(2). Plaintiffs, as detailed herein, and, on information and belief, Class members, sent numerous written communications to Caliber which were QWR's as defined in 12 U.S.C. § 2605(e)(B)(i).

216.   Pursuant to the requirements of RESPA, Caliber required to acknowledge receipt of each of Plaintiffs and other Class members' QWR's within five (5) days of their receipt and to take action with respect to Plaintiffs and other Class members' inquiries within thirty (30) days of their receipt.  Caliber did none of this regarding Plaintiffs.  On information and belief, Caliber did none of this regarding all other Class members.

217.   Plaintiffs and other Class members, as a result of the Defendant's violations of RESPA and their failures to respond as required as set forth herein, suffered actual damages and are entitled to recover their actual damages from Caliber.  In addition, due to Defendant's pattern and practice of RESPA violations, Plaintiffs and other Class members are also entitled to recover additional damages of up to two thousand dollars ($2,000) for each violation, as well as attorneys' fees and costs.

### SIXTH CLAIM FOR RELIEF

### (Violation of the Truth In Lending Act)

(By Plaintiffs Against Resi, Altisource, ARLP, LSF9 and Doe Defendants)

218.   Plaintiffs incorporate all preceding and succeeding allegations by reference as if fully set forth herein.

219.   Plaintiffs bring this claim individually and on behalf of the Caliber Class, Ocwen Class and Sub-Class against Defendants Resi, Altisource, ARLP, LSF9 and Doe Defendants.

220.   Resi, Altisource, ARLP, LSF9 and Doe Defendants are parties subject to the provisions of TILA.

221.   The Federal Truth in Lending Act (TILA) 15 U.S.C. § 1641(g) (specifically Section 131g, as implemented by Regulation Z, 12 CFR 1026.39) requires that a borrower be provided notice of each transfer or sale of a borrowers mortgage loan by the new owner of the loan within thirty (30) days of the sale or transfer.

222.   Resi, Altisource, ARLP, LSF9 and Doe Defendants violated TILA by, *inter alia*, failing to disclose to Plaintiffs and Class members each sale or transfer of their mortgage loan.

223.   Resi, Altisource, ARLP, LSF9 and Doe Defendants systematically and pervasively engaged in violations of TILA to the detriment of members of the Class.

224.   As a direct result of Resi, Altisource, ARLP, LSF9 and Doe Defendants' illegal conduct, Plaintiff and Class members were injured and damaged in that they were

225.   Pursuant to 15 U.S.C. Section 1640(a) of TILA, Plaintiffs and all other Class members are entitled to actual and statutory damages, plus reasonable attorneys' fees and costs of suit, an amounts to be proven at trial.

**SEVENTH CLAIM FOR RELIEF**

**(Breach of Written Contract)**

(By Plaintiffs Against Caliber, Ocwen and LSF9)

226.   Plaintiffs incorporate all preceding and succeeding allegations by reference as if fully set forth herein.

227.   Plaintiffs bring this claim individually and on behalf of the Caliber Class, Ocwen Class and Sub-Class against Defendants

228.   When LSF9 purportedly took ownership of the Note and DOT, it became a party and subject to the terms and conditions set out in those agreements.

229.   On February 9, 2017 Caliber recorded a Notice of Default on the property and did so at the direction of, US Bank and LSF9. Exhibit "."

230.   On March 1, 2017, Caliber sent Plaintiffs a Notice of Default and Intent to Accelerate the loan.  Exhibit "JJJ."

231.   The Deed of Trust is a valid, legal and/or enforceable contract to which Plaintiffs and Defendants are parties.

232.   Paragraph 22 of the Deed of Trust, to which both Plaintiffs are parties, governs the giving of notices of intent to accelerate and the recording of notices of default.   Paragraph 22 requires the lender to give notice to the borrower prior to acceleration of the debt and that such notice specify "(a) the default; (b) the act required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration may result in acceleration of the sums secured by this Security Instrument and sale of the Property."

233.   The notice must also notify the borrower that "If the default is not cured on or before the date specified in the notice, Lender, at its option may require immediate payment in full of all the sums secured by this Security Instrument without further demand and may invoke the power of sale and any

other remedies permitted by Applicable Law."

234.   The requirements of Paragraph 22 continue and further provide that "If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located."

235.   Thus, pursuant to Paragraph 22 of the Deed of Trust, an NOD can only be recorded *after*: a) a borrower has been sent a Notice of Intent to Accelerate; and b) the period of time permitted therein for the borrower to cure has expired. Caliber's recording of the NOD on February 9, 2017 violates the terms of the NOD because that recording was done *prior* to Caliber's issuance of the required Notice of Intent to Accelerate and prior to the expiration of the required time period in which Plaintiffs could cure the alleged default.  As such, the NOD was not authorized, thus rendering it invalid and a breach of the express terms of the Deed of Trust.

236.    On information and belief, the language of Paragraph 22 in the Deed of Trust is standard and appears in all Deeds of Trust on loans serviced by Caliber, whether assigned to it by Ocwen or another servicer.

237.   Plaintiffs have performed all of their obligations, covenants and conditions required of them under the Deed of Trust, except to the extent any such obligations, covenants or conditions have been excused, prevented or waived by Defendants' acts and omissions.

238.   Defendants have breached Paragraph 22 of the Deed of Trust by a) failing to timely send Plaintiffs and the Class members a Notice of Intent to Accelerate prior to recording the NOD; and b) failing to permit expiration of the time period within which Plaintiffs and the Class members had a right to cure any default prior to recording the NOD.

239.   Further, based upon information and belief Caliber and/or Ocwen, provided servicer advances to LSF9 and other securitized trusts purporting to own Plaintiff's and other class member's loans, which service advances consisted of payments of principal and interest payments on the mortgage, property taxes and assessments and property insurance premiums. As a result of these servicer advances by Caliber and/or Ocwen, parties unrelated to the underlying loan agreements between Plaintiff's, other class members' and their respective lenders, any purported default of the loans of Plaintiff's and other class members could not be validated and Plaintiffs' and other class members' were not in default. Accordingly, the filing of Notices of Default and the initiation of foreclosure proceedings on Plaintiff's and class member's loans subject to such servicer advances was invalid and in breach of the terms of the respective Deeds of Trust.

240.   Plaintiffs have been damaged as a direct result of Defendants' breaches as set forth above, and have suffered actual damages.

## EIGHTH CLAIM FOR RELIEF

**(Violation of the Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq*.)**

(By Plaintiffs Against Defendants Caliber, US Bank, and LSF9)

241.   Plaintiffs incorporate all preceding and succeeding allegations by reference as if fully set forth herein.

242.   Plaintiffs bring this claim individually and on behalf of the Caliber Class and Sub-Class pursuant to Section 17200 et seq. of the Business & Professions Code, the Unfair Competition Law ("UCL") against Defendants Caliber, US Bank, and LSF9.

243.   California's UCL prohibits unfair competition, which includes any "unlawful, unfair or fraudulent" act or practice, as well as any "unfair, deceptive, untrue or misleading" advertising. Cal. Bus. & Prof. Code § 17200 et seq.

244. A business act or practice is "unlawful" under the UCL if it violates any other law or regulation.

245. Defendants committed, and continue to commit, "unlawful" business acts or practices by, among other things, violating the Homeowner Bill of Rights ("HBOR"), Cal. Civ. Code Section 2920 et seq.; California's Rosenthal Fair Debt Collection Practices Act ("Rosenthal Act"), Cal. Civ. Code Section 1788 et seq.; the Real Estate Settlement Practices Act ("RESPA"), 12 U.S.C. § 2605, and the Federal Truth in Lending Act (TILA) 15 U.S.C. § 1641(g).

246. As described above, Defendants' conduct is unlawful in that it violated Section 2924.17 of the HBOR. Specifically, Section 2924.17(a) of the California Civil Code mandates "A declaration recorded pursuant to Section 2923.5 or, until January 1, 2018, pursuant to Section 2923.55, a notice of default, notice of sale, assignment of a deed of trust, or substitution of trustee recorded by or on behalf of a mortgage servicer in connection with a foreclosure subject to the requirements of Section 2924, or a declaration or affidavit filed in any court relative to a foreclosure proceeding shall be accurate and complete and supported by competent and reliable evidence."

247. Further, Section 2924.17(b) of the California Civil Code provides that "Before recording or filing any of the documents described in subdivision (a), a mortgage servicer shall ensure that it has reviewed competent and reliable evidence to substantiate the borrower's default and the right to foreclose, including the borrower's loan status and loan information."

248. Defendants, prior to taking the actions herein alleged, did not ensure as required by statute that they had reviewed competent and reliable evidence substantiating their legal authority to record, either themselves or on their behalf, the Notice of Default and other related documents specified herein.

249. As described above, Defendants' conduct is also unlawful in that it violated California's Rosenthal Fair Debt Collection Practices Act ("Rosenthal

Act") which prohibits creditors and debt collectors from, among other things, making false, deceptive, or misleading representations in an effort to collect a debt. Cal. Civ. Code Section 1788 et seq.

250.  As alleged above, Defendants' conduct also violated various provisions of RESPA (12 U.S.C. § 2605(e)) as well as TILA (15 U.S.C. § 1641(g)).

251.  A business act or practice is "unfair" under the UCL if the reasons, justifications, and motives of the alleged wrongdoer are outweighed by the gravity of the harm to the alleged victims.

252.  Defendants committed, and continue to commit, "unfair" business acts or practices by, among other things:  (a) engaging in conduct for which the utility of the conduct, if any, is outweighed by the gravity of the consequences to the Plaintiffs and all other Class members;  (b) engaging in conduct that is immoral, unethical, oppressive, unscrupulous, or substantially injurious to Plaintiffs and all other Class members;  and (c) engaging in conduct that undermines or violates the spirit or intent of the laws that this Complaint invokes.

253.  Specifically, Defendants Caliber, US Bank, and LSF9 engaged in unfair business acts or practices in violation of the UCL by representing themselves as having the legal right to collect payments from Plaintiffs and Class members and to initiate foreclosure on their real properties.  As alleged herein, Defendants Caliber, US Bank, and LSF9 falsely represented the character and amount of debts to the Plaintiffs and Class members and used false representations or deceptive means, including the knowing preparation of false assignments of the Note, to collect or attempt to collect those debts. Accordingly, Defendants could not demonstrate that they had the legal right to enforce the alleged debt nor could they validate the correct amount of any debt on behalf of the purported owner of the underlying Notes or Deeds of Trust on Plaintiffs' and other Class members' homes.

254.   These acts and practices are unfair because they caused Plaintiffs and all other Class members to falsely believe that Defendants were the proper party to collect debts on behalf of or as the owner of the beneficial interest under the Deed of Trust and, ultimately, had the authority to initiate foreclosure on their home.  As a result, Plaintiffs and all other Class members were induced to believe that Defendants Caliber, US Bank, and LSF9 were able to legally collect on their mortgage debt, as well as the parties with the legal capacity to institute the recording of NODs on their homes, forcing Gigi, and on information and belief, Class members, to incur fees and costs and take legal action to prevent the threatened foreclosure on her home.

255.   The gravity of harm to Plaintiffs and Class members resulting from these unfair acts and practices outweighed any business justifications for Defendants' deceptive acts and practices.  By committing the acts and practices alleged herein, Defendants engaged in unfair business practices within the meaning of the UCL.  Such acts and violations have not abated and will continue to occur unless enjoined.

256.   A business act or practice is "fraudulent" under the UCL if it is likely to deceive members of the consuming public.

257.   Defendants   Caliber,   US   Bank,   and   Defendant   LSF9's misrepresentations regarding their rights, standing and authority, as set forth above, were false, misleading, and likely to deceive the public within the meaning of California Business and Professions Code Section 17200.

258.   Defendants' misrepresentations were made with knowledge of their effect, and were done to induce Plaintiffs and Class members to believe that they owed Defendants monies and that Defendants had the right to foreclose on their home when they did not have such legal right because they did not have the standing or authority to collect, nor could they validate the amount of the debt allegedly owed.

259.   Plaintiffs and all other Class members reasonably relied and reasonably expected that Defendants would comply with the law, to deal honestly with then and to comply with the provisions of the Rosenthal Act and the HBOR.

260.   As further described above, Section 1692e of the FDCPA provides that a debt collector may not use any "false, deceptive, or misleading representation or means in connection with the collection of any debt including: (2) The false representation of (A) the character, amount or legal status of any debt…." 15 U.S.C. § 1692e (2)(A).

261.   Section 1692e (10) further provides that "[t]he use of any false representation or deceptive means to collect or attempt to collect any debt..." is conduct in violation of that Section. Id. at § 1692e (10).

262.   On information and belief, and as alleged herein, Defendants Caliber, US Bank, and LSF9 knew or had reason to know that documents and information, including but not limited to the assignments of deed of trust or substitutions of trustee, and endorsements of the Promissory Note, were not valid to establish their legal right to collect payments from Plaintiffs and Class members or to seek to foreclose on their properties. They also knew they lacked documentation that would enable them to validate the nature and extent of the debt allegedly owed by Plaintiffs and Class members, which Defendants were seeking to collect. Accordingly, Defendants cannot establish their legal right to collect payments from Plaintiffs and Class members or their right to foreclose upon the properties.

263.   Without the ability to establish their legal right to collect payments or foreclose, Defendants have engaged in debt collection activities in violation of the Rosenthal Act, California Civil Code Section 1788.10 et seq., and by implication, the FDCPA, by, among other things:  (a) misstating the character, amount or legal status of the debt they collected or sought to collect from Plaintiffs and Class members; (b) threatening to take or did take action (initiating foreclosure) that cannot be legally taken given their inability to establish their authority to do so;

and (c) using false representations or deceptive means (representing they had standing to take the actions they were taking when the rights they seek to enforce were not assigned to them) to collect or attempt to collect the debt from Plaintiffs and Class members.

264.   As alleged herein, Defendants Caliber and LSF9 falsely represented the character and amount of debts to the Plaintiffs and Class members and used false representations or deceptive means to collect or attempt to collect those debts in that they could not demonstrate that they had the legal right to collect any debt on behalf of the purported owner of the underlying Note or Deed of Trust on the property.

265.   Plaintiffs and all other Class members have suffered injury in fact and suffered monetary loss as a direct result of Defendants' conduct described herein. Specifically, Plaintiffs and all other Class members have incurred and will continue to incur legal fees and costs in order to prevent the wrongful loss of their property.

266.   Under Section 17203 of the Business & Professions Code, Plaintiffs and all Class members are entitled to (a) restitution and disgorgement of all unjustly retained monies; (b) equitable relief; (c) pre- and post-judgment interest at the highest rate allowable by law; (d) payment of attorneys' fees and costs pursuant to Section 1021.5 of the California Code of Civil Procedure; and (e) any other relief this Court deems proper.

## NINTH CLAIM FOR RELIEF

## (Violation of the Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq*.)

### (By Plaintiffs Against Defendants Ocwen, Wilmington Trust, and ARLP)

267.   Plaintiffs incorporate all preceding and succeeding allegations by reference as if fully set forth herein.

268.   Plaintiffs bring this claim individually and on behalf of the Ocwen Class and Sub-Class pursuant to Section 17200 et seq. of the Business & Professions Code, the Unfair Competition Law ("UCL") against Defendant Caliber, US Bank, and LSF9.

269.   California's UCL prohibits unfair competition, which includes any "unlawful, unfair or fraudulent" act or practice, as well as any "unfair, deceptive, untrue or misleading" advertising. Cal. Bus. & Prof. Code § 17200 et seq.

270.   A business act or practice is "unlawful" under the UCL if it violates any other law or regulation.

271.   Defendant committed, and continue to commit, "unlawful" business acts or practices by, among other things, violating the Homeowner Bill of Rights ("HBOR"), Cal. Civ. Code Section 2920 et seq.; California's Rosenthal Fair Debt Collection Practices Act ("Rosenthal Act"), Cal. Civ. Code Section 1788 et seq.; the Real Estate Settlement Practices Act ("RESPA"), 12 U.S.C. § 2605, and the Federal Truth in Lending Act (TILA) 15 U.S.C. § 1641(g).

272.   As described above, Defendants' conduct is unlawful in that it violated Section 2924.17 of the HBOR.  Specifically, Section 2924.17(a) of the California Civil Code mandates "A declaration recorded pursuant to Section 2923.5 or, until January 1, 2018, pursuant to Section 2923.55, a notice of default, notice of sale, assignment of a deed of trust, or substitution of trustee recorded by or on behalf of a mortgage servicer in connection with a foreclosure subject to the requirements of Section 2924, or a declaration or affidavit filed in any court relative to a foreclosure proceeding shall be accurate and complete and supported by competent and reliable evidence."

273.   Further, Section 2924.17(b) of the California Civil Code provides that "Before recording or filing any of the documents described in subdivision (a), a mortgage servicer shall ensure that it has reviewed competent and reliable

evidence to substantiate the borrower's default and the right to foreclose, including the borrower's loan status and loan information."

274.   Defendant, prior to taking the actions herein alleged, did not ensure as required by statute that they had reviewed competent and reliable evidence substantiating their legal authority to record, either themselves or on their behalf, the Notice of Default and other related documents specified herein.

275.   As described above, Defendants' conduct is also unlawful in that it violated California's Rosenthal Fair Debt Collection Practices Act ("Rosenthal Act") which prohibits creditors and debt collectors from, among other things, making false, deceptive, or misleading representations in an effort to collect a debt. Cal. Civ. Code Section 1788 et seq.

276.   As alleged above, Defendants' conduct also violated various provisions of RESPA (12 U.S.C. § 2605(e)) as well as TILA (15 U.S.C. § 1641(g)).

277.   A business act or practice is "unfair" under the UCL if the reasons, justifications, and motives of the alleged wrongdoer are outweighed by the gravity of the harm to the alleged victims.

278.   Defendant committed, and continue to commit, "unfair" business acts or practices by, among other things:  (a) engaging in conduct for which the utility of the conduct, if any, is outweighed by the gravity of the consequences to the Plaintiffs;  (b) engaging in conduct that is immoral, unethical, oppressive, unscrupulous, or substantially injurious to Plaintiffs; and (c) engaging in conduct that undermines or violates the spirit or intent of the laws that this Complaint invokes.

279.   Specifically, Defendant Ocwen engaged in unfair business acts or practices in violation of the UCL by representing themselves as having the legal right to collect payments from Plaintiffs and to initiate foreclosure on their real property.  As alleged herein, Defendant Ocwen falsely represented the character

1   and amount of debts to the Plaintiffs and used false representations or deceptive

2   means, including the knowing preparation of false endorsements and assignments

3   of the Note, to collect or attempt to collect those debts. Accordingly, Defendant

4   could not demonstrate that they had the legal right to enforce the alleged debt nor

5   could they validate the correct amount of any debt on behalf of the purported

6   owner of the underlying Notes or Deeds of Trust on Plaintiffs' home.

7   280.   These acts and practices are unfair because they caused Plaintiffs to

8   falsely believe that Defendants were the proper party to collect debts on behalf of

9   or as the owner of the beneficial interest under the Deed of Trust and, ultimately,

10  had the authority to initiate foreclosure on their home.  As a result, Plaintiffs and

11  were induced to believe that Defendants Ocwen, Wilmington Trust and ARLP

12  were able to legally collect on their mortgage debt, as well as the parties with the

13  legal capacity to institute the recording of NODs on their homes, forcing Gigi, , to

14  incur fees and costs and take legal action to prevent the threatened foreclosure on

15  her home.

16  281.   The gravity of harm to Plaintiffs resulting from these unfair acts and

17  practices outweighed any business justifications for Defendants' deceptive acts

18  and practices.  By committing the acts and practices alleged herein, Defendants

19  engaged in unfair business practices within the meaning of the UCL.  Such acts

20  and violations have not abated and will continue to occur unless enjoined.

21  282.   A business act or practice is "fraudulent" under the UCL if it is likely

22  to deceive members of the consuming public.

23  283.   Defendants Ocwen, Wilmington Trust and ARLP misrepresentations

24  regarding their rights, standing and authority, as set forth above, were false,

25  misleading, and likely to deceive the public within the meaning of California

26  Business and Professions Code Section 17200.

27  284.   Defendants' misrepresentations were made with knowledge of their

28  effect, and were done to induce Plaintiffs to believe that they owed Defendants

monies and that Defendants had the right to foreclose on their home when they did not have such legal right because they did not have the standing or authority to collect, nor could they validate the amount of the debt allegedly owed.

285.   Plaintiffs reasonably relied and reasonably expected that Defendants would comply with the law, to deal honestly with then and to comply with the provisions of the Rosenthal Act and the HBOR.

286.   As further described above, Section 1692e of the FDCPA provides that a debt collector may not use any "false, deceptive, or misleading representation or means in connection with the collection of any debt including: (2) The false representation of (A) the character, amount or legal status of any debt…." 15 U.S.C. § 1692e (2)(A).

287.   Section 1692e (10) further provides that "[t]he use of any false representation or deceptive means to collect or attempt to collect any debt..." is conduct in violation of that Section. Id. at § 1692e (10).

288.   On information and belief, and as alleged herein, Defendants Ocwen, Wilmington Trust and ARLP knew or had reason to know that documents and information, including but not limited to the assignments of deed of trust or substitutions of trustee, and endorsements of the Promissory Note, were not valid to establish their legal right to collect payments from Plaintiffs or to seek to foreclose on their property. They also knew they lacked documentation that would enable them to validate the nature and extent of the debt allegedly owed by Plaintiffs, which Defendants were seeking to collect.  Accordingly, Defendants cannot establish their legal right to collect payments from or their right to foreclose upon the properties.

289.   Without the ability to establish their legal right to collect payments or foreclose, Defendants have engaged in debt collection activities in violation of the Rosenthal Act, California Civil Code Section 1788.10 et seq., and by implication, the FDCPA, by, among other things:  (a) misstating the character, amount or legal

status of the debt they collected or sought to collect from Plaintiffs and Class members; (b) threatening to take or did take action (initiating foreclosure) that cannot be legally taken given their inability to establish their authority to do so; and (c) using false representations or deceptive means (representing they had standing to take the actions they were taking when the rights they seek to enforce were not assigned to them) to collect or attempt to collect the debt from Plaintiffs and Class members.

290.   As alleged herein, Defendants Ocwen, Wilmington Trust and ARLP falsely represented the character and amount of debts to the Plaintiffs and used false representations or deceptive means to collect or attempt to collect those debts in that they could not demonstrate that they had the legal right to collect any debt on behalf of the purported owner of the underlying Note or Deed of Trust on the property.

291.   Plaintiffs have suffered injury in fact and suffered monetary loss as a direct result of Defendants' conduct described herein.  Specifically, Plaintiffs have incurred and will continue to incur legal fees and costs in order to prevent the wrongful loss of their property.

292.   Under Section 17203 of the Business & Professions Code, Plaintiffs and all Class members are entitled to (a) restitution and disgorgement of all unjustly retained monies; (b) equitable relief; (c) pre- and post-judgment interest at the highest rate allowable by law; (d) payment of attorneys' fees and costs pursuant to Section 1021.5 of the California Code of Civil Procedure; and (e) any other relief this Court deems proper.

# TENTH CLAIM FOR RELIEF

## (Violation of the California Homeowner Bill of Rights,

## Cal. Civ. Code § 2920 et seq.)

(By Plaintiffs Against Defendants Caliber, US Bank, LSF9, Zieve and Certain Doe Defendants)

293.   Plaintiffs incorporate all preceding and succeeding allegations by reference as if fully set forth herein.

294.   Plaintiffs bring this claim individually on behalf of themselves only.

295.   Plaintiffs bring this action pursuant to the California Homeowner Bill of Rights, California Civil Code Section 2920.5 et seq. (the "HBOR").

296.   Plaintiffs are "borrowers" as that term is defined by the HBOR.

297.   Section 2924(a)(6) of the California Civil Code provides that no entity shall record or cause a notice of default to be recorded unless "it is the holder of the beneficial interest under the mortgage or deed of trust, the original trustee or the substituted trustee under the deed of trust, or the designated agent of the holder of the beneficial interest."  The Section further provides that "No agent of the holder of the beneficial interest under the mortgage or deed of trust, original trustee or substituted trustee under the deed of trust may record a notice of default or otherwise commence the foreclosure process except when acting within the scope of authority designated by the holder of the beneficial interest."

298.   Section 2924.17(a) of the California Civil Code mandates "A declaration recorded pursuant to Section 2923.5 or, until January 1, 2018, pursuant to Section 2923.55, a notice of default, notice of sale, assignment of a deed of trust, or substitution of trustee recorded by or on behalf of a mortgage servicer in connection with a foreclosure subject to the requirements of Section 2924, or a declaration or affidavit filed in any court relative to a foreclosure proceeding shall be accurate and complete and supported by competent and reliable evidence."

299.   Section 2924.17(b) of the California Civil Code provides that "Before recording or filing any of the documents described in subdivision (a), a mortgage servicer shall ensure that it has reviewed competent and reliable evidence to substantiate the borrower's default and the right to foreclose, including the borrower's loan status and loan information."

300.   Section 2923.55 of the California Civil Code provides in pertinent part that a mortgage servicer, mortgagee, trustee, beneficiary, or authorized agent may **not** record a notice of default pursuant to Section 2924 until thirty (30) days after contact is made with the borrower to assess the borrower's financial condition and explore options for the borrower to avoid foreclosure or thirty (30) days after satisfying the due diligence requirement with regard to contacting or attempting to contact the borrower.   In addition, before recording a notice of default, the mortgage servicer must also notify the borrower that they may request a copy of the promissory note, the deed of trust, all assignments of the deed of trust and a copy of the payment history on the loan.

301.   As alleged in detail above, Defendants' actions are contrary to the provisions and requirements of the HBOR. In addition to their own admissions regarding the absence of competent and reliable evidence, a simple review of the assignment chain, the endorsement chain, the payment history, the prior recorded and rescinded notices of default, the loan file received from the predecessor servicer (Ocwen), correspondence received from Plaintiffs, and even a basic comparison of signatures on said documents would have revealed significant gaps in the assignment chain and the endorsement chain as well as signature irregularities on necessary title documents such that Defendants lacked competent and reliable evidence demonstrating that they had  the right, power or authority to record notices of default or otherwise commence foreclosure proceedings on Plaintiffs property.

302.   Further, Defendants, by their own admission, knew: a) that there were discrepancies between the amounts stated as due in their debt validation letters and the monthly mortgage statements sent to Plaintiffs; b) that there were discrepancies in the amounts they were seeking to collect based on alleged fees and costs that had been waived according to their own payment history; c) that they lacked a full and complete payment history on the loan; and d) that as a result of servicer advances the alleged debts as well as purported default of Plaintiffs' loan could not be validated or substantiated. Consequently, Caliber knew that it clearly lacked the ability to accurately know and thus validate the nature and true amount of the alleged debt owed by Plaintiffs.

303.   Defendants, prior to taking the foreclosure related actions herein alleged, did not ensure, as required by statute, that they had reviewed competent and reliable evidence substantiating their legal authority to record, either themselves or as the beneficiary's agent, the Notice of Default.  Indeed, at the time the NOD was recorded and the Notice of Trustee's Sale issued, in addition to the foregoing failures, Defendants also knew or from a review of competent and reliable evidence should have known, that the NOD was recorded despite the failure to first provide Plaintiffs with the required Notice of Default and Intent to Accelerate and the requisite time to cure the alleged default as required by the DOT.

304.   In addition, as part of the NOD recorded on February 9, 2017, Michael Busby, the purported representative for the Trustee defendant Zieve, attested that "The loan servicer has fulfilled its obligations under either California Civil Code section 2923.5 or 2923.55 (as applicable). Please see Declaration of Compliance attached hereto."  A copy of the Trustee's attestation is attached as Exhibit "FFF."

305.   A review of the Declaration of Compliance attached to the NOD reveals that it was neither accurate nor complete.  First, it was not executed by

Caliber, the then loan servicer, on behalf of the then purported owner of the loan, LSF9. Instead, the declaration was executed back in August 2015 by Ocwen, the predecessor servicer to Caliber, and was executed not on behalf of LSF9, but on behalf of another entity altogether, the ARLP trust. Exhibit "FFF." Second, this declaration was executed in connection with and as support for a wholly separate and prior NOD that was recorded by and subsequently rescinded by Ocwen. The recording of the present NOD by Caliber was required to be accurate and complete, and supported by competent and reliable evidence. Caliber also had to comply with the provisions contained within Civil Code section 2923.55. They did neither.

306.   Caliber and LSF9 cannot support the current NOD with an almost two (2) year old declaration executed by a different servicing entity on behalf of a different purported owner.  Nor can Caliber and LSF9 support the current NOD with an almost two (2) year old declaration that supported a now rescinded NOD. There is also no basis for defendant Zieve's attestation or any possible way that either they as Trustee or the loan servicer, Caliber, fulfilled their obligations under Civil Code § 2923.55, and Civil Code Section 2924.17.  For these reasons the recording of the NOD by Caliber on behalf of LSF9 was on its face void and invalid. Despite these serial and material HBOR violations, and despite the lack of competent and reliable evidence, Defendants nevertheless proceeded to record the NOD.

307.   Although required to do so prior to recording a notice of default, Caliber failed to provide Plaintiffs with notice of their right to request a copy of the promissory note, the deed of trust, all assignments of the deed of trust and a copy of the payment history on the loan.  Nor did Caliber attempt to contact the Plaintiffs to assess their financial condition as required to be attested to in the Declaration in support of the NOD.

308.   Defendants' actions as alleged herein constitute material violations of the HBOR and were carried out by Defendants intentionally, recklessly or were the result of willful misconduct by Defendants.   Defendants admitted that there were gaps in the chain of title and were aware that there was a myriad of other problems which made were at odds with the requirement that they have competent and reliable evidence.   Additionally, had Defendants reviewed competent and reliable evidence before recording the NOD and issuing the Notice of Trustee's Sale, they would have seen the errors and irregularities in the documents and ownership and would have recognized they did not have the legal right or standing to take the actions they took. They would have also realized that they had not complied with the provisions of Civil Code section 2923.55 and accordingly lacked the ability to record the NOD or issue the Notice of Trustee's Sale. Further, they were aware that as a result of Ocwen's and Caliber's own servicer advances the alleged debts as well as purported default of Plaintiffs loan could not be validated or substantiated.

309.   Plaintiffs have suffered actual economic damages as a direct and proximate result of Defendants' misconduct.   Accordingly, Plaintiffs are entitled to all relief provided by the HBOR, including attorneys' fees. See Cal. Civ. Code § 2924.12(I).   In addition, Plaintiffs are entitled to injunctive relief pursuant to Section 2924.12(a)(2), with said injunction remaining in place until such time as the defendants have corrected and remedied the various violations of the HBOR as set forth herein.

**ELEVENTH CLAIM FOR RELIEF**

**(Violation of the Rosenthal Fair Debt Collection Practices Act,**

**Cal. Civ. Code § 1788 *et seq.*)**

(By Plaintiffs Against Defendants Ocwen, Resi, Altisource, Wilmington Trust,

ARLP and Certain Doe Defendants)

310.   Plaintiffs incorporate all preceding and succeeding allegations by reference as if fully set forth herein.

311.   Plaintiffs bring this claim individually on behalf of themselves only.

312.   California's Rosenthal Fair Debt Collection Practices Act ("Rosenthal Act") prohibits creditors and debt collectors from, among other things, making false, deceptive, or misleading representations in an effort to collect a debt. Cal. Civ. Code Section 1788, et seq.

313.   Plaintiffs are "debtor[s]" as that term is defined by California Civil Code Section 1788.2(h).  Under the Rosenthal Act, a "debt collector" is defined as "any person who, in the ordinary course of business, regularly, on behalf of himself or herself or others, engages in debt collection."   *Id.* at § 1788.2(c). Defendants are "debt collectors" as that term is defined in California Civil Code Section 1788.2(c) because they regularly sent or directed to be sent mortgage bills, communications and other notices seeking to collect money from Plaintiffs and acted as the servicer(s) of Plaintiffs mortgage loan.

314.   California Civil Code Section 1788.17 provides that "every debt collector collecting or attempting to collect a consumer debt shall comply with the provisions of Sections 1692b to 1692j, inclusive, of, and shall be subject to the remedies in Section 1692k of, Title 15 of the United States Code."  Cal. Civ. Code § 1788.17.  Thus, the Rosenthal Act incorporates the provisions of the federal Fair Debt Collection Practices Act (hereinafter "FDCPA") and a plaintiff may state a claim for violation of the Rosenthal Act by showing that a defendant violated any of several provisions of the FDCPA.

315.   Section 1692e of the FDCPA provides that a debt collector may not use any "false, deceptive, or misleading representation or means in connection with the collection of any debt including: (2) The false representation of (A) the character, amount or legal status of any debt…." 15 U.S.C. § 1692e(2)(A). Section 1692e(10) further provides that "[t]he use of any false representation or deceptive means to collect or attempt to collect any debt..." is conduct in violation of that Section. *Id*. at § 1692e(10).

316.   On information and belief, and as alleged herein, Defendants knew or had reason to know that documents and information, including but not limited to the assignments of the deed of trust and endorsements of the Promissory Note, were not valid to establish their legal right to collect payments from Plaintiffs.

317.   On information and belief, and as alleged herein they further knew or should have known that Plaintiffs loan was an interest only loan for the first ten (10) years of its term.   Yet, despite knowing this, Defendants repeatedly and consistently sent monthly mortgage statements to Plaintiffs seeking to collect payments consisting of principal and interest as if a principal payment was required. This not only contradicted by the express terms of the Promissory Note, but also rendered the accounting on the loan fatally flawed and inaccurate as it did not correctly reflect the true amount due under the loan. Considering this, every mortgage statement, every debt validation letter and every escrow analysis sent by Ocwen to Plaintiffs during the time period when Ocwen was servicing the debt was materially inaccurate and incorrect. Ocwen accordingly lacked the ability to accurately know and thus validate the nature and true amount of the alleged debt owed by Plaintiffs.

318.   Additionally, they were aware that as a result of servicer advances the alleged debts as well as purported default of Plaintiff's loan could not be validated or substantiated.

319.   Without the ability to establish their legal right to collect payments, or to validate the nature and true amount of the debt allegedly owed by Plaintiffs, Defendants have engaged in debt collection activities in violation of the Rosenthal Act, California Civil Code Section 1788.10 et seq., and by implication, the FDCPA, by, among other things:   (a) misstating the character, amount or legal status of the debt they collected or sought to collect from Plaintiffs; (b) threatening to take or taking action (filing a Notice of Default to initiate non judicial foreclosure) that cannot be legally taken given their inability to establish their authority to do so; and (c) using false representations or deceptive means (representing they had standing to take the actions they were taking when the rights they seek to enforce were not assigned to them) to collect or attempt to collect the debt from Plaintiffs.

320.   As alleged herein, Defendants also falsely represented the character and amount of debts to the Plaintiffs and used false representations or deceptive means to collect or attempt to collect those debts in that they could not demonstrate that they had the legal right to collect any debt on behalf of the purported owner of the underlying Note or Deed of Trust.  Nor could they validate and confirm the accuracy of the debt amounts allegedly owed.

321.   Plaintiffs reasonably relied at the time on Defendants' representations of the character, amount, and validity of the debt allegedly owed and the Defendants' authority to service the debt and collect payments on behalf of the legal owner of the Promissory Note.

322.  Defendants' acts as described above were done willfully and knowingly within the meaning of California Civil Code Section 1788.30(b).  As alleged herein, Defendants knew they did not have the documentation necessary and required to establish their right to collect payments from Plaintiffs, to initiate foreclosure on the Property, or to validate the nature and amount of the debt allegedly owed, yet they continued to do so as though they did.

323.   The payments demanded by Defendants on the mortgage purportedly owed by Plaintiffs are "debt[s]" within the meaning of California Civil Code Section 1788.2(d), because they are "money, property or their equivalent which [are] due or owing or alleged to be due or owing from a natural person to another person."

324.   As a result of Defendants' actions herein, Plaintiffs have been damaged and Plaintiffs seek all available relief under the California Rosenthal Fair Debt Collection Practices Act.  Pursuant to California Civil Code Section 1788.17, Plaintiffs are entitled to recover actual damages sustained because of Defendants' violations of the Rosenthal Act, which incorporates the FDCPA.  Such damages include, without limitation, monetary losses and damages.  Additionally, because Defendants' violations of the Rosenthal Act were committed willingly and knowingly, Plaintiffs are entitled to recover statutory damages in the amount of $1,000 for each violation.  See Cal. Civ. Code § 1788.17 and 15 U.S.C. 1692k(a)-(c).

325.   Pursuant to California Civil Code Section 1788.17 and Section 1629k of Title 15 of the United States Code, Plaintiffs are also entitled to recover all attorneys' fees, costs, and expenses incurred in the bringing of this action.

### TWELTH CLAIM FOR RELIEF

### (Slander of Title)

(By Gigi Against Ocwen, Wilmington Trust, ARLP and Certain Doe Defendants)

326.   Plaintiffs incorporate all preceding and succeeding allegations by reference as if fully set forth herein.

327.   Plaintiff brings this claim individually on behalf of herself only.

328.   Gigi is the holder of title to the Property and has held title thereto since receiving it by way of quitclaim deed in September 2008.

329.   Defendants Ocwen, Wilmington and ARLP harmed Gigi by taking actions that cast doubt about Gigi's ownership of the real property.   More

specifically, Defendants first created false and misleading chain of title documents including Note endorsements and assignments of the DOT which they recorded in an attempt to substantiate their ownership of the loan. Next, based on these documents, they caused to be recorded as part of the public record a NOD with respect to Gigi's Property and did so even though they lacked competent and reliable evidence upon which to do so and even though Gigi is not a borrower under the Promissory Note.  The NOD also does not state the proper amount allegedly due or identify the true owner of the note and, as such, the NOD, in addition to being baseless, contains false and misleading information.

330.  These actions by these defendants were not privileged, but were malicious and taken with knowledge of or with reckless disregard for the truth as to whether or not they had an interest in the property or for whether the information they were making part of the public record was true or false, accurate or misleading.  Indeed, Defendants were on notice of the fact that the chain of title on the property was seriously and substantially deficient such that they could not establish ownership of the loan or any rights therein.  Defendants acknowledged and admitted to creating these suspect documents years after the fact in an attempt to back-fill the chain of title in an attempt to secure the property to which they had no legitimate claim.

331.  Defendants knew or should have known or recognized that others might act in reliance upon the NOD they caused to be recorded in the public record and that this could result in actual harm or financial loss to Gigi, including but not limited to her having to incur attorneys' fees and costs to address the NOD, which has already happened.  Indeed, Gigi received both written and verbal inquiries regarding the Property wherein the person making the contact references the recorded NOD.

332.  Defendants' conduct was a substantial factor in causing Gigi's harm.

## THIRTEENTH CLAIM FOR RELIEF

### (Slander of Title)

(By Gigi Against Caliber, US Bank, LSF9, Zieve and Certain Doe Defendants)

333.   Plaintiffs incorporate all preceding and succeeding allegations by reference as if fully set forth herein.

334.   Plaintiff brings this claim individually on behalf of herself only.

335.   Gigi is the holder of title to the Property and has held title thereto since receiving it by way of quitclaim deed in September 2008.

336.   Defendants Caliber, US Bank, Zieve and LSF9 harmed Gigi by taking actions that cast doubt about Gigi's ownership of the real property.   More specifically, Defendants Caliber, U.S. Bank and LSF9 first created false and misleading chain of title documents including assignments of the DOT, which they recorded, in an attempt to substantiate their ownership of the loan. Next, based on these documents, they, with the assistance of Defendant Zieve who improperly attested to their compliance with Civil Code 2923.55, caused to be recorded as part of the public record a NOD with respect to Gigi's Property and issued a Notice of Trustee's Sale even though they lacked competent and reliable evidence upon which to do so and even though Gigi is not a borrower under the Promissory Note. The NOD and Notice of Trustee's Sale also do not state the proper amount allegedly due or identify the true owner of the note and, as such, the NOD and the Notice of Trustee's Sale, in addition to be baseless, contain false and misleading information.

337.   These actions by these defendants were not privileged, but were malicious and taken with knowledge of or with reckless disregard for the truth as to whether or not they had an interest in the property or whether the information they were making part of the public record was true or false, accurate or misleading.   Indeed, Defendants were on notice of the fact that the chain of title on the property was seriously and substantially deficient such that they could not

establish ownership of the loan or any rights therein.  Defendants acknowledged and admitted to creating these suspect documents years after the fact in an attempt to back-fill the chain of title in an attempt to secure the property to which they had no legitimate claim.

338.  Defendants knew or should have known or recognized that others might act in reliance upon the NOD and the Notice of Trustee's Sale they issued and caused to be recorded in the public record and that this could result in actual harm or financial loss to Gigi, including but not limited to her having to incur attorneys' fees and costs to address the NOD and Notice of Trustee's Sale, which has already happened.  Indeed, Gigi has received both written and verbal inquiries regarding the Property wherein the person making the contact references the recorded NOD.

339.  Defendants' conduct was a substantial factor in causing Gigi's harm.

## FOURTEENTH CLAIM FOR RELIEF

### (Negligence)

(By Plaintiffs Against Caliber, US Bank, LSF9, Zieve and Certain Doe Defendants)

340.  Plaintiffs incorporate all preceding and succeeding allegations by reference as if fully set forth herein.

341.  Plaintiffs bring this claim individually on behalf of themselves only.

342.  On Plaintiffs' information and belief, Caliber was servicing the mortgage loan at the request of and at the direction of US Bank and LSF9, and was instructed by them to seek to collect payments on the mortgage loan from Plaintiffs as well as to initiate non-judicial foreclosure on their behalf. On Plaintiffs further information and belief Zieve was acting as the foreclosure trustee on behalf of LSF9 and instructed by them to execute the attestation contained in the NOD.

343.   Section 2924(a)(6) of the California Civil Code provides that no entity shall record or cause a notice of default to be recorded unless "it is the holder of the beneficial interest under the mortgage or deed of trust, the original trustee or the substituted trustee under the deed of trust, or the designated agent of the holder of the beneficial interest."  The Section further provides that "No agent of the holder of the beneficial interest under the mortgage or deed of trust, original trustee or substituted trustee under the deed of trust may record a notice of default or otherwise commence the foreclosure process except when acting within the scope of authority designated by the holder of the beneficial interest."

344.   Section 2924.17(a) of the California Civil Code provides that "A declaration recorded pursuant to Section 2923.5 or, until January 1, 2018, pursuant to Section 2923.55, a notice of default, notice of sale, assignment of a deed of trust, or substitution of trustee recorded by or on behalf of a mortgage servicer in connection with a foreclosure subject to the requirements of Section 2924, or a declaration or affidavit filed in any court relative to a foreclosure proceeding shall be accurate and complete and supported by competent and reliable evidence."

345.   Section 2924.17(b) of the California Civil Code provides that "Before recording or filing any of the documents described in subdivision (a), a mortgage servicer shall ensure that it has reviewed competent and reliable evidence to substantiate the borrower's default and the right to foreclose, including the borrower's loan status and loan information."

346.   Thus, according to California statute, Caliber had a duty to exercise reasonable care to ensure that prior to recording the DOT it had reviewed competent and reliable evidence substantiating the alleged default and the right to foreclose, as well as LSF9's legal ownership of the loan and its ability to direct Caliber to initiate non-judicial foreclosure proceedings.

347.   Caliber breached this duty as alleged herein by failing to review competent and reliable evidence as to LSF9's ownership of the loan and their

ability to initiate a non-judicial foreclosure on the property. Had it done so, Caliber would have realized that there were serious deficiencies in the chain of title of the Note and DOT, gaps they themselves acknowledged existed, thus calling the legal ownership of the loan into question as well as their ability to institute a non-judicial foreclosure on behalf of LSF9. This breach of duty was compounded by Caliber's proceeding to create documents out of whole cloth years after the fact in an attempt to fill the gaps in the chain of title.

348.   Additionally, Caliber was aware that as a result of servicer advances the alleged debt owed to LSF9, as well as the purported default of Plaintiff's loan, could not be validated or substantiated, further adding to the inability of LSF9 to institute foreclosure proceedings on Plaintiff's home.

349.   Further, also according to California statute, Zieve had a duty to exercise reasonable care to ensure that prior to executing the attestation in the NOD they reviewed competent and reliable evidence substantiating the accuracy and completeness of the NOD and the Declaration of Compliance.

350.   Zieve breached its duty as alleged herein by failing to review competent and reliable evidence as to accuracy and completeness of the NOD, including the Declaration of Compliance. Had they done so Zieve would have realized that the Declaration of Compliance was executed not by Caliber, but a year and half earlier by Ocwen, a totally different party and not the current servicer of the loan.

351.   Defendants were also under a duty to comply with the requirements of Section 2923.55.  However, Defendants Caliber, US Bank, LSF9 and Zieve instead short cut the process and the protections Section 2923.55 is intended to provide by recording on February 9, 2017, a Notice of Default and Intent to Accelerate which was supported by a Declaration of Compliance (the accuracy of which Zieve attested to as required by Civil Code § 2924.17(a)) that was not executed by Caliber (the present loan servicer) on behalf of the present purported

owner of the loan (LSF9), but instead the Declaration was executed back in August 2015 by Ocwen (a predecessor servicer) on behalf of the ARLP trust (the alleged predecessor owner of the loan). Making matters worse, this Declaration was executed in support of a prior NOD recorded by Ocwen which was subsequently rescinded. As such the attestation signed by defendant Zieve as well as the Declaration of Compliance attached to the NOD were invalid, as they failed to comply with the provisions of California Civil Code § 2923.55, and California Civil Code § 2924.17(a), rendering the NOD void.

352. On November 1, 2016, Caliber sent a letter to Plaintiffs acknowledging that they had in fact received a Qualified Written Request for information regarding the loan from Plaintiffs' representative.  Having received such a QWR, Caliber was under a duty and legal obligation to respond both timely and completely to the request.  Caliber responded, but rather than providing clear proof of the loan being owned by the LSF9 Trust and clearly establishing their legal ability to cause a Notice of Default to be filed on the loan, it provided "completed" Note endorsements and allonges which on their face raised even more concerns over the chain of title.

353. A review of the "endorsements" reveals that the same person, Elizabeth Willard (who also was a signatory to the November 12, 2010 assignment transferring the loan from MTGLQ to Resi) executed two of the endorsements Caliber relied upon.  Her signature first appears on an undated allonge where she supposedly endorsed a transfer of the Note from MTGLQ to Resi.  Her signature appears again on the bottom of the Note itself, supposedly endorsing the Note from CitiMortgage to MTGLQ.  This signature was also undated.

354.  Certain problems are presented by these documents.  The first is that Elizabeth Willard's signatures on these two supposed endorsements do not match.  While her signature on the November 12, 2010 assignment matches her signature on the endorsement from MTGLQ to Resi, it clearly does not match her signature

on the endorsement from CitiMortgage to MTGLQ.  This is most curious and raises an inference that one of these signatures was affixed by someone other than Ms. Willard.  The second problem is that based on the recorded assignments, the endorsement from MTGLQ to Resi which is reflected on the allonge, had to occur prior to the alleged endorsement from CitiMortgage to MTGLQ.  This raises the question of how the endorsement from CitiMortgage to MTGLQ appears on the bottom of the Note as opposed to on a subsequent allonge after the endorsement to Resi.  The only thing that makes sense is that in their haste to provide an endorsement chain that might support Caliber's stated position as to the ownership of the loan, whoever was recreating the documents got the order wrong.

355.   In addition, the supposed endorsement chain provided by Caliber has gaps in the chain of endorsements, lacking endorsements from certain necessary parties in order to establish that the LSF9 trust is in fact the legal owner of the loan.  For instance, there is no endorsement from MTGLQ to Invesco, there is no endorsement from Invesco to Altisource and there is no endorsement from Altisource to ALRP. Nor, if Resi was the owner of the loan as reflected in the Assignment chain, is there any endorsement from Resi to either Invesco or Altisource, or from Altisource to the ARLP 2014-2 trust.  It is impossible to establish from the documents provided and relied upon by Caliber that the LSF9 Master Participation Trust is, in fact, the legal owner of the loan and thus has the legal authority to seek to collect under the Note or to enforce its terms via the initiation of non-judicial foreclosure.

356.  Caliber was put on notice of the material problems with the endorsements, but Caliber ignored these substantial issues and went ahead and recorded an NOD with the Orange County Recorder's Office on February 9, 2017, doing so, upon information and belief, without examining the endorsements which would have revealed the material problems with the chain of title that precluded

such a recording.  Caliber then compounded this wrongful behavior by issuing a Notice of Trustee's Sale on May 16, 2017 setting a sale date of June 16, 2017.

357.   On Plaintiffs' information and belief, US Bank and LSF9 were aware that there were serious deficiencies in the chain of title of the Note and DOT, calling their ownership of the loan into question as well as their ability to allow Caliber to initiate a non-judicial foreclosure on their behalf. On Plaintiffs' further information and belief, US Bank and LSF9 were also aware that Caliber intended to and had created and recorded after-the-fact assignments in an attempt to correct these title deficiencies. Additionally, on Plaintiff's information and belief US Bank and LSF9 were aware that as a result of servicer advances the alleged debt owed to LSF9, as well as the purported default of Plaintiff's loan, could not be validated or substantiated. Despite having such knowledge, US Bank and LSF9 failed to properly supervise Caliber and allowed them to negligently proceed as alleged herein.

358.   Additionally, Caliber had a duty to exercise reasonable care to ensure that they did not use any "false, deceptive, or misleading representation or means in connection with the collection of any debt including: (2) The false representation of (A) the character, amount or legal status of any debt…." 15 U.S.C. § 1692e(2)(A).

359.   On information and belief, and as alleged herein, Caliber knew or had reason to know that documents and information, including but not limited to the assignments of the deed of trust and endorsements of the Promissory Note, were not valid to establish their legal right to collect payments from Plaintiffs on behalf of LSF9.

360.   Caliber, by its own admission, also knew that they did not possess a full, complete, and accurate payment history of the loan from its inception and also that there were errors and discrepancies in their debt validation letters as well as monthly statements sent to Plaintiffs. They also knew that there were discrepancies

between the amounts they asserted were owed by Plaintiffs and the same amounts being reflected as waived in their payment history of the loan. Additionally, they were aware that the information on the amounts allegedly due which was obtained from Ocwen was inaccurate as they were based on amortization tables which included principal payments during the first ten (10) years of the loan when the terms of the loan were interest only for that period. They also knew that as a result of servicer advances the alleged debt as well as purported default of Plaintiff's loan could not be validated or substantiated. Accordingly, Caliber lacked the ability to accurately know or determine and thus validate the nature and true amount of the alleged debt owed by Plaintiffs.

361.   Caliber breached its duty as alleged herein by failing to ensure that LSF9 had the legal right to collect payments from Plaintiffs, and that it could validate the nature and true amount of the debt allegedly owed by Plaintiffs, prior to attempting to collect the debt as evidenced by the mortgage loan.

362.   On Plaintiffs' information and belief, US Bank and LSF9 had actual or constructive knowledge of Caliber's actions as described herein and their inability to validate the nature and amount of the debt and that based on this their attempts to collect these sums from the Plaintiff were improper and illegal. Despite having such knowledge, US Bank and LSF9 failed to properly supervise Caliber and allowed them to negligently proceed as alleged herein.

363.   As a direct and proximate result of the actions herein alleged Plaintiffs have suffered and continued to suffer damage and injury in an amount and of a degree subject to proof.

## FIFTEENTH CLAIM FOR RELIEF

### (Quiet Title)

(By Gigi Against All Defendants and All Persons Unknown, Claiming Any Legal or Equitable Right, Title, Estate, Lien, or Interest in the Property Described in the Complaint Adverse to Plaintiff's Title, Or Any Cloud on Plaintiff's Title Thereto and Certain Doe Defendants)

364.   Plaintiffs incorporate all preceding and succeeding allegations by reference as if fully set forth herein.

365.   Gigi brings this claim individually on behalf of herself only.

366.   Gigi isthe legal owner of the Property which has the following legal description:

PARCEL 1:
LOT 45 OF TRACT NO. 8384, IN THE CITY OF LAKE FOREST, COUNTY OF ORANGE, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 390, PAGES 11 TO 13 INCLUSIVE OF MISCELLANEOUS MAPS IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

PARCEL 2:
AN UNDIVIDED 1/55TH INTEREST IN LOT AA THROUGH QQ INCLUSIVE OF SAID TRACT NO. 8384.  EXCEPT THEREFROM FROM ALL OIL, GAS, MINERALS AND OTHER HYDROCARBON SUBSTANCES LYING BELOW A DEPTH OF 500 FEET FROM THE SURFACE OF SAID LAND, BUT WITH NO RIGHT OF SURFACE ENTRY AS PROVIDED IN DEEDS OF RECORD.

(together, the "Property").

367.   Gigi seeks to quiet title against the claims of all Defendants and ALL PERSONS UNKNOWN, CLAIMING ANY LEGAL OR EQUITABLE RIGHT, TITLE, ESTATE, LIEN, OR INTEREST IN THE PROPERTY DESCRIBED IN THE COMPLAINT ADVERSE TO PLAINTIFF'S TITLE, OR ANY CLOUD ON PLAINTIFF'S TITLE THERETO; and Certain Doe Defendants (collectively referred to herein as the "Title Defendants") as the Title Defendants hold

themselves out as entitled to fee simple ownership of the Property.  In fact, the Title Defendants have no right to title or interest in the Property and no right to entertain any rights of ownership including the right to foreclosure, offering the Property for sale at a trustee's sale, demanding possession or filing cases for unlawful detainer.  Nevertheless, it appears by having recorded a Notice of Default and issuing the Notice of Trustee's Sale setting a sale date of June 16, 2017 that the Title Defendants intend to proceed with a non-judicial foreclosure sale illegally and with unclean hands.

368.  Gigi seeks to quiet title as of the date of the recording of the Quitclaim deed to her from Robert, which is believed to be on or about September 23, 2008, because the subsequent assignments and transfer of the DOT were fraudulent, void, ineffective and without proper legal basis.  Gigi seeks a judicial declaration that the title to the Property is vested in Gigi alone and that the Title Defendants and each of them be declared to have no interest estate, right, title or interest in the subject property and that the Title Defendants, their agents and assigns, be forever enjoined from asserting any estate, right title or interest in the Property adverse to Gigi' rights.

369.  Gigi is not required to tender any sums allegedly in default by Robert under the terms of the original Promissory Note encumbering the property to any of the defendants named in this cause of action because: a) it would be inequitable to require tender, especially in light of the defendants' inability to substantiate their beneficial ownership of the loan, their inability to confirm and validate the amount of the alleged debt owed, and their alleged fraudulent endorsements of the Promissory Note; b) she is not the borrower or obligee under the Promissory Note; c)  she is not in default under the Promissory Note; d) the assignments of the DOT are void, not merely voidable, as a result of intrinsic fraud in their creation and utilization, thus obviating the need for any tender by Gigi as a tender would constitute an affirmation thereof; and e) Gigi's damage claim acts as a set-off.

## SIXTEENTH CLAIM FOR RELIEF

### (To set aside and rescind the Notice of Default and Notice of Trustee's Sale)

(By Plaintiffs against Defendants Caliber, US Bank, LSF9, Zieve and Certain Doe Defendants)

370.   Plaintiffs incorporate all preceding and succeeding allegations by reference as if fully set forth herein.

371.   Plaintiffs bring this claim individually on behalf of themselves only.

372.   The recording of the DOT by Defendant Caliber on February 9, 2017 before the March 1, 2017 mailing of the Notice of Default and Intent to Accelerate to Plaintiffs and the expiration of the thirty (30) day cure period violated the express provisions of Paragraph 22 of the DOT. As such the filing and recording of the DOT was invalid and void *ab initio*.

373.   Section 2924(a)(6) of the California Civil Code provides that no entity shall record or cause a notice of default to be recorded unless "it is the holder of the beneficial interest under the mortgage or deed of trust, the original trustee or the substituted trustee under the deed of trust, or the designated agent of the holder of the beneficial interest."

374.   Section 2924.17(a) of the California Civil Code mandates "A declaration recorded pursuant to Section 2923.5 or, until January 1, 2018, pursuant to Section 2923.55, a notice of default, notice of sale, assignment of a deed of trust, or substitution of trustee recorded by or on behalf of a mortgage servicer in connection with a foreclosure subject to the requirements of Section 2924, or a declaration or affidavit filed in any court relative to a foreclosure proceeding shall be accurate and complete and supported by competent and reliable evidence."

375.   Section 2924.17(b) of the California Civil Code provides that "Before recording or filing any of the documents described in subdivision (a), a mortgage servicer shall ensure that it has reviewed competent and reliable evidence to

substantiate the borrower's default and the right to foreclose, including the borrower's loan status and loan information."

376.   In addition to their own admissions, a simple review of the assignment chain, the endorsement chain, the payment history, the loan file received from the predecessor servicer, correspondence received from Plaintiffs, and even a cursory comparison of signatures on said documents would have revealed significant gaps in the assignment chain and the endorsement chain as well as signature irregularities regarding necessary title documents. This would have informed Defendants Caliber, US Bank and LSF9 that they lacked competent and reliable evidence demonstrating that they had the right, power or authority to record the NOD or otherwise commence foreclosure proceedings on Plaintiffs property.

377.   Further still, Defendants Caliber, US Bank, LSF9 and Zieve failed to comply with Civil Code § 2923.55.  Section 2923.55 provides in pertinent part that a mortgage servicer, mortgagee, trustee, beneficiary, or authorized agent may not record a notice of default pursuant to Section 2924 until thirty (30) days after contact is made with the borrower to assess the borrower's financial condition and explore options for the borrower to avoid foreclosure or thirty (30) days after satisfying the due diligence requirement with regard to contacting or attempting to contact the borrower.   In addition, before recording a notice of default, the mortgage servicer must also notify the borrower that they may request a copy of the promissory note, the deed of trust, all assignments of the deed of trust and a copy of the payment history on the loan.

378.   Despite this express requirement, rather than comply with the letter and spirit of Section 2923.55, Defendants Caliber, US Bank, LSF9 and Zieve instead short cut the process and the protections it is intended to provide by recording on  February 9, 2017, a Notice of Default and Intent to Accelerate which was supported by a Declaration of Compliance that was not executed by Caliber

(the present loan servicer) on behalf of the present purported owner of the loan (LSF9), but instead the Declaration was executed back in August 2015 by Ocwen (a predecessor servicer) on behalf of the ARLP trust (the alleged predecessor owner of the loan). Making matters worse, this Declaration was executed in support of a prior NOD recorded by Ocwen which was subsequently rescinded. As such both Zieve's attestation as well as the Declaration of Compliance attached to the NOD were invalid, as they failed to comply with the provisions of California Civil Code § 2923.55, and California Civil Code § 2924.17(a), rendering the NOD void.

379.   Defendants Caliber, US Bank, LSF9 and Zieve, prior to filing the NOD, did not ensure, as required by statute, that they had reviewed competent and reliable evidence substantiating their legal authority to record, either themselves or on their behalf, the Notice of Default.

380.   Despite these material HBOR violations, Defendants nevertheless had the NOD recorded and issued the Notice of Trustee's Sales setting a June 16, 2017 sale date.   Defendants did not correct or remedy these violations despite being repeatedly provided information questioning the validity of their actions.

381.   As Caliber, US Trust, LSF9 and Zieve lacked reliable and competent evidence substantiating that LSF9 was the true legal owner of the loan at the time the NOD was filed and recorded, such recording violated the provisions of the HBOR referenced. As it could not be conclusively shown that the Note and DOT had been properly endorsed and assigned to LSF9 from the original lender, they could not provide a basis for a Notice of Default, or any attempt at non-judicial foreclosure, and as such the recording of the NOD was improper, illegal, and void ab initio as was the issuance of the Notice of Trustee's Sale.

382.   Accordingly, Plaintiff hereby requests an order of this Court that the Notice of Default and the Notice of Trustee's Sale are legally void and should be ordered rescinded and set aside as invalid.

## SEVENTEENTH CLAIM FOR RELIEF

### (Fraudulent Concealment)

(By Plaintiffs Against Ocwen and Certain Doe Defendants)

383.   Plaintiffs incorporate all preceding and succeeding allegations by reference as if fully set forth herein.

384.   Plaintiffs bring this claim individually on behalf of themselves only.

385.   On information and belief, in or about October 2011, Ocwen acquired all the assets and liabilities of Litton Loan Servicing and obtained all of the loan files and related documentation from Litton, including those related to Plaintiffs' loan.

386.   As alleged herein, Plaintiffs sent multiple QWRs pursuant to the Real Estate Settlement Practices Act (RESPA), 12 U.S.C. § 2605 to Ocwen during the time Ocwen was acting as the servicer of the loan.

387.   Although legally obligated to do so, Ocwen failed and refused to provide full and complete responses to the QWRs, including but not limited to its failure to provide documentation evidencing any endorsements and transfers of the Note.

388.   Plaintiffs also sent QWRs to Caliber after it became the servicer.  In response to Plaintiffs' QWRs pursuant to RESPA, Caliber ultimately provided an endorsement chain for the promissory note to Plaintiffs – something Ocwen had failed and refused to provide, concealing it from Plaintiffs.

389.   Had Plaintiffs been provided with the endorsements on the note it would have revealed several material issues.  First, a review of the "endorsements" reveals that the same person, Elizabeth Willard (who also was a signatory to the November 12, 2010 assignment transferring the loan from MTGLQ to Resi) executed two of the endorsements.  Her signature first appears on an undated allonge where she supposedly endorsed a transfer of the Note from MTGLQ to Resi.  Her signature appears again on the bottom of the Note itself, supposedly

endorsing the Note from CitiMortgage to MTGLQ.   This signature was also undated.

390.   In addition, Elizabeth Willard's signatures on these two supposed endorsements do not match.   While her signature on the November 12, 2010 assignment matches her signature on the endorsement from MTGLQ to Resi, it clearly does not match her signature on the endorsement from CitiMortgage to MTGLQ.  This is most curious and raises an inference that one of these signatures was affixed by someone other than Ms. Willard.

391.   Furthermore, based on the recorded assignments, the endorsement from MTGLQ to Resi which is reflected on the allonge, had to occur prior to the alleged endorsement from CitiMortgage to MTGLQ.  This raises the question of how the endorsement from CitiMortgage to MTGLQ appears on the bottom of the Note as opposed to on a subsequent allonge after the endorsement to Resi.

392.   Ocwen, by failing and refusing to provide the endorsements as required under RESPA (something Plaintiffs could not have discovered on their own and did not know of), knowingly and intentionally concealed the deficiencies and errors in the chain of title from Plaintiffs.

393.   Had Ocwen been forthcoming and provided Plaintiffs with the documentation it was legally required to provide in response to the QWRs, Plaintiffs would have behaved differently with respect to the loan and the attempts being made to collect upon it and foreclose upon the property it secured.  Ocwen's concealment of the true facts precluded and negatively impacted Plaintiffs' ability to ascertain who may have had adverse ownership claims to the Property or interests in the Note and DOT and, in turn, prevented, impeded and inhibited Plaintiffs from communicating with the appropriate parties about resolution of issues surrounding the loan and the Property.

394.   It was reasonably foreseeable to Ocwen (which was in the loan servicing business) that the flawed endorsements on the note would be used and

relied upon by others.   Indeed, these endorsements have been relied upon by, among others, Defendant Caliber which relied on the endorsements in order to record, on behalf of its beneficiary, a Notice of Default in the Orange County Recorder's Office as a foundational step in the non-judicial foreclosure process.

395.   By its actions herein, Ocwen intended to deceive not only Plaintiffs but everyone else relying upon the validity of the endorsements, chain of title and the recorded documents in the Orange County Recorder's Office.

396.   As a direct and proximate result, Plaintiffs have suffered damages in an amount to be proven at trial, including reasonable attorneys' fees and costs. Plaintiffs have further suffered equitable harm for which legal damages are insufficient.

397.   As set forth herein, Ocwen's acts were taken in conscious disregard of Plaintiffs' rights and with the intent to vex, injure or annoy, sufficient to constitute fraud, oppression, or malice under Cal. Civ. Code § 3294, therefore entitling Plaintiffs to an award of punitive damages in an amount appropriate to deter and punish Ocwen.

## EIGHTEENTH CLAIM FOR RELIEF

### (Declaratory Relief)

(By Plaintiffs Against Caliber, US Trust, LSF9 and Certain Doe Defendants)

398.   Plaintiffs incorporate all preceding and succeeding allegations by reference as if fully set forth herein.

399.   Plaintiffs bring this claim individually on behalf of themselves only.

400.   When LSF9 purportedly took ownership of the Note and DOT, it became a party and subject to the terms and conditions set out in those agreements.

401.   On February 9, 2017 Caliber recorded a Notice of Default on the property and did so at the direction of, US Bank and LSF9. Exhibit "FFF."

402.   On March 1, 2017, Caliber sent Plaintiffs a Notice of Default and Intent to Accelerate the loan.  Exhibit "JJJ."

403.   Paragraph 22 of the Deed of Trust, to which both Plaintiffs are parties, governs the giving of notices of intent to accelerate and the recording of notices of default.   Paragraph 22 requires the lender to give notice to the borrower prior to acceleration of the debt and that such notice specify "(a) the default; (b) the act required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration may result in acceleration of the sums secured by this Security Instrument and sale of the Property."

404.   The notice must also notify the borrower that "If the default is not cured on or before the date specified in the notice, Lender, at its option may require immediate payment in full of all the sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law."

405.   The requirements of Paragraph 22 continue and further provide that "If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located."

406.   Thus, pursuant to Paragraph 22 of the Deed of Trust, an NOD can only be recorded *after*: a) a borrower has been sent a Notice of Intent to Accelerate; and b) the period of time permitted therein for the borrower to cure has expired. Caliber's recording of the NOD on February 9, 2017 violates the terms of the NOD because that recording was done *prior* to Caliber's issuance of the required Notice of Intent to Accelerate and prior to the expiration of the required time period in which Plaintiffs could cure the alleged default.  As such, the NOD was not authorized, thus rendering it invalid and a beach of the express terms of the Deed of Trust.

407.   An actual dispute and controversy has arisen and now exists between Plaintiffs, on the one hand, and Defendants Caliber, US Trust and LSF9, on the other hand, concerning their respective rights, duties and obligations relative to the DOT and Notice of Default.  Specifically, Plaintiffs contend the Notice of Default is void and ineffective because it was issued and recorded in contravention of Paragraph 22 of the DOT which requires that Defendants provide Plaintiffs with written notice of default and intent to accelerate the loan and to provide Plaintiffs the requisite time to cure the alleged default ***before*** issuing and recording the Notice of Default.

408.   Plaintiffs are informed and believe that Caliber, US Trust and LSF9 deny Plaintiffs' contentions, as evidenced by their issuance and recording of the NOD and their intention to proceed with the foreclosure sale of the Property as evidenced by their issuance of  Notice of Trustee's Sale setting a sale date of June 16, 2017.

409.   Plaintiffs desire a judicial determination whether Caliber, US Trust and LSF9 have the legal right to foreclose on the Property when they have failed to adhere to the express terms and conditions of the DOT, specifically Paragraph 22 thereof, by issuing and recording the NOD (which remains in effect as of this filing) which Defendants rely upon as the foundation for their non-judicial foreclosure activity, including but not limited to their Notice of Trustee's Sale.

410.   A judicial declaration is necessary and appropriate at this time under the circumstances in order that Plaintiffs may ascertain their rights and interests relative to the DOT and the NOD.

\ \ \

\ \ \

\ \ \

\ \ \

\ \ \

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury.

**WHEREFORE**, Plaintiffs pray for judgment as follows:

1. This action be certified as a class action, where requested, that Plaintiffs be designated the class representatives, and that their counsel be appointed as class counsel;

2. On all claims for relief for compensatory damages;

3. On the Fifteenth Claim for Relief, for exemplary damages pursuant to Section 3294 of the California Civil Code;

4. On the Sixteenth Claim for Relief for a judicial declaration that Caliber, US Trust and LSF9 do not have the legal right to foreclose on the Property because they have failed to adhere to the express terms and conditions of Paragraph 22 of the Deed of Trust by issuing and recording the Notice of Default before giving Plaintiffs' the required written notice of default and intent to accelerate the loan and providing Plaintiffs the requisite time to cure the alleged default;

5. On the Fourteenth Claim for Relief for an order setting aside and cancelling the Notice of Default recorded against the Property on February 7, 2017 and the Notice of Trustee's Sale issued on May 16, 2017;

6. On the Thirteenth Claim for Relief for an order quieting title in favor of Gigi and against all Defendants as of September 23, 2008;

7. On the First Claim for Relief for an injunction restraining the material violations of the HBOR by the Defendants, including an injunction preventing Defendants from proceeding with any foreclosure, foreclosure related activity or trustee's sale with

respect to the Property until such time as Defendants have corrected and remedied the material violations of the HBOR as set forth herein;

8. On all claims for relief for costs of suit incurred herein;

9. For civil penalties pursuant to statute and/or reasonable attorneys' fees where provided for by law and according to proof; and

10. For any and all other and further relief as the court deems just and proper.

ZIMMERMAN REED, LLP

Dated: June 30, 2017          By:    /s/ Christopher P. Ridout
                                     Christopher P. Ridout
                                     2381 Rosecrans Ave., Suite 328
                                     Manhattan Beach, CA 90245
                                     Tel. (877) 500-8780
                                     Fax (877) 500-8781

                                     David N. Lake
                                     LAW OFFICES OF DAVID N. LAKE, APC
                                     16130 Ventura Boulevard, Suite 650
                                     Encino, CA 91436
                                     Tel. (818) 788-5100
                                     Fax (818) 788-5199